08-01-02 Vol 2.txt

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

---oOo---

BEFORE THE HONORABLE WILLIAM B. SHUBB, JUDGE

---oOo---

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                                    No. CR. S-03-00384

ALLEN HARROD, aka Isaac,
MICHAEL LA BRECQUE, aka Joseph,
and JULIETTE LA BRECQUE, aka
Mary,

        Defendants.

                     /

---oOo---

REPORTER'S TRANSCRIPT

JURY TRIAL

VOLUME 2

WEDNESDAY, JANUARY 2, 2008

---oOo---

Reported by:    KATHY L. SWINHART, CSR #10150

KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

```
 1                         APPEARANCES

 2

 3      For the Plaintiff:

 4              MCGREGOR W SCOTT
                United States Attorney
 5              501 I Street, Suite 10-100
                Sacramento, California  95814
 6              BY:     LAUREL D. WHITE
                        ELLEN V. ENDRIZZI
 7                      Assistant U.S. Attorneys

 8

 9      For Defendant Michael LaBrecque:

10              DANIEL J. BRODERICK
                Federal Defender
11              801 I Street, 3rd Floor
                Sacramento, California  95814
12              BY:     CARO MARKS
                        Senior Litigator

13

14      For Defendant Juliette LaBrecque:

15              JAN DAVID KAROWSKY
                716 19th Street, Suite 100
16              Sacramento, California  95811

17      For Defendant Allen Harrod:

18              MOSS & LOCKE
                555 University Avenue, Suite 170
19              Sacramento, California  95825
                BY:     BRUCE LOCKE
20

21      Also Present:

22                      MICHAEL LA BRECQUE

23                      JULIETTE LA BRECQUE

24                      ALLEN HARROD

25
```

KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

                                                    14

```
 1                    SACRAMENTO, CALIFORNIA
```

Page 2

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

2          WEDNESDAY, JANUARY 2, 2008, 9:00 A.M

3                         ---oOo---

4          (The following proceedings were had outside

5          the presence of the prospective jurors:)

6          THE CLERK:  Calling case Cr. S-03-384, the United

7     States versus Michael LaBrecque, et al.

8          THE COURT:  All defendants appear to be present with

9     counsel.

10         MS. MARKS:  Good morning, Your Honor.

11         THE COURT:  Good morning.  I'm informed that we're

12    still waiting for two jurors, hopefully they will be here.

13    But in the meantime, I just wanted to go over with you the

14    procedure.  We're going to bring all of them in here.  As I

15    was looking at your questionnaires, there is very little that

16    I could ask them which would ordinarily be part of my general

17    questioning that is not already contained in your

18    questionnaires, so I don't know exactly what subjects you

19    wanted me to discuss with them before we have them come back

20    individually.

21         Were there any subjects that were not addressed in the

22    questionnaires that any of you wanted me to ask them about

23    before we talked to them individually?

24         MR. KAROWSKY:  Your Honor, from the defense I don't

25    think there's anything.  I think the Court's absolutely

      KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

                                                              15

1     accurate that we have all the information that we really need.

2     It would be, I believe, our position that if the Court is

3     going to give a statement or some -- whatever the Court -- by

4     way of a statement to the twenty, that would be all we're

                              Page 3

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

 5   asking the the Court to do and then leave it up to counsel to

 6   do the questioning for cause.

 7          And the government has indicated they have no problem

 8   with alternating with the defense going first and then they

 9   follow, and then the next juror they go first and we follow is

10   my understanding.

11          MS. WHITE:  That's correct, Your Honor.

12          MR. KAROWSKY:  And that's fine with the defense.

13          THE COURT:  All right.  The general statement that I

14   make to them could simply be to explain the procedure that

15   we're going to follow.  I ordinarily have the government read

16   the indictment, but I noticed in question No. 44 here or 45

17   you briefly explain the charges to the jurors, and I don't

18   know that there's any more necessary as part of this process.

19          MS. WHITE:  I would concur, Your Honor.

20          MR. LOCKE:  Right, I agree, Your Honor.

21          One thing, though, we -- the defense discussed was we

22   would like, after they come in individually, if you would --

23   when we're finished with the questioning, if you would excuse

24   them, tell them to sit outside, and then we would discuss with

25   you whether we have a challenge for cause on the basis.  Then


KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347


                                                              16

 1   your Courtroom Deputy could, when she goes to get the next

 2   juror, tell the one that we just saw either that she's excused

 3   or she can go down to the jury room and do whatever they do

 4   there or she's to come back on the 15th or whatever the day

 5   is.

 6          THE COURT:  All right.  If they're excused, they'll

Page 4

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

7      just be excused altogether.

8                    MR. LOCKE:  Right.

9                    THE COURT:  In other words, they won't come back for

10     this trial at all.

11                   MR. LOCKE:  That's right.

12                   MS. WHITE:  Correct.

13                   THE COURT:  And I don't have a convenient place for

14     them on this floor if all twenty of them are going to remain,

15     so I'm thinking that I can keep maybe twelve and have them

16     stay in the jury deliberation room while we wait to call them

17     and then bring the rest of them back this afternoon.

18                   MR. LOCKE:  That's fine with us.

19                   MS. WHITE:  That's fine, Your Honor.

20                   Your Honor, the one thing that was not attached to the

21     questionnaire, as I was going through the different

22     questionnaires, it became very obvious after the first one

23     that there was no witness list that they could then --

24                   THE COURT:  Oh, really?

25                   MS. WHITE:  There was not.  So I --


KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347


                                                                   17

1                    THE COURT:  That's funny.  Because they checked the

2      box as if they had read a witness list, so I assumed that they

3      had.

4                    MS. WHITE:  Well, some of them indicated some obvious

5      confusion, and so that was an oversight on our part.  But I do

6      have the witness list here which, you know, I'm prepared to

7      read.

8                    THE COURT:  All right.  I just looked at some, and it

Page 5

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

9   said do you know any of the potential witnesses, and here this

10   one juror he said no.  I assumed that he had read the exhibit

11   list.  So we'll do that, then.

12              MS. WHITE:  Okay.

13              MS. ENDRIZZI:  Your Honor, they were told when we

14   realized this when we gave out the questionnaire.  So you'll

15   see that some of them skipped it, they knew that no witness

16   list was going to be attached.

17              THE COURT:  All right.

18              MR. KAROWSKY:  Your Honor, the only other thought I

19   had is I saw that the agent had -- was using the conference

20   room  I just want to make sure there's no materials in the

21   conference room that we looked at earlier --

22              THE COURT:  All right.  Would one of you, Ms. Endrizzi

23   or -- there are two conference rooms back there, so we'll just

24   use the one that the agent is not using.  And I'll have the

25   court security officer show the jurors to that room, so you


KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347


18

1    can show the security officer which room we're using.

2              MS. MARKS:  Your Honor, is this voir dire open to the

3    public?  Is this a public proceeding?

4              THE COURT:  Any reason why not?

5              MS. MARKS:  Well, I think there's every reason why

6    not.  I mean, I thought the point of doing it in an individual

7    capacity was to spare the potential juror the embarrassment of

8    discussing intimate matters in front of people.

9              THE COURT:  Well, it's also to spare the other jurors

10   being tainted by hearing the questions and answers of the

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

11  others.

12          MS. WHITE:  That's my understanding as to --

13          THE COURT:  But it's open to the public otherwise.

14          MS. MARKS:   Okay.

15          (Off the record.)

16          THE COURT:  If the two others that are supposed to be

17  here don't show up, I propose we proceed without them because

18  we can always pick them up this afternoon in the second batch.

19          MS. WHITE:  That's fine, Your Honor.

20          THE COURT:  What if they don't show up, do you want to

21  go ahead without them?

22          MR. KAROWSKY:  Your Honor, that would be -- I'm just

23  speaking out of turn.  That would be fine, but I think I'd

24  also like to come up with a timing.  I guess, you know,

25  there's probably 15, 20 minutes per person it seems to me.


KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347


19

1           THE COURT:  Why don't we start and see how it goes,

2   and then if it looks like the Court needs to set some limits,

3   I can do that.  But I'd like to start by just letting you go

4   through it and see how long it takes.

5           MR. KAROWSKY:  That's perfect.  Thank you.

6           THE COURT:  All right.  Let's bring them all in

7   then, those that are here.

8           THE CLERK:  Okay.  There's one more parking his car on

9   his way up.

10          THE COURT:  Okay.  We'll wait for the one parking his

11  car.

12          (Off the record.)

Page 7

08-01-02 Vol 2.txt

13          THE COURT:  Ms. Endrizzi, I'm going to have you or Ms.

14   White read the list of witnesses then.  All right?

15          MS. WHITE:  That's fine, Your Honor.

16          MS. ENDRIZZI:  Thank you, Your Honor.

17          THE COURT:  And I'm going to ask the defense if they

18   have any other witnesses that they'd like to identify.

19          MS. ENDRIZZI:  And both the conference rooms are open

20   and empty except for magazines.

21          MR. KAROWSKY:  Your Honor, does the government have a

22   spare copy of the witness list?

23          MS. WHITE:  Regrettably I do not.

24          MR. KAROWSKY:  Okay.  That's fine.  I'll just listen.

25          THE COURT:  While we're waiting, you might let them


KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347


                                                              20

1    look at it.

2           MS. WHITE:  Sure.

3           (Off the record.)

4           MR. KAROWSKY:  Your Honor?

5           THE COURT:  Yes.

6           MR. KAROWSKY:  As I'm sitting here, is it possible to

7    put the jurors, the one juror that we're talking to in the

8    elevated row as opposed to the lower rows?

9           THE COURT:  Yeah, where would be better?  Which seat

10   would be the best?

11          MR. KAROWSKY:  Just somewhere in the center.

12          And I guess the other question is procedurally is the

13   questioning by counsel going to be from the podium?

14          MS. WHITE:  Excuse me.  I'm sorry?

Page 8

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

15        THE COURT:  He wants to know whether the questioning

16    from counsel would be by the podium  I think so.

17            And you can have them sit in whichever seat is easiest

18    to see.  Which seat do you like?

19        MR. KAROWSKY:  Probably the center of the back row

20    would be fine with me, Your Honor.

21        THE COURT:  All right.  We'll just tell them to sit

22    somewhere in the middle of the back row and see which seat

23    they end up in.

24        (The following proceedings were had in the

25        presence of the prospective jurors:)


KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347


                                                              21

1        THE COURT:  The case has already been called, and this

2    is the case of United States versus Michael LaBrecque,

3    Juliette LaBrecque and Allen Harrod.  The jurors are back.

4    Thank you very much for returning, Ladies and Gentlemen.

5            We have your questionnaires which you completed the

6    last time you were here, so I am not going to have to ask you

7    as many questions as I ordinarily would.  I'm going to have

8    you identify yourselves again, I'm going to remind you who the

9    parties are and just have a few general questions for you when

10   we begin.

11           After we finish that phase, I'm going to excuse all of

12   you except one, and we are going to question each of you

13   individually.  I'm going to ask some questions, the lawyers

14   are going to ask some questions, and then after we're through

15   questioning you individually we're going to have you go back

16   to a room, and we are going to discuss whether to leave you in

                                 Page 9

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

17    until the next phase of the trial.  Now, that doesn't mean

18    that you'll necessarily be on the jury if you're left in.  But

19    if you're not left in and you're excused, then your services

20    for this case will no longer be necessary.

21              While I'm questioning you individually, I'm going to

22    have some of you remain in the jury room just outside this

23    courtroom, and I'm going to have some of you leave for the

24    morning and come back this afternoon.  That is the procedure

25    that we're going to follow.


KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347


22

1              I need to know who all of you are to start with so --

2    do you have the microphone there?

3              THE CLERK:  Yes, Your Honor.

4              THE COURT:  As the microphone is handed to you, just

5    tell us who you are, and then I want to ask you just a couple

6    of general questions.

7              THE CLERK:  I'm going to put a fresh battery just in

8    case.

9              THE COURT:  All right.

10             Yes, Mr. -- are you Mr. Bubak?

11             PROSPECTIVE JUROR BUBAK:  Bubak.

12             THE COURT:  Bubak.  All right.  Keith Vincent Bubak.

13             PROSPECTIVE JUROR BUBAK:  Yes, sir.

14             THE COURT:  Thank you.  Would you pass the microphone.

15             PROSPECTIVE JUROR HUDSON:  William Hudson.

16             THE COURT:  Mr. Hudson.

17             PROSPECTIVE JUROR SHERWOOD:  William Sherwood.

18             THE COURT:  Mr. Sherwood.

Page 10

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt
19                PROSPECTIVE JUROR GREEN:   John-Charles Green.

20                THE COURT:   Mr. Green.

21                PROSPECTIVE JUROR CADDEL:   Rosemarie Caddel.

22                THE COURT:   All right.   Thank you.

23                PROSPECTIVE JUROR NAVA:   Constantino Nava.

24                THE COURT:   Thank you.

25                PROSPECTIVE JUROR CANO:   Juanita Cano.


KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347


                                                      23

1                THE COURT:   Thank you.

2                PROSPECTIVE JUROR EBERT:   Karen Ebert.

3                THE COURT:   Thank you.

4                PROSPECTIVE JUROR GENTILI:   Robert Gentili.

5                THE COURT:   Thank you.

6                PROSPECTIVE JUROR PARRY:   Chris Parry.

7                THE COURT:   Mr. Parry.   Thank you.   Would you pass the

8    microphone up to the front.   Oh, that would be nice.

9                PROSPECTIVE JUROR COWELL:   I'm Jack Cowell.

10               THE COURT:   Mr. Cowell.

11               PROSPECTIVE JUROR RESHKE:   Victoria Reshke.

12               THE COURT:   Ms. Reshke.

13               PROSPECTIVE JUROR TOCH:   Aaron Toch.

14               THE COURT:   Thank you.

15               PROSPECTIVE JUROR SADLER:   Catherine Sadler.

16               THE COURT:   Thank you.

17               PROSPECTIVE JUROR SIEMSEN:   Ronald Siemsen.

18               THE COURT:   Thank you.

19               PROSPECTIVE JUROR CUSHMAN:   Stacy Cushman.

20               THE COURT:   Thank you.

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

21          PROSPECTIVE JUROR MASTY:   Jan Masty.

22          THE COURT:   Ms. Masty.   Thank you.

23          PROSPECTIVE JUROR WELLS:   Carrie Wells.

24          THE COURT:   And Ms. Wells.

25          PROSPECTIVE JUROR KONVALIN:   And William Konvalin.


KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

24

1          THE COURT:   Mr. Konvalin.

2          Okay.   So we should have one empty seat alongside of

3     you.   One of the people that showed up last time is not back

4     for reasons that we need not discuss.

5          There was one question that we were unable to have you

6     answer because somebody neglected to put the list of witnesses

7     with the questionnaire that you answered.   So one of the

8     questions asked you if you knew any of the witnesses, and of

9     course you weren't able to answer that question without

10     knowing who they were.   I'm going to have the United States

11     attorney read the list of witnesses that the government

12     intends to call, and then after she's finished I'm going to

13     ask you if any of you know or think you might know any of

14     those people.

15          Ms. White.

16          MS. WHITE:   Thank you, Your Honor.   Good morning.

17          The government intends to call among the following

18     witnesses:   Robert Challoner; James Harris, seated right here;

19     Samantha Dussell; Jennifer Johnson; Robert Thompson; John

20     Harrod; Joshua Harrod; Abigayil Harrod; Teresa LaBrecque;

21     Sarah LaBrecque; Keliha LaBrecque; Maria Ornelas; Richard

22     Zomper; Irene Hunt; Barbara Williams; Art Dorl; MaryAnelle

Page 12

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

23    Hamner; and Samuel LaBrecque.

24              THE COURT:  Do any of you know or think you might know

25    any of the persons whose names have just been read to you?  If

KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

25

1    you think you might know them, raise your hand and we can ask

2    you some follow-up questions to determine if you really do

3    know them

4              Mr. Green, do you think you might know any of these

5    people?

6              PROSPECTIVE JUROR GREEN:  Yes.

7              THE COURT:  Who do you think you might know?

8              PROSPECTIVE JUROR GREEN:  I work for a bank, and one

9    of my customers' name is Jennifer Danley Johnson.  I don't

10    know if that's the same --

11              THE COURT:  Jennifer Danley Johnson.  Would that be

12    the witness, Ms. White?

13              MS. WHITE:  I don't know, Your Honor, because I don't

14    know Ms. Johnson's last name.  I do -- I can tell him that

15    Jennifer Johnson is an evidence tech with the Folsom Police

16    Department if that rings any bells.

17              PROSPECTIVE JUROR GREEN:  It doesn't.  It sounds

18    unlikely that she would be the customer that I've helped.

19              THE COURT:  Where is your bank?

20              PROSPECTIVE JUROR GREEN:  Off of Watt Avenue and 50,

21    Highway 50.

22              THE COURT:  All right.  That's not too far from

23    Folsom, so it's possible.

24              PROSPECTIVE JUROR GREEN:  Right.

Page 13

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt
25                    THE COURT:  Let me ask you this, then, Mr. Green:   If


KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

                                                                    26
1        it should turn out that this customer is a witness in the case
2        and the nature of her testimony is that she will identify some
3        evidence -- is she an expert witness as well?
4                    MS. WHITE:  No, Your Honor.  All she was was the
5        evidence tech who handed evidence from their evidence locker
6        to an FBI agent.
7                    THE COURT:  If it should turn out that this is one of
8        your customers, would the fact that she's your customer at all
9        affect your ability to listen to the evidence objectively and
10       reach a verdict based on the evidence in the case?
11                   PROSPECTIVE JUROR GREEN:  No, Your Honor.
12                   THE COURT:  All right.  Anybody else think you might
13       know any of the persons whose names were read?
14                   All right.  Do any of the defense attorneys have any
15       prospective witnesses whose names should be read to the jury
16       at this time in addition to those that the government has
17       read?
18                   MR. KAROWSKY:  No, we don't at this time, Your Honor.
19       Thank you.
20                   MR. LOCKE:  No, Your Honor.
21                   THE COURT:  All right.  Have any of you ever studied
22       law or criminal justice?
23                   Mr. Nava.
24                   PROSPECTIVE JUROR NAVA:  Uh-huh.
25                   THE COURT:  Tell us about that.


                              Page 14

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

27

1            PROSPECTIVE JUROR NAVA:   Well, I went through the law
2       program at Butte College for two years and then I went to the
3       police academy.
4            THE COURT:   You went to the police academy.   As you
5       know from the questionnaire that you've already answered, if
6       you're selected as a juror in the case, it will be your
7       responsibility to follow the law as I give it to you whether
8       you agree with it or not, whether you think it's good law or
9       bad law.   If the instructions that I give you on the
10      applicable law should differ from the law as you understand it
11      or remember it from the courses that you have taken, would you
12      be able to follow the law as I give it to you rather than as
13      you remember it from the courses that you took?
14           PROSPECTIVE JUROR NAVA:   Yes, sir.
15           THE COURT:   All right.   Is there any one of the -- are
16      any other jurors unable to follow the law as I give it to you
17      without regard to whether you agree with it or not or whether
18      you think it's good law or bad law?   Is there any one of you
19      who could not follow the law as I instruct you for any reason?
20           All right.   I want to just, before you leave and we
21      bring you back here, remind you who the parties are.   They
22      were all introduced to you earlier, and you may have forgotten
23      their names, but we're going to be calling on them and you
24      should know who the lawyers are at least.
25           The United States government is represented by

KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

28

1   Assistant United States attorneys Laurel White on the left and

2   Ellen Endrizzi immediately to her left on your right.

3          The defense attorneys are Jan Karowsky, who is on the

4   far left here, representing Juliette LaBrecque; and Caro Marks

5   from the Federal Defender's office who is representing Michael

6   LaBrecque; and Bruce Locke, who is representing Allen Harrod,

7   he's on the far right.

8          All right.  So I'm going to excuse all of you except

9   Juror No. 1, Mr. Bubak, right now.  What I'm going to have you

10  do, the Clerk will take -- I'm going to make this a little

11  more complicated because I've got a jury room there that only

12  seats 12 people, and I don't want 20 of you jammed into that

13  little room  And I'm sure that we're not going to be able to

14  get to some of you until this afternoon, but I do hope that

15  we'll be able to get to all of you today.

16         So I'm going to take the first twelve, which would be

17  through Ms. Reshke, the first twelve of you, and I'm going to

18  have you go and sit in the jury deliberation room that we have

19  off to the side.  It's the room where the jury meets to

20  deliberate at the end of the trial.  It's also the room that

21  they meet before they come into court every day.  So if you're

22  selected as a juror, you're going to become familiar with that

23  room, and it will comfortably seat twelve of you.

24         The rest of you beginning with Mr. Toch and to the end

25  of the front row, you can leave for this morning and come back

KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

29

1   at 1:30 this afternoon.  Hopefully we'll be able to get to you

Page 16

08-01-02 Vol 2.txt

2        right at that time.  All right.

3                So, counsel, is there anything else that I need to

4        address before we divide the jurors up?

5                MS. WHITE:  Not from the government, Your Honor, no.

6                MR. LOCKE:  No, Your Honor.

7                THE COURT:  All right.  So those of you that I told

8        could go, come back at 1:30 and meet outside the courtroom,

9        and the Courtroom Deputy will bring you back in.  The rest of

10       the twelve of you except Mr. Bubak, somebody will take you to

11       the juror deliberation room where you can wait until we get to

12       you later this morning.  All right.

13               (Off the record.)

14               (Prospective Juror Bubak present.)

15               THE COURT:  Mr. Bubak, why don't you sit more in the

16       middle of the back row there, and that will be the best place

17       for all of the lawyers to see you.  And we're going to give

18       you a little handheld microphone, and you'll be on.

19               Do you have the handheld mike?

20               All right.  Mr. Locke, are you going to begin?

21               MR. LOCKE:  I'm going to begin, Your Honor.

22               THE COURT:  All right.  The lawyers will begin to ask

23       you some questions, and you're still under oath so you may

24       answer their questions.

25               MR. LOCKE:  Thank you, Mr. Bubak.  My name is Bruce


KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347


                                                                    30

1        Locke, and I'm one of the defense attorneys, and I just have a

2        few questions for you.

3                And I want to let you know that in asking these

                              Page 17

08-01-02 Vol 2.txt

4    questions, I'm as uncomfortable as I expect you will be

5    talking about some of these things.  And I guarantee if we met

6    outside this courtroom, we wouldn't ever have a discussion

7    about the matters we're going to talk about, but they're the

8    matters that are relevant to this case, and they're very

9    important to this case, and I need you to be sure to tell me

10   exactly what you feel and what you think in response to my

11   questions.

12          Is that all right with you?

13          PROSPECTIVE JUROR BUBAK:  Sounds good.

14          MR. LOCKE:  The Court Reporter has to take down every

15   word, and so we need to be careful that you actually respond.

16          THE COURT:  And if you'll back up just a step there,

17   Mr. Locke, I think the microphone might pick you up better.

18          MR. LOCKE:  In that regard, Your Honor, would it be

19   better for him to be on the witness stand or -- well --

20          THE COURT:  That might not be a bad idea.

21          MR. LOCKE:  It --

22          THE COURT:  There's a microphone there.

23          MR. LOCKE:  That way the microphone would be pointed

24   at him

25          THE COURT:  Let's do that.  Mr. Bubak, there's a

KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

31

1    microphone over here on the witness stand.  The next time

2    somebody asks you if you've ever been a witness, you still

3    can't say yes.  Now you use the microphone there, Mr. Locke.

4          MR. LOCKE:  Right.  I was going to get the other one.

5    I don't know whether having two mikes there will cause a

Page 18

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

6       problem, that's all.

7               This case is going to be a difficult case to try and a

8       difficult case to -- for a person to hear.  It's going to be

9       uncomfortable, you understand that?

10              PROSPECTIVE JUROR BUBAK:  Yes.

11              MR. LOCKE:  Just from the nature of the case that you

12      know right now.

13              You're not married and you don't have any children; is

14      that right?

15              PROSPECTIVE JUROR BUBAK:  No, sir.

16              MR. LOCKE:  Okay.  Do you have any nieces or nephews?

17              PROSPECTIVE JUROR BUBAK:  Yes, I do.

18              MR. LOCKE:  Okay.  How many?

19              PROSPECTIVE JUROR BUBAK:  Three nephews and two

20      nieces.

21              MR. LOCKE:  Okay.  What are their ages?

22              PROSPECTIVE JUROR BUBAK:  Thirteen, eleven, three,

23      two, and like two months.

24              MR. LOCKE:  Okay.  And you have a good relationship

25      with your nieces and nephews?

KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

                                                                32

1               PROSPECTIVE JUROR BUBAK:  Yes.

2               MR. LOCKE:  You love them?

3               PROSPECTIVE JUROR BUBAK:  Yes.

4               MR. LOCKE:  And you have a natural feeling of wanting

5       to protect those children?

6               PROSPECTIVE JUROR BUBAK:  Yes.

7               MR. LOCKE:  And you wouldn't want to see anything bad

                            Page 19

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

8     happen to then?

9               PROSPECTIVE JUROR BUBAK:    No.

10              MR. LOCKE:    Okay.    On a scale of one to ten, with one

11    being the least deserving of punishment and ten being the most

12    deserving of punishment, how would you rate having sex with

13    children under the age of eleven?

14              PROSPECTIVE JUROR BUBAK:    Nine.

15              MR. LOCKE:    All right.    What if the person having sex

16    with that child was the child's parent?

17              PROSPECTIVE JUROR BUBAK:    Nine.

18              MR. LOCKE:    Okay.    What do you think is a worse crime

19    than what I just described to you?

20              PROSPECTIVE JUROR BUBAK:    Murder.

21              MR. LOCKE:    Okay.    What's the first word that comes to

22    your mind when I say that a parent was having sex with a

23    7-year-old daughter?

24              PROSPECTIVE JUROR BUBAK:    Disgusting.

25              MR. LOCKE:    You have a -- a mental reaction to that.


KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347


                                                                    33

1     Do you also -- do you also have a physical reaction like a

2     feeling of revulsion or nausea about thinking about that?

3               PROSPECTIVE JUROR BUBAK:    No.

4               MR. LOCKE:    Okay.    Just a mental reaction of that's

5     disgusting?

6               PROSPECTIVE JUROR BUBAK:    Yeah.

7               MR. LOCKE:    Okay.    How would you feel or what would

8     your first reaction be to learning that a father who was

9     having sex with a 7-year-old daughter was justifying it based

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

10    upon religion, that it was part of his religion that he do

11    that?

12            PROSPECTIVE JUROR BUBAK:   I'd see it as a -- as an

13    excuse.

14            MR. LOCKE:   Okay.   Do you -- you understand that this

15    case is going to have some publicity involved with it and it's

16    going to be in the newspapers?

17            PROSPECTIVE JUROR BUBAK:   Yes.

18            MR. LOCKE:   All right.   You have friends, right?

19            PROSPECTIVE JUROR BUBAK:   Yes.

20            MR. LOCKE:   And co-workers?

21            PROSPECTIVE JUROR BUBAK:   Yes.

22            MR. LOCKE:   And family members?

23            PROSPECTIVE JUROR BUBAK:   Yep.

24            MR. LOCKE:   Okay.   And all of those people are going

25    to know in some way or another that you're on a jury if you're


KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347


34

1     selected on this case.

2             PROSPECTIVE JUROR BUBAK:   Yes.

3             MR. LOCKE:   And they're going to learn from the

4     publicity, they may learn exactly what kind of case this is.

5     You understand that?

6             PROSPECTIVE JUROR BUBAK:   Yes.

7             MR. LOCKE:   In fact, have you told any of your friends

8     and co-workers or your family what the nature of this case is?

9             PROSPECTIVE JUROR BUBAK:   No, just told them that I

10    was on jury selection.

11            MR. LOCKE:   Knowing what the nature of the case is and

                              Page 21

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

12    knowing about the publicity and that people will know that

13    you -- may know that you were on this jury, do you think that

14    you could acquit any of these people if the government didn't

15    prove its case beyond a reasonable doubt?

16         PROSPECTIVE JUROR BUBAK:   Yes.

17         MR. LOCKE:   Okay.   Now, in this case, one of the

18    elements that the government has to prove is that the

19    defendant transported or aided in the transportation of a

20    child, a minor, across state lines for the purpose, with the

21    intent that the child engage in illegal sexual activity.

22    Okay?

23         Now, if in this case you were convinced that the

24    sexual activity actually took place, that the defendant had

25    oral, anal, and vaginal sex with the minor, but if the


KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347


35

1    government offered no evidence to show that the defendant

2    intended that at the time that the child was transported

3    across state lines, would you be able to vote to acquit the

4    defendants in that case?

5         PROSPECTIVE JUROR BUBAK:   Yes.

6         MR. LOCKE:   Okay.   You hesitated when you answered

7    that.   Why did you hesitate?

8         PROSPECTIVE JUROR BUBAK:   It's kind of a tough --

9    tough question to answer.   But the law is the law, so you

10    gotta follow the laws.

11         MR. LOCKE:   Okay.   Would you think that you would be

12    able to explain to the satisfaction of your friends and your

13    family and your co-workers that you voted to acquit somebody

*Page 22*

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

14  in a case like that?

15          PROSPECTIVE JUROR BUBAK:  The honest truth, I don't

16  have to explain myself to anybody.

17          MR. LOCKE:  Okay.  You don't think that you would feel

18  compelled to explain to your family how you came to that

19  decision?

20          PROSPECTIVE JUROR BUBAK:  Either way my family is

21  still going to love me, so it doesn't matter.

22          MR. LOCKE:  Okay.  Okay.  Is there any question that

23  you think I should ask you about this case or about your being

24  on this case that I haven't asked you?

25          PROSPECTIVE JUROR BUBAK:  Not that I can think of.


KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347


                                                            36

1           MR. LOCKE:  Okay.

2           THE COURT:  Ms. Marks, do you have any questions?

3           MS. MARKS:  No thank you.

4           THE COURT:  Mr. Karowsky?

5           MR. KAROWSKY:  No thank you, Your Honor.

6           THE COURT:  Ms. Endrizzi or Ms. White?

7           MS. WHITE:  No, Your Honor, the government has no

8   questions for this prospective juror.

9           THE COURT:  All right.  Mr. Bubak, if you'll step back

10  to the back of the courtroom now, the court security officer

11  will show you the room that we want you to wait in just

12  briefly until we tell you whether to come back later or not.

13          PROSPECTIVE JUROR BUBAK:  Okay.

14          THE COURT:  All right.  Thank you.

15          (Prospective Juror Bubak departed courtroom)

Page 23

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

16          THE COURT:  All right.  Mr. Bubak is outside the
17   courtroom
18          I don't know what you're going to say, but I hope
19   they're all like him
20          MR. KAROWSKY:  May we have just a moment, Your Honor?
21          THE COURT:  Yes.
22          (Defense counsel conferring.)
23          MR. LOCKE:  We're not going to raise a challenge, Your
24   Honor.
25          MS. WHITE:  None from the government, Your Honor.


KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347


                                                          37

1          THE COURT:  All right.  Then when do you want me to
2   tell Mr. Bubak to come back?
3          MR. LOCKE:  I would guess, Your Honor, that on the
4   morning of the 15th.  That's when we're going to do the
5   peremptory challenges and then go into opening statements I
6   guess, right?  Is it the 15th?
7          THE COURT:  Yes.  I'm just wondering whether -- what
8   you want to do if we finish earlier with this process, still
9   come back the 15th?
10          MR. LOCKE:  I think that's the one thing we can be
11   sure of.
12          THE COURT:  All right.
13          MR. LOCKE:  And it won't take much time to do the
14   peremptories --
15          THE COURT:  All right.  And if we run out of time or
16   if we have extra time this week, we just won't worry about it.
17          MS. WHITE:  I concur, Your Honor.

Page 24

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

18          THE COURT:  All right.  We're not going to meet Friday
19    of -- Friday the 18th we're not going to meet, I have another
20    matter that I have to take care of.  And then January the 21st
21    is a holiday, so we're only going to have a three-day week the
22    following week.  So there's two three-day weeks in a row, but
23    that shouldn't be a problem because, after that, we should be
24    okay until we get to the next holiday.
25          MS. MARKS:  Excuse me, Judge Shubb.  I've already --


KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347


                                                              38
1     I've already notified the government and my co-counsel that my
2     daughter has a cardiologist appointment on Friday the 25th in
3     the afternoon, it's been set for a year, and I need to not be
4     here on that day.
5          THE COURT:  Okay.  Friday the 25th?
6          MS. MARKS:  Yes, please.  I can come here all morning.
7     I just have to --
8          THE COURT:  All right.  So that will only be a two-day
9     week.
10         MS. MARKS:  Thank you, Your Honor.
11         MR. KAROWSKY:  Your Honor, while we're talking about
12    scheduling, maybe the Court could give me an assist.  I have
13    an appearance in front of Judge Jensen --
14         THE COURT:  Here?
15         MR. KAROWSKY:  Yes.  And I'll give the Court the date,
16    it's a morning appearance, I just can't find it right now off
17    the top of my head.  But --
18         THE COURT:  It's on a Tuesday morning, that's when his
19    calendar is.
                            Page 25

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

20          MR. KAROWSKY:  Right.

21          THE COURT:  We'll work that out.

22          MR. KAROWSKY:  I just want to let the Court know

23    since --

24          THE COURT:  Judge Jensen is very accommodating.  See

25    if you can work it out with him, and if you can't work it out


KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

                                                                    39

1    with him, I'll talk to him

2          MR. KAROWSKY:  Great.  Thank you.

3          THE COURT:  All right.  So we'll tell Mr. Bubak to

4    come back on the January the 15th at 9:00.

5          MS. WHITE:  Correct.

6          THE COURT:  All right.  Could you have him just come

7    back into the courtroom, please.

8          (Prospective Juror Bubak entered courtroom)

9          THE COURT:  Mr. Bubak, you can stay back there.  I'm

10   ordering you to return to this court at 9:00 a.m on January

11   the 15th.  The Clerk is going to get a telephone number from

12   you now so that we can be in touch with you in case there is

13   any change of plans, and you have a number I think that you

14   can call if you have any problems.

15          Before you leave, I'm also admonishing you not to

16   discuss this case with anyone and not to seek or receive any

17   information about the case or any issue that you think might

18   be involved in the case.  All right?

19          PROSPECTIVE JUROR BUBAK:  Okay.

20          THE COURT:  So the Clerk is going to give you her card

21   now.  Thank you for coming today, and we will see you at 9:00

                              Page 26

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

22    a.m on January the 15th, which is a Tuesday morning.

23              All right.  Would you bring in Mr. Hudson, please.

24              THE CLERK:  Yes.

25              (Prospective Juror Bubak departed courtroom)


KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347


                                                              40

1               (Prospective Juror Hudson entered courtroom)

2               THE COURT:  All right.  Mr. Hudson, I'm going to let

3     the attorneys do the examination now, and I think we'll begin

4     with the government lawyer.

5               MS. WHITE:  Correct.

6               THE COURT:   Ms. White will ask you some questions, and

7     then if the defense attorneys have any questions they'll ask

8     you.  It looks like it's Ms. Endrizzi that's going to ask the

9     questions.

10              MS. ENDRIZZI:  Good morning, Mr. Hudson.

11              PROSPECTIVE JUROR HUDSON:  Good morning.

12              MS. ENDRIZZI:  Question, when was your car broken

13    into, what year; do you remember?

14              PROSPECTIVE JUROR HUDSON:  Oh --

15              MS. ENDRIZZI:  Ballpark, five years, ten years ago?

16              PROSPECTIVE JUROR HUDSON:  It was probably fifteen, 10

17    or 15 years ago.

18              MS. ENDRIZZI:  Okay.  And would that experience keep

19    you from being a fair and impartial juror in this case?

20              PROSPECTIVE JUROR HUDSON:  No.

21              MS. ENDRIZZI:  Okay.  Now your sister-in-law and her

22    husband worked for Berkeley Police Department?

23              PROSPECTIVE JUROR HUDSON:  Yes, that's correct.

                            Page 27

08-01-02 Vol 2.txt

24          MS. ENDRIZZI:  And would their experiences as police

25     officers affect your evaluation of the facts in this case?


KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347


41

1          PROSPECTIVE JUROR HUDSON:  No, it would not.

2          MS. ENDRIZZI:  Okay.  And two of the defendants in

3     this case were involved -- were enlisted in the United States

4     Air Force.  Would your military experience color or bias your

5     evaluation of the facts here in this case?

6          PROSPECTIVE JUROR HUDSON:  No, it would not.

7          MS. ENDRIZZI:  What does a material engineer do?  Just

8     had to ask you.

9          PROSPECTIVE JUROR HUDSON:  Primary responsibilities

10    are to work with suppliers and evaluating quality problems and

11    also making recommendations to design engineers about which

12    parts or which suppliers to use.

13         MS. ENDRIZZI:  Okay.  Do you remember what the charges

14    were in each of the two criminal trials where you were a

15    juror?

16         PROSPECTIVE JUROR HUDSON:  In the first trial, the one

17    in Santa Clara County, which was long time ago, almost 30

18    years ago I think, the main charge was attempted murder, and

19    there were also some lesser charges, one of which I remember

20    was dealing with embezzlement or some amount of funds.

21         And then on the more recent trial, I think it was a

22    misdemeanor, attacking a police officer --

23         MS. ENDRIZZI:  Okay.

24         PROSPECTIVE JUROR HUDSON:  -- was the charge.

25         MS. ENDRIZZI:  And do you remember about when that

Page 28

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

42

1    was?

2              PROSPECTIVE JUROR HUDSON:   I think it was about three

3    years ago approximately.

4              MS. ENDRIZZI:   And would your experiences as a juror

5    color your ability to evaluate the facts here in this case?

6              PROSPECTIVE JUROR HUDSON:   No.

7              MS. ENDRIZZI:   Okay.   And then -- Mr. Hudson was

8    actually one of the jurors who requested to be excused briefly

9    for travel, and I think the jury consultant let you know that

10   you could travel; is that correct?

11             PROSPECTIVE JUROR HUDSON:   Right.

12             MS. ENDRIZZI:   Okay.

13             PROSPECTIVE JUROR HUDSON:   I think when -- well, it's

14   on the 10th and 11th, which I think you may be interviewing

15   other jurors --

16             MS. ENDRIZZI:   Right.

17             PROSPECTIVE JUROR HUDSON:   -- potential jurors.

18             MS. ENDRIZZI:   Quick question, do you know what

19   division your sister-in-law and brother were in in the police

20   department, homicide or vice or --

21             PROSPECTIVE JUROR HUDSON:   Not per se.   I know that

22   there were times they were on the streets, but I don't know

23   which --

24             MS. ENDRIZZI:   Okay.

25             PROSPECTIVE JUROR HUDSON:   -- division, though.

Page 29

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt
KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

43

1              MS. ENDRIZZI:  All right.  Very good.  Thank you, Mr.
2    Hudson.
3              THE COURT:  Mr. Locke.
4              MR. LOCKE:  Thank you, Your Honor.
5              Good morning, Mr. Hudson.
6              PROSPECTIVE JUROR HUDSON:  Good morning.
7              MR. LOCKE:  My name is Bruce Locke, and I'm one of the
8    defense attorneys in this case.  And I want to thank you for
9    being here.
10             And I want you to know that these questions that I'm
11   going to ask you, some of them make me uncomfortable and I'm
12   sure they'll make you uncomfortable, and I guarantee you that
13   we wouldn't be having this kind of a discussion if we met
14   outside this courtroom  But right now you're one of the most
15   important people in the courtroom because you may be called
16   upon to decide this case.
17             Do you understand that?
18             PROSPECTIVE JUROR HUDSON:  Yes.
19             MR. LOCKE:  And as someone who may be deciding the
20   facts of this case, I need to know exactly how you would feel
21   about some of the things that are going to come up in this
22   case.  You understand?
23             PROSPECTIVE JUROR HUDSON:  Yes, I do.
24             MR. LOCKE:  Okay.  And you understand from the nature
25   of what's been told to you so far about the charges in this

KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

44

1    case, that it involves allegations of adults having sex with

2    children.  Do you understand that?

3              PROSPECTIVE JUROR HUDSON:  Yes.

4              MR. LOCKE:  And it involves parents, allegations of

5    parents having sex with their own children.  Do you understand

6    that?

7              PROSPECTIVE JUROR HUDSON:  Yes, I do.

8              MR. LOCKE:  Okay.  And I noted that you have three

9    children; is that right?

10             PROSPECTIVE JUROR HUDSON:  That's correct, yes.

11             MR. LOCKE:  I mean, they're boys and they're

12   considerably -- they're in their twenties and thirties now.

13   But when you were raising them, obviously you had -- you loved

14   your children, you love your children.

15             PROSPECTIVE JUROR HUDSON:  Right.

16             MR. LOCKE:  Right?

17             And how do you feel about a parent's duty to protect

18   their children from harm?

19             PROSPECTIVE JUROR HUDSON:  Well, I certainly feel a

20   parent should do that, should --

21             MR. LOCKE:  Okay.

22             PROSPECTIVE JUROR HUDSON:  -- do all that he or she

23   can do.

24             MR. LOCKE:  Do all that he or she can do to protect

25   the child?

KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

45

1              PROSPECTIVE JUROR HUDSON:  Right.

Page 31

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

2        And I mean, at the same time, you have to sometimes be

3    tough in one's discipline of your child.  I mean, parenting is

4    a big job.

5        MR. LOCKE:  Okay.  On a scale of one to ten, ten being

6    the least serious crime and ten being the most serious crime,

7    where would you place --

8        THE COURT:  You had ten being the most and the least.

9        MR. LOCKE:  Did I?

10       Ten being -- one being the least and ten being the

11   most serious, where would you place having sex with a minor?

12       PROSPECTIVE JUROR HUDSON:  Probably around eight or

13   nine.

14       MR. LOCKE:  Okay.  And what about if I added the fact

15   of having sex with a minor who is your own child?

16       PROSPECTIVE JUROR HUDSON:  Same.

17       MR. LOCKE:  Same?

18       PROSPECTIVE JUROR HUDSON:  Probably nine.

19       MR. LOCKE:  Is it the same or is it worse?

20       PROSPECTIVE JUROR HUDSON:  It would be slightly worse.

21   It would be worse.

22       MR. LOCKE:  Okay.  What's the first word that comes to

23   your mind if I tell you that there's a parent who is having

24   sex, oral sex with a 7-year-old daughter?  What's the first

25   word that comes to your mind?


KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

                                                              46

1        PROSPECTIVE JUROR HUDSON:  Disgusting.

2        MR. LOCKE:  All right.  You would feel very strongly

3    then that someone who was guilty of doing that should be

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

4    punished?

5            PROSPECTIVE JUROR HUDSON:   Yes.

6            MR. LOCKE:   You know that this case is going to

7    have -- do you -- well, let me suggest to you that this case

8    is going to involve some publicity.   There's going to be

9    articles about it in the newspaper.

10           And your friends and family are going to know that

11   you're on a jury, right?

12           PROSPECTIVE JUROR HUDSON:   Well, they're going to know

13   that I'm on a jury, yes.

14           MR. LOCKE:   Right.   And eventually they would learn

15   that you were on this particular jury after -- certainly by

16   the time the case was over.

17           Given how you feel about the nature of the charges

18   here, that they're disgusting and how you feel about the

19   people who committed those kind of acts should certainly be

20   punished, do you think that you would be able to explain to

21   your family and your friends if you voted to acquit any of

22   these defendants in this case?

23           PROSPECTIVE JUROR HUDSON:   Yes.   If -- if the facts of

24   the case were not proven, I could do that.

25           MR. LOCKE:   Okay.   In this case, the government is


KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

                                                                    47

1    required to prove that -- that the defendant or defendants

2    transported or aided in the transportation of a person under

3    the age of eighteen across state lines with the intent that

4    that person engage in criminal sexual activity.

5            You understand that?

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

6          PROSPECTIVE JUROR HUDSON:   Yes.

7              MR. LOCKE:   Okay.   And the criminal sexual activity in

8      this case would be having sex with a minor.

9              Okay.   Now, if the facts in this case were that a

10     child, age fourteen, was transported from Texas to California,

11     and after the child arrived in California a defendant had oral

12     sex with the child, anal sex with the child, and vaginal sex

13     with the child, but if the government offered no evidence that

14     the defendant intended that to happen at the time that the

15     child crossed state lines, would you be able to vote to acquit

16     that person in that kind of a case?

17             PROSPECTIVE JUROR HUDSON:   If everything you say is

18     true, if the intent was not proven and that's part of the law

19     that the judge would give, then -- then I would give a -- that

20     verdict of being it wasn't proved, it was not guilty.

21             MR. LOCKE:   Okay.   And you'd be able -- you feel that

22     you would be strong enough to be able to explain that to your

23     family and your friends?

24             PROSPECTIVE JUROR HUDSON:   Yes.

25             MR. LOCKE:   Okay.   Is there any reason that you know


          KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347


                                                                   48

1      of why you shouldn't be a juror on this case, anything that I

2      haven't asked you that would cause you concern if you were a

3      defendant and -- and you were going to be on the jury?

4              PROSPECTIVE JUROR HUDSON:   No, I don't think so.

5              THE COURT:   All right.   Any more questions, Mr. Locke?

6              MR. LOCKE:   I don't have any questions.   I'm sorry,

7      Your Honor.   I think Mr. --

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

8      THE COURT:  Before we get to Mr. Karowsky, Ms. Marks,

9  do you have any questions?

10      MS. MARKS:  No.

11      THE COURT:  Mr. Karowsky.

12      MR. KAROWSKY:  Thank you, Your Honor.

13      Good morning, sir.  I'll be brief.

14      I notice that you are religious yourself, correct?

15      PROSPECTIVE JUROR HUDSON:  Yes, I'm a Christian.

16      MR. KAROWSKY:  Okay.  Do you understand that there are

17  going to be allegations in this case, in fact there's going to

18  be proof probably that at least the two male defendants took

19  Bible -- the Bible, crafted stories from the Mormon belief and

20  theology and Judaism and basically perverted those stories to

21  justify the molestation, the anal, the oral, the sex with

22  their children.

23      Do you understand that?

24      PROSPECTIVE JUROR HUDSON:  Well, I'll --

25      MR. KAROWSKY:  Do you understand that?

KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

49

1      PROSPECTIVE JUROR HUDSON:  -- take your word for what

2  you say.

3      MR. KAROWSKY:  Okay.  Fine.  Do you find that equally

4  as disgusting as the sex with the kids?

5      PROSPECTIVE JUROR HUDSON:  It -- it is certainly --

6  taking the Bible and twisting it is not -- I don't know -- you

7  said as disgusting.  I don't know if I would put it on the

8  same par, but I certainly understand that sometimes people use

9  the scriptures erroneously.

Page 35

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

10          MR. LOCKE:  Right, that's well put.  I mean, I agree
11    it's more disgusting to be harming a child than it is to be
12    perverting theology potentially.  But doesn't that upset you,
13    doesn't that get you upset that the -- the Lord's word is
14    being used as a basis for these disgusting, repulsive,
15    revolting, obnoxious acts?
16          PROSPECTIVE JUROR HUDSON:  It is -- it does upset me,
17    yes.
18          MR. KAROWSKY:  All right.  It does.  It's upsetting to
19    all of us.  I'm not suggesting it's not upsetting to me.  I
20    have a constitutional duty to represent my client --
21          THE COURT:  Don't get into your own views.
22          MR. KAROWSKY:  Thank you, Your Honor.
23          Are you going to be able to sit -- I mean, can you sit
24    there right now and have the image of one of these males
25    putting their penis in the anus of a 7-year-old?  Is that --


      KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347


                                                            50
1    is that an image you're willing to endure for this trial and
2    forever?
3          PROSPECTIVE JUROR HUDSON:  It -- it is not something
4    that I would choose to do.  However, I've been called to be
5    potentially a juror, and I think I could serve in a fair
6    way --
7          MR. KAROWSKY:  Okay.
8          PROSPECTIVE JUROR HUDSON:  -- even though there are
9    things that I'm sure are going to come up that I would prefer
10    not to see or hear.
11          MR. KAROWSKY:  All right.  Well, can you turn the

                          Page 36

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

12    other cheek?

13            PROSPECTIVE JUROR HUDSON:   I can give a fair,

14    unbiased -- or applying the law according to the facts.

15    Throughout my time as being a materials engineer, I had to

16    separate certain facts from others and come up with an

17    appropriate judgment, and I think I can do that well as a

18    juror.

19            MR. KAROWSKY:   Can you be true to your own faith and

20    not choose to follow your human emotions in seeking punishment

21    for repugnant acts even if the law tells you -- that is the

22    law the Court will tell you, the judge, that you're otherwise

23    obligated to vote for not guilty?

24            In other words, if the facts aren't there but you're

25    satisfied that all these repulsive acts have occurred


KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347


                                                              51

1    including the perversion of the Bible, can you justify to

2    yourself and to your faith that you could vote not guilty even

3    in light of the otherwise disgusting, repugnant acts?

4            PROSPECTIVE JUROR HUDSON:   Yes, I could vote not

5    guilty if the facts are not proven.

6            MR. KAROWSKY:   And do you promise that that's what you

7    will do if chosen as a juror?

8            PROSPECTIVE JUROR HUDSON:   Yes.

9            MR. KAROWSKY:   Okay.   Could you tell me what your wife

10    used to do before she was retired.

11            PROSPECTIVE JUROR HUDSON:   She did several things.

12    She first started as a chemist at Stanford Research Institute.

13    More recently, she was the administrative assistant at our

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

14        church, and she was that for about ten years before she

15        retired the last time.

16               MR. KAROVSKY:  Okay.  And are you going to have any

17        problems -- are you going to have problems or be willing to

18        endure if the newspaper shows not guilty on technical charges

19        on any of these defendants?  Can you go back to the people you

20        know and love who are in law enforcement and explain that you

21        had to vote the law rather than your own conscience?

22               PROSPECTIVE JUROR HUDSON:  I can do that.

23               MR. KAROVSKY:  Okay.  And will you do that --

24               PROSPECTIVE JUROR HUDSON:  Yes.

25               MR. KAROVSKY:  -- if appropriate?


          KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

                                                                        52

1                PROSPECTIVE JUROR HUDSON:  Yes.

2                MR. KAROVSKY:  Thank you.

3                THE COURT:  Any other questions for Mr. Hudson before

4         we proceed?

5                MR. LOCKE:  No, Your Honor.

6                THE COURT:  All right.  Mr. Hudson, I'm going to ask

7         you to go back and the CSO, the court security officer will

8         show you the room that you're to sit in just for a few minutes

9         while we discuss whether you should come back for the next

10        phase of the trial.

11               PROSPECTIVE JUROR HUDSON:  All right.

12               THE COURT:  Thank you.

13               PROSPECTIVE JUROR HUDSON:  Thanks.

14               (Prospective Juror Hudson departed courtroom)

15               THE COURT:  Mr. Hudson is outside the room

                              Page 38

08-01-02 Vol 2.txt

16           Before we proceed, could we make sure we're all on the

17   same page?  Do you want to limit this examination to the

18   question that was addressed by the Ninth Circuit or do you

19   want to proceed on other grounds for challenge for cause

20   during this examination of these people?

21           MR. KAROWSKY:  Your Honor, I'm not sure what the

22   Court's reference to the Ninth Circuit --

23           THE COURT:  Well, we're talking about whether these

24   potential jurors can be fair in light of the allegations

25   having to do with sex.  And Ms. Endrizzi was addressing some

KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

53

1    other questions, and if we're going to do that, that's fine.

2    I just want to make sure we're all on the same page, and when

3    we come back later some of you don't think that we're supposed

4    to address the other questions then and some of you think that

5    we addressed them now.

6            MS. WHITE:  No.  Your Honor, it's the government

7    intent that we address all the questions now.

8            THE COURT:  All the questions of challenge for cause?

9            MS. WHITE:  Correct.

10           THE COURT:  Are we all on the same page?

11           MR. KAROWSKY:  Absolutely, that's my understanding.

12           THE COURT:  Okay.  All right.  Any challenge for

13   cause?

14           MR. LOCKE:  No, Your Honor.

15           MS. WHITE:  No, Your Honor.

16           THE COURT:  All right.  Bring Mr. Hudson back.

17           (Prospective Juror Hudson entered courtroom)

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

18    THE COURT:  Mr. Hudson, you can stay back there.  I'm

19    ordering you to return to this court at 9:00 a.m on Tuesday,

20    January the 15th for further proceedings.  The Clerk is going

21    to ask you for a phone number where we can reach you, and

22    she's going to give you her card which has the phone number

23    where she can be reached in case something comes up in the

24    meantime.

25        All right.  Mr. Hudson, in the meantime, before you

KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

54

1    return to court on January the 15th, I'm instructing you not

2    to seek or receive any information about this case or any

3    issue that you think might be involved in this case and not to

4    discuss this case with anyone.

5        PROSPECTIVE JUROR HUDSON:  All right.

6        THE COURT:  All right?  Thank you for coming, and

7    we'll see you on the 15th.

8        Bring in Mr. Sherwood.

9        THE CLERK:  Yes, Your Honor.

10        (Prospective Juror Hudson departed courtroom)

11        (Prospective Juror Sherwood entered courtroom)

12        THE COURT:  Mr. Sherwood, the lawyers are going to ask

13    you some questions now, and we're going to begin with one of

14    the attorneys for the defendants.

15        Mr. Locke is going to ask you some questions.

16        MR. LOCKE:  Thank you, Your Honor.

17        Good morning, Mr. Sherwood.

18        PROSPECTIVE JUROR SHERWOOD:  Good morning.

19        MR. LOCKE:  My name is Bruce Locke, and I'm one of the

Page 40

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt
20        defense attorneys in this case.

21             I want to tell you right up front having this

22        conversation with you is -- is difficult for me, as I expect

23        it is for you.  And I want to tell you that if we met outside

24        this courtroom, we wouldn't be discussing these things.

25             PROSPECTIVE JUROR SHERWOOD:   Okay.


KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347


55
1             MR. LOCKE:  But it's conceivable that you could be one

2        of the jurors deciding the facts in this case, and that makes

3        you the most important person in the courtroom right now.

4             PROSPECTIVE JUROR SHERWOOD:  I want you to -- you to

5        move that mike up or speak up a little bit.

6             MR. LOCKE:  Oh, okay.  Sorry.

7             PROSPECTIVE JUROR SHERWOOD:  Okay.

8             THE COURT:  Okay.  If you'll do the same, Mr.

9        Sherwood, then you'll both hear each other.

10            PROSPECTIVE JUROR SHERWOOD:  Okay.

11            MR. LOCKE:  All right.  So you understand that you're

12        one of the most -- you're one of the most important people in

13        the courtroom right now.

14            PROSPECTIVE JUROR SHERWOOD:  Certainly.

15            MR. LOCKE:  All right.  So I need you to answer the

16        questions, be brutally truthful about the answers.  Okay?  So

17        that we can make a fair judgment.

18             I know from your questionnaire you have kids.

19            PROSPECTIVE JUROR SHERWOOD:  Yes.

20            MR. LOCKE:  And you have stepchildren, also; is that

21        right?

Page 41

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

22              PROSPECTIVE JUROR SHERWOOD:   Yes.

23              MR. LOCKE:   And some members of your family have

24    experienced abuse.

25              PROSPECTIVE JUROR SHERWOOD:   Yes.


         KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

                                                                    56

1               MR. LOCKE:   Okay.   And you know that this case

2     involves allegations of child abuse.

3               PROSPECTIVE JUROR SHERWOOD:   Yes.

4               MR. LOCKE:   And it's child abuse of a sexual nature.

5               PROSPECTIVE JUROR SHERWOOD:   Yes.

6               MR. LOCKE:   And that it involves allegations of men

7     having oral, anal, and vaginal sex with children as young as

8     seven years old.   You understand that?

9               PROSPECTIVE JUROR SHERWOOD:   I can't remember the age,

10    but I knew it was young.

11              MR. LOCKE:   Well --

12              PROSPECTIVE JUROR SHERWOOD:   Yes.

13              MR. LOCKE:   And that some of the allegations involve

14    parents having sex with their own children.

15              PROSPECTIVE JUROR SHERWOOD:   Yes.

16              MR. LOCKE:   Given your personal experience with the

17    effects of child abuse, would -- would you be able to be fair

18    and impartial in this case?

19              PROSPECTIVE JUROR SHERWOOD:   Well, I weighed that

20    pretty heavy the day you gave me that questionnaire, and I

21    think I summed it up pretty good at the back, I think it was

22    the back page or somewhere back there when I put it on there.

23    I was asked two questions that I think speaks to this.

                                Page 42

08-01-02 Vol 2.txt
24              One question was what you just asked me, and I
25      answered that I thought that I could judge based on what I


          KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

                                                              57

1       am -- what I see and what I am told.  Don't really want to,
2       but I could.  And if I heard something that I've turned out
3       and believed to be true, then I would look at it as being true
4       if I believed it to be true.
5               The second thing that I said -- and if I'm going
6       beyond bounds, please tell me.  But the second thing that I
7       said was is that obviously this issue is something that has
8       influenced my life not last week, my life, and as a result of
9       that it's there.  You can't ask me to come in this courtroom
10      and it not be there.  It would be like asking me to come in
11      and forget how to drive.  It's there, that's that.
12              MR. LOCKE:  Right.  And what I'm asking is, do you
13      think that your experience, your life experience that is part
14      of you, you can't get away from that, would affect you in such
15      a way that you would weigh things more heavily against the
16      defendants because of your own personal experience with it?
17              PROSPECTIVE JUROR SHERWOOD:  I think that -- hard
18      question for me.
19              MR. LOCKE:  Right.
20              PROSPECTIVE JUROR SHERWOOD:  And I'll answer it.  Give
21      me a second to work my brain here.
22              But I think that when you consider that I am who I am
23      and I come in here with what I come in here with, of course,
24      to some degree it's going to.  But I wasn't kidding you when I
25      said if I believed it to be true, I'll believe it to be true.

                              Page 43

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

58

1    If I don't believe it to be true, I won't believe it to be

2    true.

3            MR. LOCKE:  I understand that.

4            Let me use maybe a silly example, but do you follow

5    college football?

6            PROSPECTIVE JUROR SHERWOOD:  No.

7            MR. LOCKE:  Well, any sport.

8            PROSPECTIVE JUROR SHERWOOD:  Okay.  Whatever, yeah.

9            MR. LOCKE:  Well, they don't let people from Ohio

10   State referee Ohio State football games.

11           PROSPECTIVE JUROR SHERWOOD:  Right.

12           MR. LOCKE:  Because they're -- they're who they are,

13   it's part of who they are, and it affects the way they think.

14           And I want you to be fair with me, your personal

15   experience with your family -- your wife was abused when she

16   was young?

17           PROSPECTIVE JUROR SHERWOOD:  Very young.

18           MR. LOCKE:  And your two stepdaughters were abused by

19   their father?

20           PROSPECTIVE JUROR SHERWOOD:  Yes.

21           MR. LOCKE:  And you have a daughter that was raped --

22           PROSPECTIVE JUROR SHERWOOD:  Yes.

23           MR. LOCKE:  -- right?

24           Those are part of you and those are going to -- that

25   experience in knowing that is going to affect how you think --

KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

Page 44

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

59

1           PROSPECTIVE JUROR SHERWOOD:   Yes

2           MR. LOCKE:  -- about things, right?

3           PROSPECTIVE JUROR SHERWOOD:   Correct.

4           MR. LOCKE:  And so let me give you an example.  If the

5    evidence in this case was that -- well, let me tell you what

6    the government has to prove.

7           The government has to prove in this case that the

8    defendants transported or aided in the transportation of a

9    person under the age of eighteen across state lines with the

10   intent that the person engage in criminal sexual activity.

11   And criminal sexual activity would be having sex under the age

12   of eighteen.  Okay?

13          But what I want you to focus on is that one of the

14   elements is that the defendants intended that to occur at the

15   time that the child was transported across state lines.

16          Now, if the evidence was clear that sexual activity

17   did occur, in other words, the -- a defendant had oral sex,

18   anal sex, and vaginal sex with a 14-year-old, but there was no

19   evidence that the defendant intended that at the time that the

20   child was transported across state lines, would --

21          PROSPECTIVE JUROR SHERWOOD:   That's a very specific

22   question.

23          MR. LOCKE:  Right.  And it's -- it's important because

24   would you be able to acquit, vote to acquit someone who you

25   knew molested the child, but where one of the elements wasn't

KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

60

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

1 proven?

2   PROSPECTIVE JUROR SHERWOOD:  Well, got asked that

3 question this morning.  And this very narrow specific question

4 that you've asked me here is, is -- yes, I -- yes.  Because if

5 that's what I'm really charged at and I'm not charged with

6 looking at the other, I suspect had I had been one of those

7 people in my past, it probably would have been a little --

8 even more difficult for me.  I would not be happy about it, I

9 wouldn't like doing it if I believed one side and yet had to

10 acquit on another side.  I wouldn't be happy about that, but

11 could I do it?  Yes.  Would I want to?  No, but I could.

12   MR. LOCKE:  What -- do you think you would have

13 difficulty telling your wife and your daughters and your

14 stepdaughters that --

15   PROSPECTIVE JUROR SHERWOOD:  No.

16   MR. LOCKE:  -- you had voted to acquit in that kind of

17 a situation?

18   PROSPECTIVE JUROR SHERWOOD:  No.  No.  Because his job

19 is to tell me the restraint of what I can judge.  If I -- if I

20 do what he tells me and I believe it and I say that, then, no,

21 I wouldn't have any trouble.

22   I think also, if you'll read in there, my wife is a

23 therapist, and she's been involved in this system most of her

24 professional life.  And she's been called to court to testify,

25 she's been forced to testify, and she has dealt with some

KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

61

1 horrendous cases that I peripherally kind of knew a little bit

2 about.  So, you know, does it -- even with hers, does it -- is

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

3    she able to maintain some decorum and some distance when she

4    comes home and says, boy, I've really had a tough one today

5    and this is kind of why?  Yes, she can.  And can I?  Yes.

6         I'm an intelligent person, I can take a look at this.

7    And if it says A, B, C and D and I get to look at A, B, C and

8    D, I can do that.

9         MR. LOCKE:  I noticed in your questionnaire that you

10   checked the box that you would give greater weight to I think

11   it was police officials, is that correct, if they testified?

12        PROSPECTIVE JUROR SHERWOOD:  Well, certainly.  Greater

13   weight, I don't know what you -- again, you're doing really

14   good at these specific questions.  Put a specific question

15   behind that, because of course I am  I mean, a policeman

16   pulls me over alongside the road, I'm going to give that dude

17   some weight, you bet I am  So just by virtue of the fact that

18   he has been given a badge, I'm going to give him weight.  So

19   what are you asking me?

20        MR. LOCKE:  Well, that's what I'm asking.  Just

21   because he's given a badge or he works for the FBI, you would

22   treat his testimony as entitled to more weight than a regular

23   person getting up on the stand just by the fact that -- what

24   his job is.

25        PROSPECTIVE JUROR SHERWOOD:  Okay.  Well, let me try

62

1    to answer that one.

2         You know, I've been alive for the last few years, and

3    I went through the O.J. Simpson thing.  And I went through the

4    gal that drove her kids off into the pond and stood up and

Page 47

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

5    begged people to find them and bring them home.  And I -- and

6    all that is out there.  So there -- of course, there is some

7    level of skepticism in me about anything that I hear.  The

8    older I get, I tend to be a bit more skeptical of things that

9    I hear.

10         If a police official or an FBI agent stood up here and

11   I honestly believe that there was no connection between them,

12   that there was no benefit and I believed that, that there was

13   no benefit for them to sit up here and lie, and they told me

14   that this fact is true based on the fact that they found this

15   or they seen this or they done that or they pulled this person

16   over here, then I would tend to put that on the side of the

17   category of saying, okay, well, I gotta look at that very

18   seriously because there's some facts that was given to me.

19   And I assume that you aren't going to let them give me

20   bullshit, you're going to see to it they give me facts.

21         MR. LOCKE:  Well, sometimes there's a dispute as to

22   the facts.

23         PROSPECTIVE JUROR SHERWOOD:  Yeah.

24         MR. LOCKE:  And what I'm asking is, would you tend to

25   believe the police officer because he is a police officer over


KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347


                                                              63

1    someone who isn't a police officer?  I think what you're

2    telling me is --

3         PROSPECTIVE JUROR SHERWOOD:  At the moment of final

4    decision you're saying?

5         MR. LOCKE:  Yes.

6         PROSPECTIVE JUROR SHERWOOD:  It comes down to, like,

08-01-02 Vol 2.txt

7    one thing.  Here this person says, you know what, I didn't do

8    it, and this person says he did it.  And I'm going to say, oh,

9    well, he must have done it, this guy said he did it is what

10    you're asking me.  Well, I can't see that it's going to come

11    down to that.

12          I suspect -- I was told this trial is going to last up

13    to nine weeks.  There's no way in heck I want to be here for

14    nine weeks.  But if this trial did last nine weeks, there's

15    going to be a whole lot of stuff for me look at over whether

16    or not this particular police officer stood up and said he did

17    it because I knew he did it because I seen this piece of

18    paper, I think there's going to be a lot more to look at than

19    that.

20          MR. LOCKE:  Okay.  Why did you say you weren't going

21    to be here nine weeks?

22          PROSPECTIVE JUROR SHERWOOD:  I didn't say I wasn't

23    going to be.  I said I don't want to be here.

24          THE COURT:  He said he didn't want to be here.

25          PROSPECTIVE JUROR SHERWOOD:  I don't want to be here

KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

64

1    nine weeks.  I mean, I'm trying -- you told me to be honest.

2    I'm being honest.

3          MR. LOCKE:  No, I appreciate that.  I appreciate that.

4          THE COURT:  If we find somebody who says they want to

5    be here nine weeks, then we're going to question whether

6    they're honest.

7          PROSPECTIVE JUROR SHERWOOD:  What's wrong with them,

8    huh?

Page 49

08-01-02 Vol 2.txt

9            THE COURT:  Including me and including all three

10    lawyers.

11            MR. LOCKE:  Okay.  But what it comes down to is, you

12    know, there are some cases where people, due to their own

13    personal experience, they wouldn't be the best judges of the

14    facts for that particular case.  And what I'm concerned about

15    is your personal experience.

16            You love your daughters, right?

17            PROSPECTIVE JUROR SHERWOOD:  Yes.

18            MR. LOCKE:  You love your wife.

19            PROSPECTIVE JUROR SHERWOOD:  Yes.

20            MR. LOCKE:  You love your stepdaughters.

21            PROSPECTIVE JUROR SHERWOOD:  Yes.

22            MR. LOCKE:  And I imagine that you have very, very

23    specific and antagonistic feelings about the people who hurt

24    them; is that right?

25            PROSPECTIVE JUROR SHERWOOD:  Antagonistic?


KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347


                                                          65

1            MR. LOCKE:  You don't like the people who hurt them

2            PROSPECTIVE JUROR SHERWOOD:  Of course not.

3            MR. LOCKE:  Okay.  Do you hate the people who hurt

4    them?

5            PROSPECTIVE JUROR SHERWOOD:  Most of them I don't

6    know, but --

7            MR. LOCKE:  Okay.  But you wouldn't like them

8            PROSPECTIVE JUROR SHERWOOD:  No.

9            MR. LOCKE:  And --

10            PROSPECTIVE JUROR SHERWOOD:  Conversely, at the same

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

11 time, that doesn't mean that 20 years later I couldn't see

12 them being somebody else, because time does go on.

13    MR. LOCKE:  You couldn't see them being somebody else?

14    PROSPECTIVE JUROR SHERWOOD:  They could -- people --

15 they could change.  Maybe I didn't like this person.  Doesn't

16 mean that that person is still the same 10 years, 20 years

17 later.

18    MR. LOCKE:  Okay.

19    PROSPECTIVE JUROR SHERWOOD:  So maybe I'd like them

20 here.  I don't -- maybe I could get on with that, I don't

21 know.  I don't know.  I just haven't been faced with that

22 situation at all so I don't know.

23    MR. LOCKE:  Okay.  So are you telling me that you

24 think you could be as fair as any other person in judging the

25 facts in this case?

KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

66

1    PROSPECTIVE JUROR SHERWOOD:  Well, two-part answer.

2 One side of me says I probably would be more fair because I

3 have a basis of a lot of information.  The other side of me

4 says you have to trust whether or not that information is

5 going to go your way.  I don't know.  You know, I told you --

6 I answered him by not raising my hand, and I've answered you

7 several times.  If you show it to me, I'll look at it.  If you

8 don't show it to me, then I'm going to -- I'm going to look at

9 what I do get shown.

10    MR. LOCKE:  Okay.

11    PROSPECTIVE JUROR SHERWOOD:  I don't know how else to

12 put that.  I don't know how else to say it.

Page 51

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

13          I don't know that I'm better than anybody else to
14     judge this situation or that I am worse.   I'm certainly
15     someone that has some experience in it, and I've seen the
16     fallout.   And I've lived with a woman for 35-plus years now
17     who was sexually abused for many years starting when she was
18     five years old.   And -- and I know today right now at sixty
19     some years old, I know her, and I know that there's certain
20     things in the house I can't do because -- I can't pull a blind
21     down a certain way.   I know all those facts.   So in certain
22     ways, I feel like I have a lot of information about what these
23     kinds of things do.   But, nonetheless, I don't think that's
24     what I'm -- would be here for.
25          I would be here to listen to what happened with this


        KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347


                                                              67
1     case, what happened with these people and whether or not, as
2     you put it -- because you drew a very narrow line.   I don't
3     know.   She may tell me something different in a minute, I'm
4     not sure, but you drew a very narrow line.   Did they go across
5     the state line?   Did they know what they were doing when they
6     went across the state line?   Well, that's kind of like did a
7     guy speed or did he not speed?   You know, I mean --
8          MR. LOCKE:   All right.   But what you're telling me is
9     that your experience over your lifetime with your own family
10     and knowing the effects of what happens to those people as a
11     result of abuse, that you know those facts, and those facts
12     that you know would affect the way you look at this case.
13     They have to; isn't that right?   You can't put them aside
14     truthfully.   I mean, they're part of you, aren't they?
                              Page 52

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

15          PROSPECTIVE JUROR SHERWOOD:   Well, of course they're

16     part of me.   And I was -- I was so gut level honest when I

17     wrote that thing to you guys at the end of that.   I was pretty

18     blunt about that.   I am who I am and I am what I am

19          However, sir, let me attempt to do this one more time.

20     If I believe that someone didn't do what they were accused of

21     doing, I would not want to see them go to jail.   I -- I would

22     struggle with the decision to send them to jail.   If you'd

23     have got me 15 years ago, I'd have said hang the son of a

24     bitch, but it's not 15 years ago.   I'm 58 years old, I have

25     more -- I'm a little softer, a little rounder around the


KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347


68

1      edges.   I don't want to see somebody get convicted of

2      something that's not correct for them   And if I come right

3      down to it and I believe that -- that what you have narrowly

4      defined for me is true, I wouldn't be opposed to throwing the

5      damn book at them either if I had the book to throw.

6          So I don't -- I mean, does that answer your question?

7      I'm beginning to get the feeling that what you really want to

8      do is throw me off.   Well, please feel free to do so.   I want

9      to go home anyway.

10          MR. LOCKE:   But -- no, I want to know if there is a

11     reason why you shouldn't be in this case.   That's true, I want

12     to know if there's a reason.   And it strikes me that from your

13     questionnaire that it's going to be very difficult for you, I

14     think impossible for you to put that aside, your history aside

15     in a case where you knew, was dead certain that the abuse

16     occurred, that it was an adult having oral sex with a

Page 53

08-01-02 Vol 2.txt

17   7-year-old or anal sex with a 7-year-old, that I don't think

18   you'd be able to put your -- your history aside and say, well,

19   I'm going to -- I'm going to vote to acquit those people

20   because there's no evidence that they intended it --

21              PROSPECTIVE JUROR SHERWOOD:   Well, that's --

22              MR. LOCKE:   -- at that particular time.

23              PROSPECTIVE JUROR SHERWOOD:   -- kind of funny because

24   I'm sitting up here saying one thing and you're standing out

25   there saying another thing for me.   So I think I've answered


KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

69

1    that question several ways.   I don't know how else to answer

2    it.

3              I mean, you know, I tend to think that had I come into

4    a situation with -- with people -- members of my family and

5    they had been hurt and abused, and then I just went my life

6    and I lived my life and that was just that, but I always had

7    this here, I tend to think that I would view it one way.   I'm

8    going to put this to an analogy not quite as good as your

9    sports analogy, but let me try a different one here.

10             If I didn't -- if I went to high school and I got all

11   the education I can get in high school and I went through my

12   life and lived my life, I'm only going to be a certain amount

13   of smart.   If I went to college, I'm going to get more smarts.

14   I'm going to be able to think differently, I'm going to be

15   able to view things differently because I expanded my

16   knowledge base as I was doing it.

17             In this case, not only did I come into a family where

18   there had been horrendous sexual abuse and -- with my wife,

Page 54

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

19    bad sexual abuse, stopped with my stepdaughters, if I stopped

20    right there I think that I would then live my life and I would

21    be very tainted by what I had heard and I'd have my feelings

22    about it, but it didn't stop there.

23          Throughout my life, this has been there.  It's -- it's

24    always been there because my wife worked in a situation to

25    where sometimes she would have to come home, absolutely have


KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

                                                                70

1    to come home and talk to me and debrief and kind of calm

2    herself and pull herself back down, and I was then charged in

3    many cases with grounding her again.  So I don't think I could

4    be any more desensitized if you wanted to put it up on the

5    screen and show it to me.  I'm pretty damn desensitized.  I've

6    been -- I've been there, I've seen it, I've heard it.  I

7    haven't seen it, I've heard it, and I have been knowledgeable

8    of it.  And -- and I just wish it would stop, damned I wish it

9    would stop because I've seen so many people or heard of or

10   kind of knew about, most of which I don't even have a face to

11   put on or a name to put behind them, but so many people that

12   were hurt, I just wish it would stop.  And if I could just do

13   something to stop it, I would, but I can't.  You know, I

14   can't, but I've been extremely desensitized to it.

15          So if you're asking me just because of the virtue of

16   the fact that my wife was sexually abused, by the way not to

17   the degree that you're talking about here, but certainly

18   here, the result's pretty much the same.  Is that going to

19   stop me from being able to do what I need to do?  Well, like I

20   said, I've been desensitized.  It's not just my wife, it's

                              Page 55

08-01-02 Vol 2.txt

21   everything that I've been involved or come into contact with

22   in any way, shape or form

23          Is that thorough enough?   No.

24          MR. LOCKE:   It's pretty thorough, but not enough.

25          PROSPECTIVE JUROR SHERWOOD:   Okay.   Good.


KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

71

1          MR. LOCKE:   The -- let me put it this way.

2          If you went into the jury room--

3          PROSPECTIVE JUROR SHERWOOD:   Yes, sir.

4          MR. LOCKE:   -- and you knew that one or more of the

5    defendants had committed the type of abuse that I've described

6    to you, would you be able to face that those defendants would

7    walk away free based upon your verdict?

8          PROSPECTIVE JUROR SHERWOOD:   Am I voting in a block?

9    I mean, do I take, like, three or nothing?   I mean, you said

10   one or more.

11         MR. LOCKE:   One or more.

12         PROSPECTIVE JUROR SHERWOOD:   So I can let -- say,

13   well, this guy -- I don't think this guy was, but I think this

14   guy was and I think this guy was, can I do that?

15         MR. LOCKE:   Let's just make it one defendant.

16         PROSPECTIVE JUROR SHERWOOD:   Okay.   One defendant.

17   That's good.

18         MR. LOCKE:   One defendant that you know had oral,

19   anal, and vaginal sex with a child as young as seven, and --

20   but there's no evidence that that was intended at the time the

21   child crossed state lines, would you be able to vote to acquit

22   knowing that that defendant was going to walk away free the

Page 56

08-01-02 Vol 2.txt

23    next day?

24              PROSPECTIVE JUROR SHERWOOD:   Have I not said yes to

25    that?  Let me say yes, I could.  Would I like it?  No.   Would

KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

72

1    I want to?  No.   But could I?  If you prove it, you put it in

2    front of me and I believe it -- that's really the whole crust

3    of this thing, you gotta make me believe it.  I don't know.

4    Do you trust me to believe it or not?  I guess that's up to

5    you.

6              MR. LOCKE:  Well, let me -- you're shifting it.   It's

7    the government's burden to prove that the defendant intended

8    that.

9              PROSPECTIVE JUROR SHERWOOD:   Well, true.

10             MR. LOCKE:   Okay.   I don't have --

11             PROSPECTIVE JUROR SHERWOOD:   I got that part.   I kind

12    of -- I've watched all the TV shows, I know what their job is.

13             MR. LOCKE:   It's -- it's not always like a TV show.

14             PROSPECTIVE JUROR SHERWOOD:   I got that part.   I got

15    it.

16             MR. LOCKE:   And you said you want it to stop, you want

17    child abuse to just stop.

18             PROSPECTIVE JUROR SHERWOOD:   Sure I do.   You're damn

19    right I do.

20             MR. LOCKE:   All right.   So would you really be able to

21    let a defendant walk out free who you knew had committed these

22    acts of abuse?  Would you really be able to do that?

23             PROSPECTIVE JUROR SHERWOOD:   Okay.   What's your name

24    again?

Page 57

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

25                 THE COURT:   Judge Shubb.


          KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

                                                                          73

1                 PROSPECTIVE JUROR SHERWOOD:   Judge what?

2                 THE COURT:   Shubb, S-H-U-B-B.

3                 PROSPECTIVE JUROR SHERWOOD:   The judge here sit up

4       here and he said, I'm going to tell you the perimeters by

5       which you get to go in the room, you don't get to look at

6       this, this and this is what I interpreted from what he said.

7       You don't get to look at that, although it may be there.   What

8       you have to look at is we're sitting here and we're saying

9       this person is charged with taking this -- according to you,

10      taking this child across a state line with the intention of

11      sex somehow occurring and having fore knowledge of it.   I

12      don't know if those are two charges or one charge, I don't

13      know that.

14                 But -- but if he said, I'm going to tell you that you

15      can only look at that, you can only make a decision based on

16      that, and this is the law that allows you to make that

17      decision and the different -- whatever he's going to tell us,

18      I don't know.   I've never served on a jury before, so -- I

19      always just used to walk in and they'd say do you want to

20      serve and I'd say, no, I'm a contractor and they'd let me go

21      home.   You guys are being very thorough here.

22                 So if he puts those perimeters in front of me, and I

23      believe in who I am and I believe in what this is and I

24      believe in this country and what we stand for, how the hell

25      could I not do what I was told to do?   How could I not do

                                Page 58

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

74

1    that?  How -- I don't know.  It's -- it's -- the answer to

2    your question is yes.  I would then assume that it would be

3    somebody else's responsibility besides me to take on the issue

4    of the sex having occurred.  It would be somebody else's

5    responsibility to bring charges to this person for having the

6    various types of sex acts that you're talking about with a

7    young child.  I would assume that that was going to be dealt

8    with.  I don't know that it would be, but I would assume.

9        Because if I only get to deal with my part, I'll deal

10    with my part.  If somebody else gets to deal with their part,

11    then let them have at it.  Honestly I'd rather deal with this

12    part than that part.  That's not -- that's not going to be an

13    easy one if those charges ever come forth.  Anyone sitting

14    there is not going to like what they're having to go through,

15    including me.  I wouldn't like it either.

16        I don't know how -- I mean, like -- I could ask God if

17    he'd come down and validate for you and tell you that I'm a

18    good guy, but I don't know what the hell else to say to you.

19        MR. LOCKE:  No, I can tell from your answers that

20    you're a good guy.

21        PROSPECTIVE JUROR SHERWOOD:  Thank you.

22        MR. LOCKE:  I have no doubt about that.  And I have no

23    doubt that you would try to do the right thing.  Okay.

24        PROSPECTIVE JUROR SHERWOOD:  Yes, I would.

25        MR. LOCKE:  But, like you, I've had some life

KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

75

1    experience, and sometimes people try to do the right thing but
2    they're -- they just can't do it.  And what I'm trying to
3    satisfy myself about by asking a lot of questions is are you
4    the good guy who can actually do it or are you just, you know,
5    telling me you're going to try to do it?
6         PROSPECTIVE JUROR SHERWOOD:  I guess the only way, the
7    only way that that becomes an issue for me is between the two
8    of you or the four, five, six or how many of y'all sitting out
9    here that your job is to present to me so that I can make a
10   good decision.  It's a whole lot more about you than it is me
11   to be honest with me in my opinion.  I think you're either
12   going to give me the information I need or you're not.
13        Now, I guess maybe this is what I'm sort of thinking
14   maybe what you're saying to me.  Let's say that I listen to
15   everything that the three attorneys over here have to say and
16   all the people up here have to say, I listen to everything I
17   think the two attorneys over here have to say and all the
18   people they put up here to say, and it's right smack in the
19   middle, I can't really determine in my mind is it true or is
20   it not true.  That would be a terrible spot to be standing in.
21   I would feel that somebody out in this room totally failed at
22   their job if that's the case.  I would like somebody out in
23   this room to give me some clear information by which I could
24   make a decision, and then it would -- I would be able to make
25   such a decision.


KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

76

Page 60

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

1        But if it drew -- if it fell right down the middle of
2    the line and there was no information out there that could
3    over weigh the other, absolutely none, I'd be really stuck
4    with a bad decision.  I think I'd probably have to say I can't
5    make one, you didn't give me enough information, you need to
6    go back to the bulletin board on this one.
7        THE COURT:  Well, I might be able to help you in a
8    decision like that, because you haven't heard my instructions
9    on the law yet and you've never sat on a jury before.
10        But in a criminal case, the burden is upon the
11    government --
12        PROSPECTIVE JUROR SHERWOOD:  Yeah.
13        THE COURT:  -- to prove the elements of the crime, and
14    their burden is to prove all the elements beyond a reasonable
15    doubt.  So if there's not evidence, then it is your duty to
16    find the defendant not guilty because the government has the
17    burden of presenting the evidence.
18        PROSPECTIVE JUROR SHERWOOD:  Beyond a reasonable
19    doubt.
20        THE COURT:  Right.  So knowing --
21        PROSPECTIVE JUROR SHERWOOD:  So clearly not an
22    on-the-line type issue.
23        THE COURT:  Right.
24        PROSPECTIVE JUROR SHERWOOD:  Well, then I would be
25    able to stand here and say let him go, and I would hope to God


KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347


                                                              77

1    that outside that door out there there was a police officer
2    prepared to deal with the other issues.  Now whether there was

                            Page 61

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

3    or not unfortunately wouldn't be at my call, I wouldn't have

4    anything to do about that.  If the acts occurred, then I

5    think -- I hope some day that that gets faced.

6          If they didn't occur as you narrowly stated to me, and

7    these two ladies are unable to show me beyond a reasonable

8    doubt -- see, you keep asking me these marginal questions and

9    what we're really asking me here is is that there's a -- to

10   use one of my TV words, a preponderance of the evidence that

11   says, yes, okay, then it's yes.

12          MR. LOCKE:  Okay.  The problem, Mr. Sherwood, is that

13   sometimes it becomes a close question as to whether or not

14   it's beyond a reasonable doubt.

15          PROSPECTIVE JUROR SHERWOOD:  Okay.

16          MR. LOCKE:  And what I'm asking you is, if it is a

17   close question because of your history, aren't you going to

18   come out in favor of convicting the defendants?

19          Isn't that what you meant --

20          PROSPECTIVE JUROR SHERWOOD:  Okay.

21          MR. LOCKE:  -- when you said you would have trouble

22   applying the presumption of innocence in this case?

23          THE COURT:  He didn't say he would have --

24          PROSPECTIVE JUROR SHERWOOD:  Where did I say that?

25          MR. LOCKE:  It may be hard, this may be hard.


KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347



                                                              78

1          PROSPECTIVE JUROR SHERWOOD:  Well, I've said that

2    about how many times up here today.  It would be hard, I've

3    said that how many times.  Of course it would be hard.

4          But, again, if it's a matter of a question as to

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

5   whether or not I believe there is a -- the case has been

6   proven beyond a reasonable doubt, isn't that not proving it

7   beyond a reasonable doubt?

8           I mean, honestly I don't know how else to say this to

9   you.  I don't have to like the defendants in this case.  I

10  have to make a decision -- going back, again, to the narrow

11  line of which you gave me, that's all I have to do.  I get to

12  go home and take a shower and feel great and eat dinner that

13  night and know that I did my job.  Now, if I go home and I

14  pick up the newspaper and find out that you guys manipulated

15  the hell out of me, I'm going to be really mad at you, too.

16  But nonetheless it ain't mine, it's yours.  I base it on what

17  you give me to base it on.  And I said at the end of this

18  thing, could I -- you asked me flat out, can I make this

19  decision, and I said yes.

20          MR. LOCKE:  I know you can make the decision.  Can you

21  make it fairly without being influenced by your personal

22  history?

23          PROSPECTIVE JUROR SHERWOOD:  You didn't need to bring

24  me back.  I said on the last page that my personal history is

25  me.  And will it be here?  Yes.  Now, if they don't prove that

KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

79

1   they knew that they were taking them across the state line,

2   then they're not guilty if that's what the case is.

3           It's like I was honest with you because you asked me

4   specific questions on that questionnaire.  I've been since

5   then sitting here today and tried to explain to you that, you

6   know, my life spans all of that.  And there has been a

Page 63

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

7      desensitization in my life.  It's not that I'm so horrified as

8      to what happened, I am horrified that it continues to happen

9      all the time.  I'm horrified that -- of the people that

10     continue to come forward with this kind of an issue, and I

11     wish to God there was something I could do to stop it.  I'm

12     very horrified about that, not what happened.  I'm not

13     horrified about that any more, I've finally desensitized to

14     it.

15             So it almost sounds to me like if you want to put some

16     witnesses up here to give us a bunch of really beautiful

17     graphic stuff to listen to, I hope you don't, because if what

18     you're really trying to prove is that they did or didn't cross

19     that line, then give us that information and let us make a

20     decision about it.  And I'll go in this room back there, and I

21     will sit there with 11 or however other many people you want

22     to stick back there, and we're going sit there, and we're

23     going to talk about it, and we're going to reach our decision

24     as it needs to be reached.

25             I'm not going to try to say to everybody, well, you


KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347


80

1      know, my wife was abused when I was a kid and everybody that

2      does that is guilty, I don't give a shit what you say.  That

3      ain't what I'm there for.  It's going to be me making my

4      decision, and it's going to be me listening to you guys, and

5      it's going to be me listening to the rest of the jurors, and

6      then we have to make a decision as I understand it, not me.

7              MR. LOCKE:  Okay.  I have no more questions, Your

8      Honor.

Page 64

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

9           THE COURT:   Anybody else?

10          MR. KAROWSKY:   Just a couple of brief ones.

11          THE COURT:   All right.   Mr. Karowsky is going to ask

12    you some questions now.

13          PROSPECTIVE JUROR SHERWOOD:   I'm amazed you have more

14    to ask.

15          MR. KAROWSKY:   True, but --

16          THE COURT:   Maybe it's another subject.

17          MR. KAROWSKY:   I respect -- I respect your candor.   I

18    think it's as refreshing as I've seen in all the years that my

19    hair has turned gray, but I'd like to focus this.

20          Do you understand there is going to be some -- there

21    is going to be evidence in this case about sexual abuse

22    repeated on a daily basis, probably for ten years with

23    multiple children on oral, anal, vaginal sex?   We're not just

24    talking about a few times of touching.   We're talking about

25    repeated, revolting, disgusting sex over ten years by at least


KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347


81

1     the males and in some times with my client, one of the male's

2     wives.

3           And it's documented.   It's documented in documents.

4     There's no question that that's going to be documented.   This

5     is not a did they do it, that's documented.

6           Do you understand that?

7           PROSPECTIVE JUROR SHERWOOD:   I understand what you

8     just told me.

9           MR. KAROWSKY:   Now, the law says that my client is

10    presumed innocent, and the TV tells us that people are

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

11    found -- are found innocent.   People are found not guilty.

12    There's a dramatic difference between innocence and guilt.

13            Now what I'm telling you right now is that there's

14    going to be evidence that these people, these defendants

15    documented in detail on computers and it's typewritten the sex

16    that they were having with the 7-year-olds and the 8-year-olds

17    and the 12- and the 13- and the 14- and the 16-year-olds on a

18    daily -- frequently on a daily basis.

19            Can you sit here and presume that each of these people

20    have -- are completely snow driven innocent?

21            THE COURT:  Well, wait a minute.

22            PROSPECTIVE JUROR SHERWOOD:  Yeah, of what?  What are

23    you asking me?

24            MR. KAROWSKY:  Of the charges that they face.

25            THE COURT:  But, wait.  You've given him-- you can't


KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347


82

1    ask a question like that.  You can ask him if he -- if as he

2    sits here he can presume they're innocent.  But when you give

3    him a bunch of facts and then ask him to make an assumption

4    that they're innocent based upon facts, you can't ask the

5    question that way.

6            MR. KAROWSKY:  All right.  I'll rephrase it.  The

7    facts are going to show --

8            PROSPECTIVE JUROR SHERWOOD:  Can I ask you a quick

9    question?

10           MR. KAROWSKY:  Sure.

11           PROSPECTIVE JUROR SHERWOOD:  Are you -- am I correct

12    in assuming that you are here defending the same charges that

Page 66

08-01-02 Vol 2.txt

13    he's here defending?

14         MR. KAROWSKY:  Basically.  Basically.  But what I'm

15    saying is that the facts that you're going to -- that I'm

16    talking about, the sex is only tangentially related to the

17    substantive charges of transporting these kids across state

18    lines.  So once you hear the sex, can you separate that and

19    still presume that on the charges that they face, the crossing

20    state lines, that they're presumed innocent?

21         PROSPECTIVE JUROR SHERWOOD:  Well, I must say, you

22    certainly get right to the point, and I do not feel good right

23    this second having heard what you just said.

24         MR. KAROWSKY:  I understand.

25         PROSPECTIVE JUROR SHERWOOD:  I do not feel good

KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

83

1     physically, physically do not feel good.  And --

2          MR. KAROWSKY:  Let me interrupt you for a second, sir,

3     because I respect your candor.

4          We're talking about -- we're talking about that man

5     right there with the white hair sticking his penis in a

6     7-year-old's anus repeatedly and documenting it.  You got that

7     image?

8          MS. WHITE:  No, I'm going to object.

9          PROSPECTIVE JUROR SHERWOOD:  Please.

10         MS. WHITE:  Mr. Karowsky is setting forth facts that

11    I'm not even aware of.

12         THE COURT:  Well, I don't know whether you are or not,

13    but there is some useful purpose to be served by asking

14    graphic questions so that we can determine whether any juror,

Page 67

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

15      not just Mr. Sherwood here, can sit through that kind of

16      evidence and still be able to focus on the issues in the case.

17      And I was going to ask you that question myself if Mr.

18      Karowsky didn't.

19              If there's graphic evidence of the type that he has

20      just described, can you sit through the trial listening to

21      that evidence and still be able to focus on the issues that

22      you have to decide?

23              MR. KAROWSKY:   And, Your Honor, may -- I appreciate

24      that.   May I take it further.

25              And I -- Mr. Locke said it, and it's revolting.   I am

KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

84

1       not -- I am an advocate, but I'm also a human being, and it's

2       revolting.   It's just revolting.   I'm not here to tell you

3       that I believe anything other than that.   But I think until

4       one gets it in their mind, we're not just talking a graphic

5       image.   We're talking about grown parents putting their

6       penises in their children's mouth, in their anus, and in their

7       vagina, and couching that and justifying it and believing it

8       in the sake of God.   And they documented it on a daily basis

9       in computers and sent it back and forth to each other.

10              How does that make you feel, sir?   It makes me feel --

11              THE COURT:   Let's not hear how it makes you feel.

12              MR. KAROWSKY:   How does that make you feel, sir?

13              PROSPECTIVE JUROR SHERWOOD:   I already answered that

14      question.   It -- I do not feel good as a result of this.

15              Now, give me a moment, because you covered from here

16      to probably Wyoning.   Give me a second here.

Page 68

08-01-02 Vol 2.txt

17          MR. KAROWSKY:   Please do.

18          PROSPECTIVE JUROR SHERWOOD:   I suspect if I

19  understood -- if I got a question out of what you said, it was

20  kind of hard, I had to work at it, but if I got a question out

21  of what you said, if you came in here or if they came in

22  here -- I assume they're going to do that.   I sure don't think

23  you'd be wanting to be putting it up on the screen too

24  quickly.

25          But if they came in here and they put up a bunch of


KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347


85

1  graphic information, and then 15 minutes later you have any

2  belief in your mind that I would be able to sit there with

3  this open mind and listen to some other direction of

4  information being given to me, probably not.   I don't think

5  anybody in the dang box would be able to.   If you put it -- if

6  you tuck it close together, you're probably going to lose the

7  second portion because my mind and my body and my stomach is

8  going to be feeling one way at that moment.

9          I would assume that's your guys' job to see to it that

10  that's put in a way that we have at least a little bit of

11  time -- because we don't get to object over here, a little bit

12  of time to sort of settle back down after that kind of

13  presentation.

14          I also want to say to you that any and everything that

15  you've just said to me, this is not new.   I don't like it.   I

16  don't want this job.   But if I -- I can't sit in this box and

17  say to you I want it to stop and then come up here and sit in

18  this box and try to figure out some damn way to get out of

Page 69

08-01-02 Vol 2.txt

19    this trial.  I have to be honest with you.  I have to be
20    straight and honest with you.
21        But if -- nothing you've said to me is like, oh, my
22    God, does that really go on?  Can that be true?  And -- and
23    have I ever previously visualized?  Yes, of course I have.
24        MR. KAROWSKY:  Okay.
25        PROSPECTIVE JUROR SHERWOOD:  And it is disgusting.


KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347


86

1        MR. KAROWSKY:  It is.  And I'm not trying to shock
2    you, what I'm trying to say is this.
3        PROSPECTIVE JUROR SHERWOOD:  Oh, I think you're trying
4    to shock me.  I feel like I'm shocked.
5        MR. KAROWSKY:  I'm not trying to shock you, I'm trying
6    to get the image in your mind.
7        What we're looking for, sir, is you said, you know, do
8    I want this job, and the point is that you don't necessarily
9    have to have this job.  I'm satisfied that you're a fair and
10   honest man in every respect.  I think if we had a burglary
11   case here, we wouldn't be having any of this discussion, I'd
12   take you in a second.
13       But the point is that you come in -- what we're
14   looking for are judges, we're not looking for advocates.
15   We're looking for people who can sit and be absolutely fair
16   and impartial and in fact have an open mind.
17       PROSPECTIVE JUROR SHERWOOD:  Okay.
18       MR. KAROWSKY:  And the question is in this case are
19   you a judge for this case as opposed to the burglary case?
20       And let me just focus it this way.  I want you to

Page 70

08-01-02 Vol 2.txt

21   imagine that you're sitting as a defendant here, you're on

22   trial for these charges.  Do you want a juror who has the

23   state of mind of William Sherwood to be sitting in the box

24   voting on your case?

25              THE COURT:  The way the question has to be asked is if

KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

87

1   you were sitting in the position of a defendant in this case

2   or if you were sitting in the position of the United States

3   Attorney charged with the duty of presenting the evidence on

4   behalf of the United States, would you be satisfied to have

5   the case heard by 12 jurors who are in the state of mind that

6   you presently have?

7              MR. KAROWSKY:  Thank you.

8              PROSPECTIVE JUROR SHERWOOD:  And I answer that by

9   saying I have to take everything that's been said here this

10  morning in answering that question.  It's been very narrowly

11  focused for me what this case is.  I tend to think that

12  there's two sides of it.

13             If you honestly were talking about -- if I was in on

14  the trial where we were judging what you say is already

15  bald-face, flat-down proven, and yet you wanted to prove it

16  some more and I was on that jury, well, no, you probably

17  wouldn't want me on that jury.  You probably wouldn't want me

18  when I'm looking at the computer printouts and like, you know,

19  that line I was talking about, it's like it's all over here

20  and there's nothing over here, you probably wouldn't want me

21  on that one.  But that isn't what I understand.

22             MR. KAROWSKY:  Because that's not the kind of case

Page 71

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

23   that you with your background and what you bring in here can

24   be fair on.

25            PROSPECTIVE JUROR SHERWOOD:   No, that's not the


KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

88

1   kind -- you presented it, I didn't.

2            MR. KAROWSKY:   I understand.

3            PROSPECTIVE JUROR SHERWOOD:   You presented to me these

4   people are guilty and would I --

5            MR. KAROWSKY:   No, let me --

6            PROSPECTIVE JUROR SHERWOOD:   You told me that --

7            MS. WHITE:   Objection, Your Honor.   May he finish?

8            THE COURT:   Yeah, I know what he's going to say and

9   he's right, Mr. Karowsky.   The way you put it, that's why I

10   stopped you from asking the question the way you were going to

11   put it.

12            And I think what Mr. Karowsky wanted to focus on was

13   the interstate aspect of the case --

14            PROSPECTIVE JUROR SHERWOOD:   Right.

15            THE COURT:   -- the subject that Mr. Locke talked to

16   you about previously.

17            And I think, if I'm not mistaken, what Mr. Karowsky

18   wanted to ask you was, whether you would be able to focus on

19   the interstate issue in the case even though the evidence on

20   the other issues that he's talked about may be so graphic, so

21   disgusting, may be even more graphic and more disgusting than

22   he's described it, would you still be able to focus on the

23   issues in the case?

24            PROSPECTIVE JUROR SHERWOOD:   Well, I kind of thought I

Page 72

08-01-02 Vol 2.txt
25      answered that, but -- when I said that, you know, life's been


KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

89

1    kind of desensitizing for me.
2            I'll be honest with you, if I haven't already, but
3    I'll be honest with you when I -- when I was here last month
4    and I sat in that same seat I was in this morning and I had a
5    very, just a teensy little tidbit of what was going to be
6    going on here, I wasn't happy with the fact that I was sitting
7    in this courtroom   But today what you're asking me is a
8    totally different thing.  Because all I'm saying to you is is
9    that if you -- if you need to give me the graphics, which
10   don't give me any more than you have to please, I don't want
11   it.   But if you need to give it to me, give it to me.   Please
12   give us some time to digest that a little bit and let our
13   stomach settle down and perhaps maybe not right after lunch
14   and then go into the other details that you need to that are
15   more pertinent to what we're really going to be asked to do,
16   and that would be to judge -- or I'm going to be asked to do,
17   and that is to judge whether or not there was this
18   transportation that took place and whether or not they knew
19   about it.   Because to me it's -- it's night and day.
20           You're asking me can I be disgusted with someone and
21   still vote them to be innocent?  Is that a good --
22           MR. KAROWSKY:  Absolutely.
23           PROSPECTIVE JUROR SHERWOOD:   -- summation of what you
24   just said?
25           MR. KAROWSKY:  That's very well crystalized, yes.


Page 73

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

90

1          PROSPECTIVE JUROR SHERWOOD:  Well, yes.  Would I -- I

2    got 90 miles to drive home, I'd probably kick the windows out

3    on the way home, but I -- how else could I do it?  If I

4    believed it to be true -- and I'll say it one more time, your

5    job is figuring out whether you want me to trust me to be on

6    the jury.  I don't know how else to put this.  I've been blunt

7    with you all.

8          MR. KAROWSKY:  Well -- no, you've been very blunt, and

9    I appreciate it.

10          So you used a speeding example a little while ago.  I

11    mean, you indicated you've got a few speeding tickets in your

12    past?

13          PROSPECTIVE JUROR SHERWOOD:  Only one.

14          MR. KAROWSKY:  Okay.  One.  And let's assume that --

15    you know, that -- well, let me ask you this.  The people who

16    have been -- who are the abusers of your wife and your

17    stepchildren were not punished apparently.

18          PROSPECTIVE JUROR SHERWOOD:  No, they were not.

19          MR. KAROWSKY:  Okay.  There was no justice done.

20          PROSPECTIVE JUROR SHERWOOD:  No, there was not.

21          MR. KAROWSKY:  And what we're concerned about is

22    coming in here with that background and we're looking for

23    neutral judges with open minds.

24          PROSPECTIVE JUROR SHERWOOD:  It isn't there.  There --

25    I am not bringing them here.

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

91

1          Again, the person that abused my wife, I only have a
2     name.  I never met the man.  He died before I ever came into
3     her life.  I know what took place, I know how horrible he was.
4     And -- and let me take it a little bit further.
5          I am of a mindset that believes that -- that there
6     is -- there is change, there is inherent good within a
7     circumstance.  Things don't happen by accident.  There are
8     reasons that things happen, and they can be found to be good
9     things that happen, and I honestly believe that.  And I
10     can't -- I don't -- you know, my wife wouldn't be who she was
11     if that didn't happen.  And would that be better or worse?  It
12     would be different.
13          Am I making myself clear to you --
14          MR. KAROWSKY:  Yes, you are.
15          PROSPECTIVE JUROR SHERWOOD:  -- how I see things?
16          MR. KAROWSKY:  No, and I appreciate it.  I mean, it's
17     very open-minded, and I appreciate that.
18          I guess the question that struck me was this, that
19     those people were not punished, and you sat here and
20     understandably and appropriately said if I could do something
21     about it, I would.
22          PROSPECTIVE JUROR SHERWOOD:  If I could stop it, I
23     would.
24          MR. KAROWSKY:  Stop it.
25          PROSPECTIVE JUROR SHERWOOD:  That's different than if

KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

92

1     I could do something about it.

Page 75

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

2           MR. KAROWSKY:  Okay.  To stop it.  And what I'm

3    suggesting is that if you believe that these people are

4    molesters and yet you believe that the government has not

5    proven the technicality of the interstate transportation, will

6    you do something to try and stop them from molesting by voting

7    for guilt when there is no guilt there?

8           PROSPECTIVE JUROR SHERWOOD:  We don't want to, like,

9    be prejudging this trial, do we?  I mean, how the hell do I

10   know that?

11          THE COURT:  But --

12          PROSPECTIVE JUROR SHERWOOD:  How the hell do I know

13   what I'm going to vote at the end of this thing when I don't

14   know what you've given me?  And I've answered that question.

15          THE COURT:  Well, let's say the government hasn't

16   proven the interstate transportation.

17          PROSPECTIVE JUROR SHERWOOD:  Then they haven't proven

18   it.

19          THE COURT:  And would you be able to find the

20   defendants not guilty or would you do something about

21   preventing them from doing this again by finding them guilty?

22          PROSPECTIVE JUROR SHERWOOD:  Well, I said earlier,

23   ain't my job.  I would assume that somebody is out there

24   taking care of that job, and I think it's a fair assumption of

25   me to do that.  And if I'm wrong, God darn it, the system has

KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

93

1    got a big huge hole in it that needs to be fixed really bad.

2    But I'm going to assume that, I have to assume that.

3         Are you going to stand up and tell me that they're

Page 76

08-01-02 Vol 2.txt

4    totally -- no problem, the world is a great place, they walk

5    out the door, they got whatever wherever, and that's the end

6    of that, and they're just -- I don't -- you know, you're

7    asking me questions I haven't heard information on, so I can't

8    give you an answer.  You know, because I have to be honest

9    with you.  I told you in the questionnaire that I bring with

10   me my life, and you have to have that because that's me,

11   that's who I am  It got me where I'm at, and that's what I've

12   become.

13        So, in knowing that, then you have to understand that

14   if I'm asked to judge one thing, as I said earlier, I'll do

15   the best I can to judge it.  Will I try to sway the jury

16   because of my bias or my opinion to try to judge them for

17   something other than what he has given here?  You know, have

18   you ever been on a trial that maybe that happened?  I suspect

19   you probably have.  Can it happen?  I suspect it probably can.

20   Would it happen here?  I don't know, we haven't heard the

21   information yet.

22        MR. KAROWSKY:  But you won't --

23        PROSPECTIVE JUROR SHERWOOD:  Would I be the one that

24   did it?

25        MR. KAROWSKY:  You won't do that.


KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347


94

1        THE COURT:  Wait a minute.  Answer that question.

2    Would you be the one that did it?

3        PROSPECTIVE JUROR SHERWOOD:  Well, I have answered the

4    question.

5        THE COURT:  Okay.

Page 77

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

6          PROSPECTIVE JUROR SHERWOOD:   I said can I take this

7     case and judge it based on the merits of the interstate

8     transportation and the knowledge that what was going to happen

9     at the other side of that transportation, and I said yes at

10    least four ways.

11         THE COURT:   Okay.   Now, you've been questioning this

12    one juror for an hour.   Do you want to take a recess now or

13    are you going to finish with him before the recess?

14         MR. KAROWSKY:   I've got just one quick question.

15         THE COURT:   All right.

16         MR. KAROWSKY:   Based on Mr. Locke's questioning and my

17    questioning and our, if you will, pummeling of you a bit which

18    we've been doing for a purpose, but not --

19         PROSPECTIVE JUROR SHERWOOD:   I hope they have a medic

20    here is what I'm hoping.

21         MR. KAROWSKY:   Me too, me too.   Can you be fair and

22    impartial to us now?

23         PROSPECTIVE JUROR SHERWOOD:   I hope you don't take

24    this the wrong way, but you're absolutely irrelevant to me.

25         MR. KAROWSKY:   Thank you.


KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347


                                                              95

1          PROSPECTIVE JUROR SHERWOOD:   You're totally irrelevant

2     to me.

3          MR. KAROWSKY:   That's a perfect answer.   Thank you,

4     sir.

5          THE COURT:   All right.   Ms. Marks, do you have any

6     questions?

7          MS. MARKS:   No.

                        Page 78

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

8           THE COURT:  All right.  We're going to take a

9    15-minute recess now.

10          Mr. Sherwood, if you'll step outside --

11          MS. WHITE:  Your Honor, I've not had a chance to talk

12    to --

13          THE COURT:  I don't care.  We need a recess.  The

14    Court Reporter has been going for -- all right.

15          MS. WHITE:  No, that's fine.  We can come back after

16    the recess, that's fine.

17          THE COURT:  If you'll step outside, go into the room

18    that the court security officer will tell you, we're going to

19    take a little break, and then when we come back we may have

20    some more questions for you, but we'll tell you then whether

21    you're going to come back.

22          PROSPECTIVE JUROR SHERWOOD:  Okay.

23          THE COURT:  All right.

24          (Prospective Juror Sherwood departed courtroom)

25          THE COURT:  All right.  Mr. Sherwood is outside the


KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

                                                              96

1    courtroom

2           I don't know what questions you want to ask.  If you

3    want to ask him about another subject, I suppose that's fine.

4    I came out here with the mindset that I was going to resolve

5    any doubt about whether to keep these jurors in favor of the

6    defendants in light of my previous concern, which is a

7    continuing concern that I have, about whether anybody can put

8    their emotions aside and reach a decision on some of the

9    technical elements of this case in light of the evidence that

                            Page 79

08-01-02 Vol 2.txt

10      they're going to hear.

11              But I have to tell you, as I've listened to this

12      examination of Mr. Sherwood, he is a good juror, and I am not

13      going to excuse him for cause in this matter.  As a matter of

14      fact, when he keeps repeating the fact that he's desensitized,

15      that makes him a better juror in my view by reason of his

16      previous experience than if he had not had the previous

17      experience.

18              He has said every which way that can be imagined in

19      some blunt terms, in some subtle terms, some direct terms and

20      some indirect terms that he is not going to let his emotions

21      or his wife's experiences or his experiences affect his

22      deliberations in this matter.  He's not an educated man.  He

23      hasn't been told about the law yet.  He may have said some

24      things that to some judge on the Court of Appeals that's never

25      tried a case might sound like he can't follow the law and that


KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347


                                                            97

1       he cannot accord the presumption of innocence or that he's

2       going to give more weight to the testimony of a law

3       enforcement officer than he would to any other witness, but he

4       hasn't heard the Court's instructions yet and I don't care,

5       he's staying on this panel.

6               So if you want to ask him some more questions, ask him

7       some more questions, but he's staying on this panel as far as

8       I'm concerned.

9               (Recess taken.)

10              THE COURT:  All right.  I made the comments that I did

11      before we took the recess so that the government could make a

                            Page 80

08-01-02 Vol 2.txt

12    determination as to whether you wanted to ask questions or not

13    in light of the Court's inclination.   I am concerned that

14    you've spent so far an hour on Mr. Sherwood and we have 18

15    other jurors that we need to address today.

16          Ms. White.

17          MS. WHITE:   Your Honor, I agree, I'm concerned with

18    the time as well.   I was -- there was only one question I was

19    going to ask which had nothing to do with what Mr. Locke and

20    Mr. Karowsky were asking, and I think they covered that area

21    several times well.

22          I asked -- Ms. Endrizzi and I conferred about my

23    question over the recess, she clarified it for me.   I have no

24    need to ask this juror any questions.

25          THE COURT:   All right.   I want to just elaborate a


KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347


                                                                  98

1    little bit further on something I alluded to, and that is the

2    question whether the juror would give more weight to the

3    testimony of a law enforcement officer than he would to other

4    witnesses simply because it is a law enforcement officer.

5          I'm aware of the case law which requires that a judge

6    ask that question if it is requested.   I am not aware of any

7    authority that says that the judge is required to excuse the

8    juror for cause if the juror answers that question in the

9    affirmative.   If any of you are aware of such a case, I would

10    like to see it.   Otherwise, it is my view that that is

11    something that can be covered by the Court's instructions.

12          Another judge that I respect highly told me that when

13    he went to state court and was asked that question by the

Page 81

08-01-02 Vol 2.txt

14    judge he said, yes, that he would give more weight to the

15    testimony of a law enforcement officer.

16              Beyond that, I know of nothing improper by considering

17    a witness's occupation and giving that witness more

18    credibility than you might otherwise give the witness because

19    of his occupation.   Police officers are only one occupation

20    that might accord a witness some greater credibility.   One

21    might think that being a judge could accord a witness more

22    credibility or being a minister or being a firefighter or any

23    of those other occupations that people should respect, and so

24    I don't excuse jurors simply because they answer that question

25    in the affirmative.


KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347


                                                                    99

1              Sometimes I explain to them when I ask the question

2     rather than when it comes on a questionnaire that they need to

3     consider everything about a witness in determining his

4     credibility, not just his occupation, and I ask them if they

5     would always believe a police officer, and I get some further

6     answers.   But I think it was this witness who mentioned -- did

7     he mention O.J. Simpson?

8              MS. WHITE:   Yes.

9              THE COURT:   See, when he mentioned that, when he

10    mentioned that case, that showed me that he's not going to

11    believe every law enforcement officer because that was an

12    example where a law enforcement officer lied and everybody

13    knew he lied.   And so I'm not excusing him because of any of

14    his answers to that question.

15              All right.   So I'm going to bring him back in, then.

                              Page 82

08-01-02 Vol 2.txt

16        Is there a challenge for cause?

17              MR. LOCKE:  Yes, Your Honor, I would -- I would

18        challenge him but just for the record.

19              THE COURT:  All right.  I want to make sure before I

20        went to all the trouble of denying it that you really were

21        making the challenge.  So for the reasons the Court has

22        stated, that challenge for cause is denied.

23              MS. WHITE:  Your Honor, just one thing.

24              With respect to the issue of the weight given law

25        enforcement --


        KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347


                                                        100

1               THE COURT:  Just a minute.  I think that Mr. Sherwood

2         just came in.

3               (Prospective Juror Sherwood entered courtroom)

4               MS. WHITE:  I'll save that.

5               THE COURT:  We can take that later.

6               MS. WHITE:  That's fine.

7               THE COURT:   Mr. Sherwood, thank you for coming back.

8         I'm going to order you to come back here in this court at 9:00

9         a.m on January the 15th for further proceedings.  The Clerk

10        is going to give you a card with her telephone number on it.

11        If anything comes up in the meantime, that's the number you

12        can call to reach her.  She would like to have a number where

13        she can reach you in the meantime.

14              And I am instructing you that between now and the time

15        that you come back to court, do not discuss this case or any

16        issues that you think may be involved in this case with

17        anyone; and do not seek or obtain any information about the

                                Page 83

08-01-02 Vol 2.txt

18    case.

19          All right.  If you'll give her your phone number then,

20    you will be excused, and we'll see you back here on January

21    the 15th at 9:00 a.m

22          And that's probably the most personal involvement

23    you'll have in this whole trial until you finally get to the

24    point of deliberation if you're selected as a juror.

25          PROSPECTIVE JUROR SHERWOOD:   I hope so.


KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347


                                                            101

1          THE COURT:   Thank you.

2          (Prospective Juror Sherwood departed courtroom)

3          THE CLERK:   Ready for the next one?

4          THE COURT:   Yes, please bring in Mr. Green.

5          But, wait a minute, before she brings in Mr. Green,

6     were you going to say anything?

7          MS. WHITE:   Just for the record, Your Honor, as to the

8     issue given the level of weight that Mr. Sherwood indicated --

9          THE COURT:   Just a minute, yeah.

10         MS. WHITE:   -- that he would give to law enforcement

11    officers, he answered it both ways.  He said he would give --

12    tend to give greater weight, and he also said he would tend to

13    give less weight to the testimony of a law enforcement

14    officer.  Those would be questions 27 and 28.  I take that to

15    mean that it depends upon the witness, so he answered it both

16    ways.

17         THE COURT:   Well, as I say, for your future

18    edification, if you are concerned about any other jurors'

19    answers to that question, I would urge you to ask a follow-up

                            **Page 84**

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

20   question so that we can determine what the witness is

21   really -- or what the juror is really saying.

22        MS. WHITE:  Thank you.

23        THE COURT:  All right.  Bring in Mr. Green.

24        (Prospective Juror Green entered courtroom)

25        THE COURT:  Mr. Green, thank you for waiting.  The

KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

102

1   lawyers are going to ask you some questions now, and we're

2   going to begin with the attorney for the government, Ms.

3   Endrizzi.

4        MS. ENDRIZZI:  Good morning.

5        PROSPECTIVE JUROR GREEN:  Good morning.

6        MS. ENDRIZZI:  You'll find that trial is a lot of

7   hurry up and wait.  So --

8        THE COURT:  No, just this process.  After we get

9   going, trial will not be hurry up and wait.

10        MS. ENDRIZZI:  It will be rocket speed.

11        What's your relationship to Nathaniel and Benjamin

12   Green?

13        PROSPECTIVE JUROR GREEN:  They're my older brothers.

14        MS. ENDRIZZI:  Okay.  And would the fact that they are

15   Sacramento County deputies influence you in evaluating other

16   witnesses in this case?

17        PROSPECTIVE JUROR GREEN:  I don't believe it would.

18        MS. ENDRIZZI:  Okay.  You don't believe or no --

19        PROSPECTIVE JUROR GREEN:  No, it would not.

20        MS. ENDRIZZI:  Okay.  I had a question about what you

21   had written when you said you graduated from high school with

Page 85

08-01-02 Vol 2.txt

22      CHSPE.

23              PROSPECTIVE JUROR GREEN:   The California high school

24      proficiency exam

25              MS. ENDRIZZI:   Okay.   I'm not from California.


KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347


                                                    103

1               PROSPECTIVE JUROR GREEN:   Oh.

2               MS. ENDRIZZI:   You're also taking classes now.   What

3       are you studying?

4               PROSPECTIVE JUROR GREEN:   I'm not taking any classes

5       right now.

6               MS. ENDRIZZI:   Oh, you're not.   Okay.   So you're

7       working two jobs, correct?

8               PROSPECTIVE JUROR GREEN:   Correct.

9               MS. ENDRIZZI:   And that's at Washington Mutual and the

10      Old Spaghetti Factory?

11              PROSPECTIVE JUROR GREEN:   Correct.

12              MS. ENDRIZZI:   Okay.   Now, you're going to hear, and

13      you got a little bit of this through the questionnaire, that

14      the topic is child molestation.

15              PROSPECTIVE JUROR GREEN:   Right.

16              MS. ENDRIZZI:   It's gross, can be graphic.   But what

17      I'm going to ask you is whether or not all that aside, because

18      you'll have to listen to it with 11 other people in the box,

19      can you apply the facts of the case to the law as the judge

20      gives it to you so that if we only prove -- and we're the ones

21      who carry the burden of proof.   If we have to prove four

22      things and we only prove three, can you acquit that defendant

23      because we did not prove the fourth element?

                        Page 86

08-01-02 Vol 2.txt

24          And acquit -- I shouldn't use so many legal terms.

25          Can you find that defendant not guilty?  We have the


KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347


                                                        104

1    burden of proving all four elements.  If we only prove three,

2    even though those graphic images and what you hear is

3    horrible, can you still find that person not guilty if we

4    don't prove all the elements?

5          PROSPECTIVE JUROR GREEN:  Yes.

6          MS. ENDRIZZI:  Okay.  Can you promise me that if

7    you're selected for this jury that you're going to wait and

8    hear all the facts from all the witnesses before you make a

9    decision about whether these defendants are guilty or

10   innocent?

11         PROSPECTIVE JUROR GREEN:  Yes.

12         MS. ENDRIZZI:  Okay.  That's all we need to know.

13   Thanks.

14         THE COURT:  Mr. Locke has some questions now.

15         MR. LOCKE:  Mr. Green, good morning.

16         PROSPECTIVE JUROR GREEN:  Good morning

17         MR. LOCKE:  My name is Bruce Locke, and I'm one of the

18   defense attorneys in the case.

19         You under -- Ms. Endrizzi alluded to the fact that

20   some of the testimony in this case is going to be graphic.

21         PROSPECTIVE JUROR GREEN:  Uh-huh.

22         MR. LOCKE:  You understand that?

23         PROSPECTIVE JUROR GREEN:  Yes.

24         MR. LOCKE:  You understand from what we have been

25   talking about that this case involves molestation of children

                              Page 87

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

105

1    as young as seven years old.

2              PROSPECTIVE JUROR GREEN:   Yes.

3              MR. LOCKE:   Okay.   And that it involves oral sex, anal

4    sex, vaginal sex with minors.   You understand that?

5              PROSPECTIVE JUROR GREEN:   Yes.

6              MR. LOCKE:   Okay.   What is the first word that comes

7    to your mind when you -- when I say oral sex with a

8    7-year-old?

9              PROSPECTIVE JUROR GREEN:   Wrong.

10             MR. LOCKE:   Okay.   On a scale of one to ten with one

11   being the least serious and ten being the most serious crime,

12   where would you put child molestation?

13             PROSPECTIVE JUROR GREEN:   I'm not -- I'm not sure.

14   I -- eight.

15             MR. LOCKE:   Okay.   If this case came down to this

16   situation, where the government has the burden of proving

17   beyond a reasonable doubt that the defendant -- let's just

18   treat it as if there's only one defendant -- that the

19   defendant transported or aided in the transportation of a

20   child across state lines with the intent that the child engage

21   in unlawful sex, which would be sex with an adult when they're

22   still under eighteen -- okay.   So the government has to prove

23   that at the time that the child crossed state lines that the

24   intent was that the child have sex in the other state.   You

25   understand that?

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt
KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

106

1          PROSPECTIVE JUROR GREEN:  Right.

2          MR. LOCKE:  All right.  Now, if in this case it was

3    clear to you that one of the defendants had sex with that

4    child who was 14 years old, say, and the sex was oral sex,

5    anal sex, vaginal sex, but there was no evidence, none, that

6    the defendant intended that at the time that the child crossed

7    state lines -- you understand?

8          PROSPECTIVE JUROR GREEN:  Uh-huh.

9          MR. LOCKE:  Then, in that situation where you knew

10   that the molestation had occurred, would you still be able to

11   vote to acquit the defendant?

12         PROSPECTIVE JUROR GREEN:  On basis of intent?

13         MR. LOCKE:  Yeah.

14         PROSPECTIVE JUROR GREEN:  From what you've told me, I

15   believe I would, yes.

16         MR. LOCKE:  Okay.  You wouldn't be affected by the

17   fact that you knew that the molestation occurred?  You

18   wouldn't be inclined to find -- find them guilty even though

19   there was no evidence on that other issue?

20         PROSPECTIVE JUROR GREEN:  Without proof of intent, no.

21   No, I wouldn't.

22         MR. LOCKE:  Okay.  It would be pretty clear that the

23   defendant intended to have -- at the time that the child --

24   you know, when he's having sex with the child that that was

25   the intent at that time.

KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

107

1          PROSPECTIVE JUROR GREEN:   Right.

2          MR. LOCKE:   But there would be no evidence that the

3     intent existed, say, three weeks before that.

4          PROSPECTIVE JUROR GREEN:   Right.

5          MR. LOCKE:   And you'd vote to acquit?

6          PROSPECTIVE JUROR GREEN:   Right.

7          MR. LOCKE:   You don't have any problem telling me that

8     you'd do that?

9          PROSPECTIVE JUROR GREEN:   No.

10         MR. LOCKE:   You can promise me that that's -- if

11    that's the way the facts came down, that's what you'd do?

12         PROSPECTIVE JUROR GREEN:   Yes.

13         MR. LOCKE:   Okay.   There's going to be a lot of

14    publicity or there may be a lot of publicity about this case.

15    You understand that?

16         PROSPECTIVE JUROR GREEN:   Yes.

17         MR. LOCKE:   All right.   And you have two brothers who

18    are sheriff's deputies here in Sacramento County?

19         PROSPECTIVE JUROR GREEN:   Correct.

20         MR. LOCKE:   All right.   Would you be -- have a problem

21    voting to find them not -- the defendant not guilty in the

22    situation I gave you because you have to face your brothers?

23         PROSPECTIVE JUROR GREEN:   No.

24         MR. LOCKE:   Okay.   Would your brothers understand?

25         PROSPECTIVE JUROR GREEN:   I believe they would.   My

KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

108

1     relationship with the older brother is -- it's not strained,

Page 90

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

2    but we don't see each other much just because we live separate

3    lives, so that probably wouldn't even come up.   With my

4    younger brother it's a much better relationship we have, a

5    much more back and forth.

6              MR. LOCKE:  Okay.  But, you know, your family, your

7    friends, your co-workers, they're going to know you're on a

8    jury and eventually at some point in time they're going to

9    know you're on this jury.

10             PROSPECTIVE JUROR GREEN:   Right.

11             MR. LOCKE:  And you're saying that that wouldn't

12   affect what you'd do in the jury box.   You wouldn't be

13   thinking about, oh, I'm going to have to explain this to

14   somebody?

15             PROSPECTIVE JUROR GREEN:   No.

16             MR. LOCKE:   I have no further questions, Your Honor.

17             THE COURT:   Ms. Marks, any questions?

18             MS. MARKS:   Mr. Karowsky.

19             THE COURT:   Mr. Karowsky.

20             MR. KAROWSKY:   Just a couple very brief ones, Your

21   Honor.

22             I notice that you're working a full-time job and a

23   part-time job, correct?

24             PROSPECTIVE JUROR GREEN:   That's correct.

25             MR. KAROWSKY:   All right.   And yet you checked that

KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

109

1    you had no problem-- there are no exceptional personal issues

2    in terms of devoting your time to this trial, correct?

3              PROSPECTIVE JUROR GREEN:   Correct.

Page 91

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

4           MR. KAROWSKY:  All right.  Do you understand that if

5      selected this case could take six to eight weeks and you're

6      going to be sitting here for that period of time not working

7      at least the full-time job?

8           PROSPECTIVE JUROR GREEN:  Correct.

9           MR. KAROWSKY:  Is that going to be a -- pose an

10     economic problem?

11          PROSPECTIVE JUROR GREEN:  No, they would pay me

12     actually while I was working on a jury.

13          MR. KAROWSKY:  Okay.  Good.  Thank you.

14          Is there any reason that you can think of that you

15     could not be a fair and impartial juror in this case?

16          PROSPECTIVE JUROR GREEN:  No.

17          MR. KAROWSKY:  Okay.  Thank you.

18          THE COURT:  All right.  Does the government -- oh,

19     you're finished.

20          MS. ENDRIZZI:  Nothing further, Your Honor.

21          THE COURT:  All right.  Then if you'll step outside,

22     Mr. Green, I'll be asking you to come back here in just a

23     minute, and we'll tell you whether you come back on January

24     the 15th or not.

25          PROSPECTIVE JUROR GREEN:  Okay.


          KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347



                                                      110

1           (Prospective Juror Green departed courtroom)

2           THE COURT:  Is there any challenge for cause?

3           MS. ENDRIZZI:  No, Your Honor.

4           MR. LOCKE:  No, Your Honor.

5           MS. MARKS:  No, Your Honor.

                         Page 92

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

6      THE COURT:  All right.  She can bring him right back

7  in.  You can have him come in now.

8          (Prospective Juror Green entered courtroom)

9      THE COURT:  Mr. Green, you can just stand right there.

10  I'm ordering you to come back here in this court on January

11  the 15th at 9:00 a.m for further proceedings.  In the

12  meantime, I'm instructing you not to discuss this case with

13  anyone and not to seek or receive any information about the

14  case or anything that you might think is an issue in the case.

15          The Clerk is going to give you a card with her

16  telephone number on it, so if there's any reason that you need

17  to call her, you may call her at that number.  And she would

18  like to have a phone number where she can reach you in case we

19  need to between now and January the 15th.

20          All right.  You're excused now.  You're ordered back

21  on January the 15th at 9:00 a.m

22      PROSPECTIVE JUROR GREEN:   Okay.

23      THE COURT:  Thank you.

24          (Prospective Juror Green departed courtroom)

25      THE COURT:  Before you bring in the next juror I just

KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

111

1  want to raise a point.

2          Is oral, anal and vaginal sex as graphic as it gets or

3  is there more?  And the reason I ask is that I wasn't

4  concerned so much about Mr. Sherwood because of his so-called

5  what he referred to as desensitization.  But if we get

6  somebody who appears to be fragile, is there any more you can

7  tell them about the details of this to see if it's going to

Page 93

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

8    revolt them so much that they can't focus on the issues in the

9    case?

10            MS. MARKS:   I'd like to address that briefly, Your

11   Honor --

12            THE COURT:   All right.

13            MS. MARKS:   -- because it's been on my mind all

14   morning also.

15            The problem from Mr. LaBrecque's point of view is that

16   there is more, but it's subject to motions in limine that are

17   currently -- that aren't pending before the Court, but that

18   the Court decided, with our okay, I'll front that, that it

19   would be better to wait until we were in the process of the

20   trial to rule on those motions.

21            THE COURT:   Can you ask it hypothetically?  For

22   example -- there's a way to ask it that I started to approach

23   and then I backed down a little bit because I didn't want to

24   take your thunder away from you.  But when somebody looks a

25   little doubtful say, well, suppose it gets worse,


KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347


                                                            112

1    suppose just, for example, and you give one of these things,

2    what about if something like that came out?

3            MS. MARKS:   Yeah, there is more, and I've been

4    thinking that it -- I was going to bring it up to my

5    co-counsel at the lunch hour, but now that you've brought it

6    up, I'll make sure to do that.

7            THE COURT:   I think there's a way you can deal with

8    it.  Because I don't want to get somebody in here that says

9    later on, gee, you know, when you just told me it was

                              Page 94

PDF created with pdfFactory trial version www.pdffactory.com

**08-01-02 Vol 2.txt**

10    intercourse, I wasn't so concerned, but now that I hear about

11    this other stuff I'm getting physically sick.

12                THE MARKS:  I'm with you completely.  I understand.

13    And if I could have a moment, maybe I could just have a moment

14    with them now.

15                THE COURT:  Okay.  We'll take a minute before we bring

16    in the next juror.

17                (Off the record.)

18                MS. MARKS:  Thank you.

19                THE COURT:  All right.  Bring in the next juror.

20                (Prospective Juror Caddel entered courtroom)

21                THE COURT:  You're Ms. Caddel?

22                PROSPECTIVE JUROR CADDEL:  Yes.

23                THE COURT:  Have a seat there, Ms. Caddel.  The

24    lawyers are going to ask you some questions.  We're going to

25    begin with Mr. Locke.


KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347


                                                            113

1                MR. LOCKE:  Thank you, Your Honor.

2                Ms. Caddel.  Caddel, is it?

3                PROSPECTIVE JUROR CADDEL:  Caddel, yes.

4                MR. LOCKE:  Okay.  My name is Bruce Locke, and I'm one

5    of the defense attorneys in the case.

6                PROSPECTIVE JUROR CADDEL:  Okay.

7                MR. LOCKE:  And I have a few questions for you based

8    upon your answers to your questionnaire.

9                PROSPECTIVE JUROR CADDEL:  Uh-huh.

10                MR. LOCKE:  And these -- this topic is uncomfortable

11    for me, and I think it would be uncomfortable for you.  And I

**Page 95**

PDF created with pdfFactory trial version www.pdffactory.com

**08-01-02 Vol 2.txt**

12    want to assure you that, you know, if we met outside this

13    courtroom, we wouldn't be having this discussion or anything

14    like it.  But because you might end up being one of the jurors

15    who judge the facts in this case, it's important that -- that

16    I and my other defense counsel know how you would react to

17    things because you could end up being a very important person

18    in this case.  And so I would appreciate you just letting me

19    have the truth, the whole truth about what you feel about what

20    I'm going to ask you about.

21         All right?

22         PROSPECTIVE JUROR CADDEL:  Okay.

23         MR. LOCKE:  It's not meant to embarrass you at all or

24    make you feel uncomfortable, it's just something that we have

25    to do.  Okay?


KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347


114

1         You know what the -- generally what this case is

2    about, is that --

3         PROSPECTIVE JUROR CADDEL:  Generally, yes.

4         MR. LOCKE:  Okay.  And in your answers on the

5    questionnaire, you said that hearing about these charges

6    sickened you.

7         PROSPECTIVE JUROR CADDEL:  Yeah.

8         MR. LOCKE:  And so just hearing that it involved oral

9    sex and anal sex and vaginal sex with minors, that was enough

10   to sicken you; is that right?

11        PROSPECTIVE JUROR CADDEL:  I know -- may I say I know

12   generally about the case, but, you know what, I remember some

13   things on the news that I heard.  And what sickens me is

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

14   that -- I'm not saying the defendants in particular, what

15   sickens me is that these things happen to children.  It's --

16            MR. LOCKE:  Right.  And --

17            PROSPECTIVE JUROR CADDEL:  It's just -- you know, it

18   sickens me.  I think it's inappropriate and destroys lives.

19            THE COURT:  What do you remember hearing on the news?

20            PROSPECTIVE JUROR CADDEL:  Well, I remember charges of

21   child abuse, sexual child abuse.  I remember -- you know, I

22   might remember that there was a conviction somewhere, but --

23   and I remember I believe one of the daughters of a woman who

24   is grown up.  I don't remember specifics, but I do remember

25   because it's -- you know, it's coming back.


KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

                                                              115

1            THE COURT:  Uh-huh.  What makes you think it was this

2   case rather than another case?

3            PROSPECTIVE JUROR CADDEL:  I don't.  I remember

4   something.

5            THE COURT:  All right.  Do you remember any names or

6   anything that would --

7            PROSPECTIVE JUROR CADDEL:  No, absolutely not.

8            THE COURT:  Do you remember any descriptions of the

9   people involved?

10            PROSPECTIVE JUROR CADDEL:  No.

11            THE COURT:  So --

12            PROSPECTIVE JUROR CADDEL:  But I do remember a case in

13   Sacramento.  So, you know --

14            THE COURT:  How long ago?

15            PROSPECTIVE JUROR CADDEL:  Last year, I believe.

Page 97

PDF created with pdfFactory trial version www.pdffactory.com

**08-01-02 Vol 2.txt**

16       Maybe sometime this year she was on the news.   I --

17               THE COURT:   Last year would be yesterday.

18               PROSPECTIVE JUROR CADDEL:   Oh, gee.   Wow, okay.   Last

19       year.

20               THE COURT:   Day before yesterday.

21               PROSPECTIVE JUROR CADDEL:   That's right, last year,

22       you got me there.

23               THE COURT:   So you think it was sometime within the

24       last two years.

25               PROSPECTIVE JUROR CADDEL:   Yes.   Oh, definitely it was


              KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347


                                                              116

1        last year, and I remember catching a glimpse of it.   So I

2        don't know it's this case, no, I don't.

3                THE COURT:   Okay.

4                MR. LOCKE:   Okay.   But the point you were making when

5        you wrote down sickened was that you have a physical reaction

6        to hearing about child abuse cases in general?

7                PROSPECTIVE JUROR CADDEL:   No, not a physical

8        sickening.   Like, it's just -- no, it's just upsetting to me.

9        It just makes me upset that those things happen.

10               MR. LOCKE:   Right.   I didn't mean that you actually

11       got sick, but you just feel bad when you hear that.   Is

12       that -- would that be correct?

13               PROSPECTIVE JUROR CADDEL:   Well, yes.

14               MR. LOCKE:   Okay.

15               PROSPECTIVE JUROR CADDEL:   Most definitely.

16               MR. LOCKE:   And that's a normal reaction.

17               Now, there's going -- this case is going to have

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

18    publicity, there's going to be articles about it in the paper.

19    And people that you know, family and friends are going to know

20    that you were on a jury and at some point in time they're

21    going to know, if you're selected, that you were on this jury.

22         And if a case -- if the facts in this case came down

23    that there was no doubt in your mind but that child

24    molestation occurred, in other words, an adult did have

25    sex, oral sex, anal sex and vaginal sex with children as young

KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

117

1    as seven years old, would you -- could you imagine yourself

2    ever voting to acquit those people?

3         PROSPECTIVE JUROR CADDEL:  Let me -- let me say what I

4    think you're asking me or asking me.  If the evidence and the

5    facts point to that all this occurred, would I have trouble

6    acquitting then?

7         MR. LOCKE:  Could you ever?

8         PROSPECTIVE JUROR CADDEL:  And they all occurred?

9         MR. LOCKE:  Yeah.

10        THE COURT:  Well --

11        PROSPECTIVE JUROR CADDEL:  No.

12        MR. LOCKE:  Okay.

13        PROSPECTIVE JUROR CADDEL:  I hear him saying just the

14    facts and --

15        MR. LOCKE:  Let me add -- let me add one thing to

16    this.  Okay?

17        If the judge instructs you at the end of the case --

18    assume that it's clear to you that the molestation occurred,

19    but the judge instructs you at the end of the case that in

Page 99

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

20    order to find the defendants guilty, you have to find -- the

21    government has to prove beyond a reasonable doubt that --

22    let's take one defendant -- that a defendant transported the

23    child across state lines with the intent that the child engage

24    in sex, illegal sex, that's sex with -- a minor having sex

25    with an adult, and there was no evidence introduced by the


KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347


118

1    government that the defendant intended that to happen at the

2    time that the child was transported across state lines, okay,

3    would you then in that situation -- do you understand the

4    situation I'm talking about?

5            PROSPECTIVE JUROR CADDEL:  Here's what I think you're

6    saying.  May I repeat it?

7            MR. LOCKE:  Sure, please.

8            PROSPECTIVE JUROR CADDEL:  I think you're saying the

9    facts show that there was child molestation from, you know,

10   the --

11           MR. LOCKE:  From a defendant, let's make it one

12   defendant.

13           PROSPECTIVE JUROR CADDEL:  A defendant, okay.  And

14   there was transfer of children for this purpose, but there was

15   nothing written down or plotted out to prove that -- that this

16   happened?

17           THE COURT:  No.

18           MR. LOCKE:  No.

19           THE COURT:  Let me make it simpler.

20           PROSPECTIVE JUROR CADDEL:  Thank you.  I'm getting

21   confused.

Page 100

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

22          THE COURT:   Suppose there are four elements of the
23     crime that the government has to prove.
24          PROSPECTIVE JUROR CADDEL:   Uh-huh.
25          THE COURT:   One of the elements is the molestation.


KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347


                                                         119

1          PROSPECTIVE JUROR CADDEL:   Uh-huh.
2          THE COURT:   But another one of the elements is that at
3     the time the defendant transported the child from one state to
4     another, the defendant intended that the child engage in
5     illegal sex activity.  And what Mr. Locke wants to know is,
6     even though the government has shown the first element, i.e.
7     the molestation, by clear, graphic, disgusting evidence, would
8     you be able to find the defendant not guilty if the government
9     didn't prove the last element?
10          PROSPECTIVE JUROR CADDEL:   No, I would find him
11     guilty.
12          MR. LOCKE:   Okay.  Thank you.  That's all the
13     questions that I have, Your Honor.
14          THE COURT:   I'm going to ask you to explain that, what
15     you mean.
16          PROSPECTIVE JUROR CADDEL:   Okay.  I'm going to explain
17     what I think you said.
18          That there is clear evidence that one of the
19     defendants in this courtroom had molested the children, and --
20          THE COURT:   It's clear, it's graphic, it's undisputed.
21          PROSPECTIVE JUROR CADDEL:   It's done, it's undisputed.
22     But then there's this transportation of four children across a
23     border somewhere, a state for the intent of sexual abuse by

                         Page 101

08-01-02 Vol 2.txt

24    somebody else, but there isn't any proof to show this?

25         THE COURT:   No proof.

KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

                                                         120

1          PROSPECTIVE JUROR CADDEL:   Could I acquit him?

2          THE COURT:   Right.

3          PROSPECTIVE JUROR CADDEL:   No.

4          THE COURT:   All right.   Any other questions?

5          MR. LOCKE:   Thank you very much.   I appreciate your

6    being very honest.

7          PROSPECTIVE JUROR CADDEL:   That's the way I see it,

8    sorry.

9          MR. LOCKE:   No, it's --

10         THE COURT:   No, that's why we're here, and that's why

11   we're questioning people individually.

12         PROSPECTIVE JUROR CADDEL:   Okay.   Good.

13         THE COURT:   Because there's no right or wrong answer.

14   We need to know what you think inside.

15         PROSPECTIVE JUROR CADDEL:   That's in my heart.   That's

16   what I would do, that's what I would do.

17         THE COURT:   Ms. White.

18         MS. WHITE:   Just for clarification, to you acquit

19   means you would have to find that you would not be able to

20   find them not guilty under that situation?

21         PROSPECTIVE JUROR CADDEL:   That's right.   I would --

22         THE COURT:   No, you put a double negative in there.

23   Acquit means that you can't find them guilty.

24         MS. WHITE:   Guilty, correct.   I'm sorry.   Thank you.

25   You wouldn't be able to find them guilty.

                         Page 102

08-01-02 Vol 2.txt

KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

121

1          PROSPECTIVE JUROR CADDEL:   No.

2          MS. WHITE:   Okay.   I just want to clarify.   I

3    appreciate that.

4          PROSPECTIVE JUROR CADDEL:   I could not say they are

5    not guilty.   I would say he's guilty, they're guilty, whoever.

6    If there is this direct fact that this molestation occurred,

7    there's no question, and now there's this intent to transport

8    them over to another state for the same purpose but there's no

9    physical -- there's no, I don't know, papers --

10         THE COURT:   There's no evidence at all, that's the

11   hypothetical question.

12         PROSPECTIVE JUROR CADDEL:   Yeah, the deal is, they're

13   guilty.

14         MS. WHITE:   Okay.   Well, let me -- can I just clarify

15   one thing?

16         What we're talking about is we have one defendant

17   that's been charged with a crime, we're just talking about one

18   crime, transporting a minor across a state line for purposes

19   of unlawful sex.   There may be four elements to that offense.

20   And the judge is going to instruct you as to the law that you

21   need to apply to the facts in this case, and he's going to

22   tell you, I think, something along the following lines, that

23   you need to find that all four of those elements were proven

24   by the government beyond a reasonable doubt.   And one of those

25   elements is that the defendant facing the charge had to have

KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

122

1    formed the intent to have that child engage in unlawful sexual

2    conduct before the transportation.

3            Now, if you found -- that's one of the elements.  Now,

4    if the government proved all the remaining elements but not

5    that element, and the Court instructs you you have to find all

6    four elements before you can find the defendant guilty, would

7    you be able to follow the law and find the defendant not

8    guilty?

9            PROSPECTIVE JUROR CADDEL:  No.

10           MS. WHITE:  Okay.  That's all I wanted to know.

11           PROSPECTIVE JUROR CADDEL:  I would find him guilty.

12           MS. WHITE:  Thank you.

13           THE COURT:  All right.  Thank you.  If you'll step

14    outside there, Ms. Caddel, we'll get back to you in just a

15    moment and we'll tell you whether you're coming back on

16    January the 15th or not.  Yeah, out the back door.  And we'll

17    be back with you in just a minute or so.

18           PROSPECTIVE JUROR CADDEL:  Okay.

19           (Prospective Juror Caddel departed courtroom)

20           THE COURT:  All right.  Ms. Caddel is outside the

21    courtroom  I don't think it will take any more than half a

22    minute.  Any objection to challenging her for -- excusing her

23    for cause?

24           MS. MARKS:  No.

25           MS. WHITE:  No objection, Your Honor.

KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

123

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

1          THE COURT:  All right.  Bring her back in.  That's
2    what we wanted to find out.
3          (Prospective Juror Caddel entered courtroom)
4          THE COURT:  Ms. Caddel, you can stand right there.  It
5    will not be necessary for you to come back on the 15th.
6    You're excused.  Thank you very much for coming.  I'll ask
7    only that you not discuss the questions that were asked to you
8    or your answers to those questions with any of other
9    prospective jurors in case you may see them
10         PROSPECTIVE JUROR CADDEL:  Okay.
11         THE COURT:  Thank you for coming.
12         PROSPECTIVE JUROR CADDEL:  Thank you.
13         THE COURT:  All right.  Let's bring the next juror in.
14         (Prospective Juror Caddel departed courtroom)
15         THE COURT:  Before you bring the next juror in, you
16   could kind of see that coming because she had been equivocal
17   on both the questions as to whether she could follow the
18   Court's instructions.  And if we had gotten past the question
19   that Mr. Locke had asked, I was going to have to myself ask
20   her what she meant when she said she would try to answer the
21   Court's questions -- try to follow the Court's instructions
22   but she wasn't sure.
23         (Prospective Juror Nava entered courtroom)
24         THE COURT:  Mr. Nava.  Have a seat there, Mr. Nava.
25   The lawyers are going to ask you some questions now, and we're


KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347


                                                               124

1    going to begin with the lawyer for the government Ms.
2    Endrizzi.
                              Page 105

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

3                PROSPECTIVE JUROR NAVA:   Okay.

4                MS. ENDRIZZI:   Good morning.

5                PROSPECTIVE JUROR NAVA:   Good morning.

6                MS. ENDRIZZI:   Earlier you let the Court know that you

7      went to the police academy.

8                PROSPECTIVE JUROR NAVA:   Uh-huh.

9                MS. ENDRIZZI:   What changed your mind about pursuing a

10     career in law enforcement?

11               PROSPECTIVE JUROR NAVA:   Well, I was -- I was a step

12     away from starting my career in law enforcement when I had

13     contact with somebody at the current company that I work with,

14     and they needed somebody bilingual to work.   And since I

15     wasn't hired, I started working there and I started liking it,

16     and I started looking at everything and I thought, you know,

17     this is not too bad so I think I'll stick with this for a

18     while.

19               MS. ENDRIZZI:   So the police academy, they were a day

20     late?

21               PROSPECTIVE JUROR NAVA:   Yeah.

22               MS. ENDRIZZI:   Okay.   You mentioned that you had some

23     firearm charges brought against you a long time ago.

24               PROSPECTIVE JUROR NAVA:   Uh-huh.

25               MS. ENDRIZZI:   Were those charges dropped?


KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347


                                                                    125

1                PROSPECTIVE JUROR NAVA:   Yes.

2                MS. ENDRIZZI:   Now, given that you've been through the

3      police academy and that you mentioned in the questionnaire

4      that you might tend to give greater weight to the testimony of

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

5    a law enforcement officer just because he's a law enforcement

6    officer, if the judge instructed you that you have to consider

7    everything about all the witnesses when evaluating their

8    testimony --

9              PROSPECTIVE JUROR NAVA:   Uh-huh.

10             MS. ENDRIZZI:  -- could you still do that when the --

11   rather than just relying on somebody's occupation as a measure

12   of weight?  If you could look at all -- everything that you

13   knew about that witness and how they acted, what they said,

14   how they said it in evaluating that witness's testimony.

15             PROSPECTIVE JUROR NAVA:   Uh-huh.  I think so.

16             MS. ENDRIZZI:  Okay.  Could you or couldn't you?  I'm

17   going to ask you to say yes or no.

18             PROSPECTIVE JUROR NAVA:   Yes.

19             MS. ENDRIZZI:  Okay.  Now, question 51 said some --

20   asked, Is there anything about the nature of the allegations

21   in this case that would affect your ability to be fair and

22   impartial?

23             You got a little bit of a preview of what this case is

24   about --

25             PROSPECTIVE JUROR NAVA:   Uh-huh.


KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347


                                                              126

1              MS. ENDRIZZI:  -- child molestation, anal sex, oral

2    sex, vaginal sex, drinking ejaculate.  I mean, it's going to

3    be horrible to hear.

4              PROSPECTIVE JUROR NAVA:   Uh-huh.

5              MS. ENDRIZZI:  And you answered, I love children,

6    that's why I volunteer on organizations that work with

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

7    children and have since I was 17 years old.   I don't believe I

8    could be impartial due to children being hurt.

9              PROSPECTIVE JUROR NAVA:   Uh-huh.

10             MS. ENDRIZZI:   Everyone in this room thinks child

11    molestation is awful.   I would --

12             PROSPECTIVE JUROR NAVA:   Uh-huh.

13             MS. ENDRIZZI:   And that's a natural feeling.

14             PROSPECTIVE JUROR NAVA:   Yes.

15             MS. ENDRIZZI:   But what you're brought here to do as a

16    juror is to apply the facts of the case to the law that the

17    judge gives you.

18             PROSPECTIVE JUROR NAVA:   Uh-huh.

19             MS. ENDRIZZI:   And regardless of how gross it is and

20    the fact that children were hurt --

21             PROSPECTIVE JUROR NAVA:   Yes.

22             MS. ENDRIZZI:   -- could you -- what I'd -- the thing

23    that you have to carry through is could you apply the law to

24    the facts so that if the government, which has to prove the

25    case --


KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347


127

1              PROSPECTIVE JUROR NAVA:   Uh-huh.

2              MS. ENDRIZZI:   -- has four elements to prove, and we

3    prove element number one, we prove element number two, we

4    prove element number three, but we don't give you proof beyond

5    a reasonable doubt on element number four, could you find that

6    defendant not guilty and acquit that defendant?

7              PROSPECTIVE JUROR NAVA:   Boy, I would have to apply

8    the law that he told me.

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

9           MS. ENDRIZZI:  Absolutely.

10          PROSPECTIVE JUROR NAVA:  Yes.

11          MS. ENDRIZZI:  So you could find that person not

12   guilty.

13          PROSPECTIVE JUROR NAVA:  Uh-huh.

14          MS. ENDRIZZI:  If the government didn't bear its

15   burden and didn't prove elements number one, two, three and

16   four --

17          PROSPECTIVE JUROR NAVA:  Yes.

18          MS. ENDRIZZI:  -- you could find that person not

19   guilty.

20          PROSPECTIVE JUROR NAVA:  Uh-huh.

21          MS. ENDRIZZI:  Even if element one is molestation and

22   you hear all sorts of horrible things about a defendant --

23          PROSPECTIVE JUROR NAVA:  Uh-huh.

24          MS. ENDRIZZI:  -- if the government doesn't prove its

25   burden -- make its burden, you'd still vote to acquit.


KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347


                                                          128

1           PROSPECTIVE JUROR NAVA:  It has to be beyond a

2    reasonable doubt.

3           MS. ENDRIZZI:  Okay.  Just one second.

4           PROSPECTIVE JUROR NAVA:  Uh-huh.

5           MS. ENDRIZZI:  You mentioned in your questionnaire

6    that you go to church every week.

7           PROSPECTIVE JUROR NAVA:  Uh-huh.

8           MS. ENDRIZZI:  And that you're a Catholic.

9           PROSPECTIVE JUROR NAVA:  Yes.

10          MS. ENDRIZZI:  Okay.  And I'm going to ask you to say

                        Page 109

08-01-02 Vol 2.txt

11    yes or no because the Court Reporter has to write down your

12    answer, so uh-huh doesn't translate.

13              PROSPECTIVE JUROR NAVA:   Okay.

14              MS. ENDRIZZI:   There will be other evidence that a

15    defendant, the defendants put a religious overtone on sex and

16    justified it through the Bible.   Given the fact that you go to

17    church every week, okay, can you put that aside, can you put

18    what you believe, your faith aside and still apply the facts

19    as you hear them to the law?

20              PROSPECTIVE JUROR NAVA:   No.

21              MS. ENDRIZZI:   How so?

22              PROSPECTIVE JUROR NAVA:   I can't -- I can't put my

23    faith aside.

24              MS. ENDRIZZI:   Okay.   Would your -- let's put it this

25    way.   If your faith -- okay.

KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

129

1               If the testimony was such that the defendants

2     justified their actions by the Bible, okay, through the Jewish

3     faith, through tenets of what they perceived to be the Mormon

4     faith --

5               PROSPECTIVE JUROR NAVA:   Uh-huh.

6               MS. ENDRIZZI:   -- would you find them guilty just

7     because you were so horrified as a Catholic?

8               PROSPECTIVE JUROR NAVA:   Yes.

9               MS. ENDRIZZI:   Okay.   So what you said to me earlier,

10    that if the government didn't prove all of its -- all of the

11    elements that it had to prove and you said that you would find

12    the person not guilty, was that true?

Page 110

08-01-02 Vol 2.txt

13          I mean, what we're trying to get to here is can you be

14     fair?  And that's what everybody in this room wants.

15          PROSPECTIVE JUROR NAVA:   Uh-huh.

16          MS. ENDRIZZI:   We want a juror who can listen to the

17     facts, apply the law and, even if it's a tough call, if the

18     government doesn't prove up its burden beyond a reasonable

19     doubt --

20          PROSPECTIVE JUROR NAVA:   Uh-huh.

21          MS. ENDRIZZI:   -- they have to acquit.

22          PROSPECTIVE JUROR NAVA:   So you're asking if I can be

23     fair.

24          MS. ENDRIZZI:   Can you be fair?

25          PROSPECTIVE JUROR NAVA:   Yes.


KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347


                                                           130

1          MS. ENDRIZZI:   Okay.  Now there's a little bit of a

2     disconnect.

3          PROSPECTIVE JUROR NAVA:   Okay.

4          MS. ENDRIZZI:   Why don't you -- what concerns me is

5     when you said -- sorry.  I think maybe it was my poor question

6     when I asked you to put your faith aside.

7          PROSPECTIVE JUROR NAVA:   Uh-huh.

8          MS. ENDRIZZI:   Okay.  Everybody comes in here with who

9     they are, what they are, who they -- you know, soccer coach,

10     church or football coach or whatever.

11          Can you, you know -- and applying common sense, which

12     the judge will instruct you that you can use, can you listen

13     to the facts for all the witnesses and then hold the

14     government to what we have to prove and, if we met that

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

15    burden, find the person guilty, but if we didn't meet that

16    burden, find the person not guilty?

17          PROSPECTIVE JUROR NAVA:  I say yes.  But I know I'm

18    contradicting myself because of my faith, but yes.  I -- I

19    would say yes, I can -- I can --

20          MS. ENDRIZZI:  You can do that.

21          THE COURT:  When you say you may be contradicting

22    yourself, what do you mean?

23          PROSPECTIVE JUROR NAVA:  Well, because my faith, you

24    know, in my faith I believe that the Bible wasn't made to hurt

25    children.  And that's what I believe in, and there's nothing

KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

131

1     in there that justifies hurting children as far as I know, but

2     I don't read the whole Bible.

3           THE COURT:  Let's assume something just for purposes

4     of discussion.

5           PROSPECTIVE JUROR NAVA:  Okay.

6           THE COURT:  I don't know what the evidence is going to

7     be yet, but Ms. Endrizzi has talked about using the Bible to

8     justify having sex with children.  And suppose the evidence

9     were to show that the defendants not only did disgusting

10    things with children, had sex with children, but also used the

11    Bible and used the teachings of the Jewish faith and the

12    Mormon faith to justify what they were doing.

13          Okay.  Now if you assume that and assume that that's

14    what the evidence shows --

15          PROSPECTIVE JUROR NAVA:  Uh-huh.

16          THE COURT:  -- and assume that there's no question

Page 112

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

17    about it, but also assume the government has to prove one more

18    thing in order for the defendants to be proved guilty, and

19    that is the government has to prove that at the time a

20    defendant caused one of the children to go from one state to

21    another, the defendant intended that that child engage in an

22    unlawful sexual act.

23          Now, what if the government proves all those terrible

24    things about sex and using religion to justify sex but doesn't

25    prove the intent at the time the defendant caused the person

KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

132

1     to be transported in commerce.  Could you find the defendant

2     not guilty or would you still find the defendant guilty?

3          PROSPECTIVE JUROR NAVA:  Well, I would have to say

4     that I would still find him guilty.

5          THE COURT:  All right.

6          MS. ENDRIZZI:  Okay.  Nothing further.

7          THE COURT:  Any other questions?

8          MS. MARKS:  No thank you.

9          MR. LOCKE:  No, Your Honor.

10         THE COURT:  All right.  Any objection to excusing Mr.

11    Nava?

12         MR. LOCKE:  No, Your Honor.

13         MS. WHITE:  No, Your Honor.

14         THE COURT:  All right.  Mr. Nava, thank you very much

15    for coming.  We appreciate your candor.  It will not be

16    necessary for you to come back here on the 15th.  You're

17    excused.  I would ask only and instruct you that you not

18    discuss the case with the other prospective jurors and don't

Page 113

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

19    talk about the questions that you were asked or the answers

20    that you gave.  That's why we have everybody come in here

21    individually.

22              PROSPECTIVE JUROR NAVA:  I understand.  Yes, sir.

23              THE COURT:  Thank you very much.  Happy new year.

24              PROSPECTIVE JUROR NAVA:  So I'm free to go home?

25              THE COURT:  You're free to go.


KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

133

1              PROSPECTIVE JUROR NAVA:  All right.  Thank you.

2              THE COURT:  I want to tell the other jurors that we're

3     taking a lunch break so they don't sit in that jury room  You

4     can go out that way.  Any objection to my simply having the

5     Clerk go back into the jury room and tell the others to come

6     back at 1:30?

7              MS. WHITE:  No, that's fine, Your Honor.

8              MR. LOCKE:  That's fine, Your Honor.

9              MR. KAROWSKY:  That's fine.

10             THE COURT:  All right.

11             MS. MARKS:  Your Honor, could we leave our stuff here?

12             THE COURT:  Yes.  We'll be in recess until 1:30.

13             (Lunch recess taken at 12:05 p.m)

14                        ---o0o---

15

16

17

18

19

20

Page 114

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

21

22

23

24

25

KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

134

1                    SACRAMENTO, CALIFORNIA

2               WEDNESDAY, JANUARY 2, 2008, 1:30 P.M

3                          ---oOo---

4          (Out of the presence of prospective jurors.)

5               MS. WHITE:   Your Honor, during the break, just

6     before we reconvened, I spoke with opposing counsel about

7     Jurors 10 and 12 with the idea that perhaps we could agree,

8     stipulate, to excuse for cause.   They agree.

9               THE COURT:   Okay.

10              MS. WHITE:   Number 10, Mr. Parry, has a work

11    hardship.   He indicated on his questionnaire that he would

12    not be impartial due to his wife's victimization and abuse.

13    He also expressed concurrence of a tailbone accident that

14    he had as a youth and his inability to sit for long periods

15    of time.

16              As to Number 12, that juror who is Ms. Reshke, also

17    indicated some abuse issues.   But more importantly for the

18    government, she has family hardship.   Her aunt was recently

19    diagnosed as having bladder cancer.   She works part-time as

20    a police records specialist and indicated a need to care

21    for her aunt, as well as her mother, who also is in need of

Page 115

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

22    her care.

23            THE COURT:  Are you all in agreement that both --

24    is it Mr. Parry or --

25            MS. WHITE:  Mr. Parry.


CAPITOL REPORTERS (916) 923-5447


135


1            THE COURT:  -- Mr. Parry and Ms. Reshke could be

2    excused for cause?

3            MS. MARKS:  Yes, I am

4            THE COURT:  Have both of them come out, along

5    with Ms. Cano.  I will direct Ms. Cano to sit on the

6    witness stand and excuse the other two.

7            MS. WHITE:  Thank you, Your Honor.

8        (Prospective Jurors Parry, Reshke and Cano entered

9          courtroom)

10           THE COURT:  Ms. Cano, if you will sit in there.

11       Thank you.

12       Mr. Parry and Ms. Reshke, I've conferred with the

13   lawyers, and we are in agreement, that due to hardship

14   circumstances that you have described in your

15   questionnaires, that it will not be necessary for either of

16   you to remain.  So the two of you are excused.

17       Thank you for coming.

18       I believe that way.

19           THE CLERK:  Out through the front door.

20           THE COURT:  Easier to find your way out.  That is

21   a labyrinth back there.  You didn't leave anything in the

22   jury room, did you?

Page 116

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

23          (Prospective Jurors Parry and Reshke departed

24           courtroom)

25              THE COURT:  Ms. Canon, the lawyers are going to

CAPITOL REPORTERS (916) 923-5447

136

1   ask you some questions now.  We are going to start with

2   Mr. Locke who is the attorney for one of the defendants.

3              MR. LOCKE:  Good afternoon, Ms. Canon.

4              PROSPECTIVE JUROR CANO:  Good afternoon.

5              MR. LOCKE:  I am Bruce Locke.  I am one of

6   defense attorneys in the case.

7              THE COURT:  Is your microphone working?

8              MR. LOCKE:  Can you hear me?

9              PROSPECTIVE JUROR CANO:  Yes.

10             MR. LOCKE:  It is working.

11             THE COURT:  Yes.

12             MR. LOCKE:  Ms. Cano, you have a one-year-old

13  daughter?

14             PROSPECTIVE JUROR CANO:  Yes, I do.

15             MR. LOCKE:  In your jury questionnaire you

16  expressed it might be difficult for you to be on this case

17  because of your daughter?

18             PROSPECTIVE JUROR CANO:  Yes.

19             MR. LOCKE:  That is because you were told the

20  nature of the charges in this case?

21             PROSPECTIVE JUROR CANO:  Yes.

22             MR. LOCKE:  You thought that you might feel so

Page 117

08-01-02 Vol 2.txt

23    protective of your daughter that you would be inclined to

24    not be impartial in this case?

25              PROSPECTIVE JUROR CANO:   Yes.


CAPITOL REPORTERS (916) 923-5447


137

1              MR. LOCKE:   Let me just make sure that it is on

2    the record and crystal clear as to what we are talking

3    about.   Let me give you a situation where the evidence

4    comes into this case and it is clear that -- let's just

5    talk about one defendant for simplicity.   That one

6    defendant had oral and anal and vaginal sex with a minor.

7    And that's clear.   That you believe that was proved beyond

8    a reasonable doubt.

9         But the law provides that in this case the

10   government also has to prove that the minor, the child, was

11   transported across a state line by the defendant, and that

12   the defendant intended at the time that he transported the

13   child that the child would engage in criminal sex in the

14   new state that the child arrived in.   And criminal sex

15   would be any sex that the minor has with an adult.

16        Okay?

17              PROSPECTIVE JUROR CANO:   Uh-huh.

18              MR. LOCKE:   The situation is that it's clear that

19   this defendant had oral sex with the minor, vaginal sex

20   with the minor, anal sex with the minor.   But if the

21   government had no evidence that the defendant intended to

22   do that at the time that the child was transported from one

23   state to another, given the way that you feel, would it be

*Page 118*

08-01-02 Vol 2.txt

24    difficult for you to acquit the -- to find the defendant

25    not guilty in that kind of a situation?


CAPITOL REPORTERS (916) 923-5447



138

1              PROSPECTIVE JUROR CANO:   I think a portion of

2    whether they molested the child, I don't think I could be

3    impartial to that portion.   As far as you mentioned finding

4    them guilty of transporting them across state lines, that

5    would have to be, you know, depending what evidence was

6    presented.

7              MR. LOCKE:   It's one count.   In order to be

8    guilty at all, the government would have to prove that the

9    molestation occurred, and they would have to prove the

10   child was transported across a state line and the defendant

11   was transporting the child with the intent that the child

12   engage in sex, be molested.

13        Okay?

14             PROSPECTIVE JUROR CANO:   Uh-huh.

15             MR. LOCKE:   And the Judge would instruct that if

16   the government doesn't prove that the defendant had that

17   intent at that time, then you should find the defendant not

18   guilty.

19        Now, would you be able to vote somebody not guilty

20   when you knew that they had actually molested the child?

21             PROSPECTIVE JUROR CANO:   No.

22             MR. LOCKE:   You're sure of that?

23             PROSPECTIVE JUROR CANO:   Yes.

Page 119

08-01-02 Vol 2.txt

24          MR. LOCKE:   It is --

25          PROSPECTIVE JUROR CANO:   Because the way I feel

CAPITOL REPORTERS (916) 923-5447

139

1    towards children in general and they should be protected

2    and treated.

3          MR. LOCKE:   And the way parents should protect

4    their kids?

5          PROSPECTIVE JUROR CANO:   Yes.

6          THE COURT:   Ms. Marks, do you have any questions?

7

8          MS. MARKS:   I don't, Your Honor.

9          THE COURT:   Mr. Karowsky?

10         MR. KAROWSKY:   No, thank you, Your Honor.

11         THE COURT:   Does the government have any

12   questions?

13         MS. WHITE:   Just briefly, Your Honor.

14      Is it Ms. Cano or Cano?

15         PROSPECTIVE JUROR CANO:   Cano.

16         MS. WHITE:   Thank you for your honesty.   One

17   thing I just want to make clear.   Keep in mind that at the

18   end of this trial it's the Judge that gives you the law

19   that pertains to this case, not Mr. Locke, not me.   It is

20   the Judge.

21      As to each charge, as to each defendant, the Judge

22   would instruct you as to the law that you, as a prospective

23   juror, would apply to the facts that you hear in this case.

24   The facts would be delivered to you in the form of

Page 120

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

25    testimony and documents.


CAPITOL REPORTERS (916) 923-5447

140

1        Now, as the juror, it would be your job to be fact
2    finding based on the evidence that was presented to you
3    during the trial.  It is the Judge, though, who gives you
4    the law.  And as the juror, you would be sworn to follow
5    the law that the Judge gives you.  If the Judge told you
6    that in order for you to find one of the defendants guilty
7    of one of the charges, you would be required to find, say
8    three or four elements were present, you would have to find
9    beyond a reasonable doubt that all three of those elements
10   were present in the case where there were three elements of
11   the offense.
12       As Mr. Locke was trying to get you to understand, if
13   you found that two elements of the offense took place, but
14   not one, you would be required to find the defendant not
15   guilty, even if you heard evidence that that defendant
16   engaged in some pretty nasty stuff.
17       If we hadn't proven beyond a reasonable doubt as to
18   that one element that would be required, would you still
19   find the defendant guilty, as you told Mr. Locke you would?
20           PROSPECTIVE JUROR CANO:  I am a very honest
21   person and I do follow the law.  So it would be my best
22   intent to follow the law.  But, again, I have very strong
23   feelings in the protection of children, and I don't think
24   that I could.

Page 121

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt
25            MS. WHITE:  Thank you very much.


                 CAPITOL REPORTERS (916) 923-5447


                                                         141

1            Thank you, your Honor.
2                 THE COURT:  Any objection to excusing Ms. Cano?
3                 MS. WHITE:  No, your Honor.
4                 MR. KAROWSKY:  No.
5                 THE COURT:  Thank you, Ms. Cano.  Thank you for
6       coming.  It will not be necessary for you to return later.
7       You're excused.  Thank you very much.
8            (Prospective Juror Cano departed courtroom)
9                 THE COURT:  Bring in the next juror.
10           (Prospective Juror Ebert entered courtroom)
11                THE COURT:  Ms. Ebert, the lawyers are going to
12      ask you some questions now.  We will begin with the
13      attorney for the government Ms. Endrizzi.
14                MS. ENDRIZZI:  Good afternoon.
15                PROSPECTIVE JUROR EBERT:  Hi.
16                MS. ENDRIZZI:  Would you describe briefly what
17      are some of your responsibilities as a neurology
18      technician?
19                PROSPECTIVE JUROR EBERT:  I do brain wave studies
20      for people with seizures and strokes and whatnot.
21                MS. ENDRIZZI:  You evaluate those?
22                PROSPECTIVE JUROR EBERT:  I run the tests.  The
23      doctors evaluate.
24                MS. ENDRIZZI:  Do you remember the section in the
25      questionnaire that was entitled responsibilities and
                        Page 122

08-01-02 Vol 2.txt

CAPITOL REPORTERS (916) 923-5447

142

1    started about presumption of innocence?

2              PROSPECTIVE JUROR EBERT:   Uh-huh.

3              MS. ENDRIZZI:   I want to work through that.

4              PROSPECTIVE JUROR EBERT:   Okay.

5              MS. ENDRIZZI:   You had said that you would follow

6    the instruction that you would find the defendant in a

7    criminal trial presumed innocent of the charges against him

8    or her throughout the course of the trial unless or until

9    the jury reaches a verdict as to guilt or innocence.

10             Do you still believe that today?

11             PROSPECTIVE JUROR EBERT:   I think it would be

12   very difficult.

13             MS. ENDRIZZI:   You think it would be difficult?

14             PROSPECTIVE JUROR EBERT:   Yes.

15             MS. ENDRIZZI:   If the Judge told you that you

16   would have to do that, could you do that?

17             PROSPECTIVE JUROR EBERT:   I could follow the

18   Judge.  On a personal level it just cut to my core.

19             MS. ENDRIZZI:   You've gotten a preview of what

20   this case is about; it's ugly.

21             PROSPECTIVE JUROR EBERT:   Yes.

22             MS. ENDRIZZI:   There is no excuse for that.

23             PROSPECTIVE JUROR:   No, it is not pretty.

24             MS. ENDRIZZI:   That feeling is not --

25             MS. ENDRIZZI:   Pretty broad.

Page 123

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

CAPITOL REPORTERS (916) 923-5447

143

1           THE COURT:  Have you learned anything about this
2   case after you filled out the form?
3           PROSPECTIVE JUROR:   No, I did not go on line or
4   research anything.
5           MS. ENDRIZZI:  The next responsibility was not
6   discussing the case even with other jurors until sent back
7   to deliberate.
8       Can you still do that?
9           PROSPECTIVE JUROR EBERT:   (Witness nods head.)
10           MS. ENDRIZZI:  You need to give an oral answer.
11           PROSPECTIVE JUROR:   Yes.
12           MS. ENDRIZZI:  The next question is the big
13   question, is the burden of proof question.  The government
14   has the burden of proving, which means we have to prove all
15   the elements of each crime charged.
16           And if we prove all the elements beyond a reasonable
17   doubt, could you convict that person?
18   PROSPECTIVE JUROR EBERT:  Yes.
19           MS. ENDRIZZI:  You have a situation here where
20   you have -- give you a charge here.   Interstate transport
21   of a minor for sexual acts.  We have four elements.  Abuse,
22   under 18.  We prove all the steps and then there is a part
23   about having the intent for that child to travel across
24   state lines prior to their travel, before they engaged in
25   the sexual act.

Page 124

08-01-02 Vol 2.txt

CAPITOL REPORTERS (916) 923-5447

144

1          If the United States couldn't prove that to you

2     beyond a reasonable doubt, how would you vote?

3               PROSPECTIVE JUROR EBERT:  I want to stay neutral,

4     but you can't do that in this setting.

5               MS. ENDRIZZI:  Remember, that throughout the

6     Judge is going to give you the law.

7               PROSPECTIVE JUROR:  Right.

8               MS. ENDRIZZI:  And your job as a juror is to find

9     the facts and apply those facts to that law as he gives it

10    to you.  Now, if the Judge told you, like he will, that the

11    government has to prove all the elements each time beyond a

12    reasonable doubt, if they don't, you must find the person

13    not guilty.

14         Could you do that?

15              PROSPECTIVE JUROR EBERT:  Just being I never been

16    in a court situation before, this is all new to me.  But I

17    would follow the best of my ability.  And, yes, if anything

18    told me on that level that it didn't happen, I would have

19    to vote no.

20              MS. ENDRIZZI:  If it didn't?

21              PROSPECTIVE JUROR EBERT:  Right.

22              MS. ENDRIZZI:  You wouldn't?

23              PROSPECTIVE JUROR EBERT:  Put much weight on it.

24              THE COURT:  You said you want to stay neutral,

25    but you can't do that in this setting.  What did you mean?

Page 125

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

CAPITOL REPORTERS (916) 923-5447

145

1            PROSPECTIVE JUROR EBERT:  I've never been in a

2    setting like this.  You learn as you go along how this is

3    played out.  It's not your court TV trial.

4            THE COURT:  All right.

5            MS. ENDRIZZI:  You're right.  You had mentioned

6    in your questionnaire that you had been inappropriately

7    touched as a child?

8            PROSPECTIVE JUROR EBERT:  Yes

9            MS. ENDRIZZI:  Before we get into all that, we

10   have to ask the question.

11           PROSPECTIVE JUROR EBERT:  I am ready.

12           MS. ENDRIZZI:  What I will ask you to do is

13   summarize what happened to you, and if we need more details

14   I'll ask.  But otherwise I will let you summarize first.

15           PROSPECTIVE JUROR EBERT:  I was inappropriately

16   touched by my older brother.  I was about six.  He was

17   about 14.  It really didn't resurface with me until in my

18   twenties when he entered the picture again, and it was just

19   downhill from there.

20           MS. ENDRIZZI:  He had been out of your life?

21           PROSPECTIVE JUROR EBERT:  Right.

22           MS. ENDRIZZI:  Where did the touching occurring?

23           PROSPECTIVE JUROR EBERT:  When we were in

24   Seattle.

25           MS. ENDRIZZI:  I'm sorry, on your person.

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

CAPITOL REPORTERS (916) 923-5447

146

1          PROSPECTIVE JUROR EBERT:  It was sexual fondling.

2   It wasn't an intercourse situation.

3          MS. ENDRIZZI:  Breast area?  Vaginal?

4          PROSPECTIVE JUROR EBERT:  Vaginal.

5          MS. ENDRIZZI:  Obviously, you still carry that

6   with you?

7          PROSPECTIVE JUROR EBERT:  It never leaves you.

8          MS. ENDRIZZI:  Every juror in here is going to

9   come in with who they are.  But what we need to find out

10  today is whether or not you can apply the law as given to

11  the facts without bias in the sense of -- you had said your

12  brother hadn't been punished.

13         PROSPECTIVE JUROR EBERT:  Right.

14         MS. ENDRIZZI:  What we don't want to have happen

15  here is you punish a defendant for something that happened

16  to you a long time ago.  So could you apply those facts

17  that you will hear from witnesses, that you will see, to

18  the law that the Judge gives you, and, if the elements

19  aren't met, find the person not guilty?

20         PROSPECTIVE JUROR EBERT:  It is a tough question.

21  There is a twisting to them  But I can put my story aside

22  and focus on what is at hand.  I still think it would be

23  very emotional for me inside, turmoil.  But I don't project

24  it on anybody else.

25         MS. ENDRIZZI:  You said there was twisting?

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt
CAPITOL REPORTERS (916) 923-5447

147

1          PROSPECTIVE JUROR EBERT:  The way you are wording

2    things, it's tough.

3          MS. ENDRIZZI:  But you could keep your experience

4    separate?

5          PROSPECTIVE JUROR EBERT:  Separate       .

6          MS. ENDRIZZI:  Although it could cause emotional?

7

8          PROSPECTIVE JUROR EBERT:  Yes, I could.

9          MS. ENDRIZZI:  That is all I have for right now.

10         Thank you.

11         THE COURT:  Let me just ask a couple follow-up

12   questions on that last subject.  Assuming the Congress

13   speaks for the majority of the people, none of us like the

14   kind of conduct that Congress has made criminal.  But there

15   is a difference between that and having such an emotional

16   response to allegations that you're unable to focus on the

17   issues in a trial.

18         What I want to know is whether you're simply telling

19   us that this kind of conduct, which is alleged, is

20   repugnant to you or whether you're going further and

21   telling us that repugnance creates such an emotional

22   response in you that you have described as turmoil that you

23   may not be able to do your job as a juror and

24   dispassionately decide the case based on the evidence.

25         PROSPECTIVE JUROR EBERT:  I think any time --

CAPITOL REPORTERS (916) 923-5447

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

148

1    anybody who has been abused can never put it aside.

2            THE COURT:  Do you think that?  If you were in

3    the position of the defendants charged with these crimes or

4    if you were in the position of the United States Attorney

5    charged with the responsibility of presenting the evidence

6    on behalf of the government, you would be satisfied to have

7    your case heard by 12 jurors who are in the frame of mind

8    that you presently have?

9    PROSPECTIVE JUROR EBERT:  No.

10           THE COURT:  Only you can tell us your frame of

11   mind.  Other people can tell us what they think.  Only you

12   can tell us what your frame of mind is.

13           PROSPECTIVE JUROR EBERT:  Truthfully, when I left

14   here a month ago, it rocked my boat for several days.  It

15   really cut to the core of me, and I don't feel I can be

16   impartial.  Bottom line, you want to be a juror and do your

17   civil duty.  I just think it would just -- it would be

18   emotionally devastating to me.

19           MS. ENDRIZZI:  Thank you.

20           THE COURT:  Does anybody have any objection to

21   excusing Ms. Ebert?

22           MS. WHITE:  None whatsoever.

23           THE COURT:  Thank you, Ms. Ebert.  Thank you for

24   your candor.  You are excused.

25           PROSPECTIVE JUROR EBERT:  Thank you.

CAPITOL REPORTERS (916) 923-5447

Page 129

08-01-02 Vol 2.txt

149

1          THE COURT:  Would you rather leave this way?

2    That is like a maze, unless you left your purse.

3          PROSPECTIVE JUROR EBERT:  I can go out this way,

4    straight out?

5          THE COURT:  Yes.

6          PROSPECTIVE JUROR EBERT:  Thanks.

7          THE COURT:  Push harder.

8       (Prospective Juror Ebert departed courtroom)

9          MR. LOCKE:  One side opens and the other doesn't.

10

11         THE COURT:  Can you fix that so both doors open?

12      (Prospective Juror Gentili entered courtroom)

13         THE COURT:  Are you, Mr. Gentili?

14         PROSPECTIVE JUROR GENTILI:  Yes, sir.

15         THE COURT:  Mr. Gentili, the lawyers are going to

16   ask you some questions.  I'm going to leave it up to them

17   We will start with the lawyer for one of the defendants.

18   This is Mr. Locke.

19         MR. LOCKE:  Afternoon, Mr. Gentili.

20         PROSPECTIVE JUROR GENTILI:  Afternoon.

21         MR. LOCKE:  As the Judge said, I am Bruce Locke.

22   I am one of the defense attorneys in the case.

23       I notice from your questionnaire that you have three

24   children; is that right?

25         PROSPECTIVE JUROR GENTILI:  Two children and four

CAPITOL REPORTERS (916) 923-5447

Page 130

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

150

1     grandchildren.

2                 MR. LOCKE:  You obviously love your children,

3     right?

4                 PROSPECTIVE JUROR GENTILI:  Yes, sir.

5                 MR. LOCKE:  And your grandchildren?

6                 PROSPECTIVE JUROR GENTILI:  Yes, sir.

7                 MR. LOCKE:  You would feel that it would be a

8     parent's duty to protect their child?

9                 PROSPECTIVE JUROR GENTILI:  That is correct.

10                MR. LOCKE:  Am I correct that your wife is a

11    kindergarten teacher?

12                PROSPECTIVE JUROR GENTILI:  Yes.

13                MR. LOCKE:  She is dealing with kids all the

14    time?

15                PROSPECTIVE JUROR GENTILI:  Yes, sir.

16                MR. LOCKE:  Are you involved in any way?

17                PROSPECTIVE JUROR GENTILI:  In the classroom?

18                MR. LOCKE:  Yes.

19                PROSPECTIVE JUROR GENTILI:  Yes, I am  I

20    recently retired from my job.  I go in periodically and

21    help her in the classroom

22                MR. LOCKE:  Sort of a teacher's aide?

23                PROSPECTIVE JUROR GENTILI:  Correct.

24                MR. LOCKE:  In the kindergarten class?

25                PROSPECTIVE JUROR GENTILI:  Yes.

CAPITOL REPORTERS (916) 923-5447

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

151

1          MR. LOCKE:   You are used to dealing with kids
2    that are, what, five and six years old?
3          PROSPECTIVE JUROR GENTILI:   Yes.
4          MR. LOCKE:   You know the nature of this case, the
5    charges in this case?
6          PROSPECTIVE JUROR GENTILI:   Yes, sir.
7          MR. LOCKE:   That there are allegations and there
8    is going to be testimony and allegations that the
9    defendants or some of them had oral sex, anal sex and
10   vaginal sex with minors.
11         PROSPECTIVE JUROR GENTILI:   Yes, sir.
12         MR. LOCKE:   There is going to be publicity about
13   this case.   So people are going to know if you get selected
14   to be on the jury, that you are on the jury and eventually
15   learn that you are on this jury.
16       Do you understand that?
17         PROSPECTIVE JUROR GENTILI:   Yes.
18         MR. LOCKE:   The government in this case is
19   required to prove that -- I am going to use the example of
20   one defendant.
21         PROSPECTIVE JUROR GENTILI:   Okay.
22         MR. LOCKE:   It is easier to deal with.   That the
23   defendant transported a minor child across state lines with
24   the intent that that minor child have sex with a adult in
25   the new state.

CAPITOL REPORTERS (916) 923-5447

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

152

1          Okay?

2          PROSPECTIVE JUROR GENTILI:  Yes, sir.

3          MR. LOCKE:  I want you to assume that it's clear,

4    the evidence is clear that a defendant did have sex with

5    that child, anal sex, oral sex, vaginal sex with that

6    child.  But there is no evidence that the defendant

7    intended that at the time that the child was transported

8    from one state to the other.

9          Okay.  You understand?

10          PROSPECTIVE JUROR GENTILI:  I believe so.

11          MR. LOCKE:  And the Judge at the end of the case

12    will tell you that the government has to prove beyond a

13    reasonable doubt that that intent existed.

14          Given the nature of what happened to the child and

15    given your feelings about children and what your wife does,

16    would you find it difficult to acquit, find the defendants

17    not guilty in that circumstance?

18          PROSPECTIVE JUROR GENTILI:  If it was beyond a

19    shadow of doubt that they did not intend that to happen, I

20    realize that things happen that can't be stopped, and I

21    would be able, I believe.

22          THE COURT:  Let's clarify this.  You have never

23    sat on a jury before?

24          PROSPECTIVE JUROR GENTILI:  No, sir.

25          THE COURT:  The test is beyond a reasonable

CAPITOL REPORTERS (916) 923-5447

153

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

1    doubt.   And the burden is upon the government to prove the

2    case beyond a reasonable doubt.   The defense has no burden

3    to prove any facts or call any witnesses or to present any

4    evidence.

5            PROSPECTIVE JUROR GENTILI:   Okay.

6            THE COURT:   The question to you would be:   If the

7    government fails to prove the interstate or the intention

8    at the time that the interstate transportation occurred,

9    would you have any hesitance in finding the defendants not

10   guilty?   That is the question.   What would your answer be?

11       If the government doesn't prove that beyond a

12   reasonable doubt, would you have any hesitance in finding

13   the defendants not guilty?

14           PROSPECTIVE JUROR GENTILI:   That would be you

15   explaining the law as you mentioned earlier?

16           THE COURT:   I would explain the elements that the

17   government has to prove.

18           PROSPECTIVE JUROR GENTILI:   We have to go by the

19   way that you tell us, correct?

20           THE COURT:   You have to follow the Court

21   instructions.

22           PROSPECTIVE JUROR GENTILI:   Yes.

23           THE COURT:   What is behind this question

24   Mr. Locke is asking is whether you could literally follow

25   the questions I give you in light of how terrible the

CAPITOL REPORTERS (916) 923-5447

154

Page 134

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

1    evidence might be.

2             PROSPECTIVE JUROR GENTILI:   That would be

3    difficult, but I would try my best.

4             MR. LOCKE:   It would be difficult for you to do?

5             PROSPECTIVE JUROR GENTILI:   Yes, sure.

6             MR. LOCKE:   Given who you are and what you have

7    done in your life, and the kids that you have, and

8    grandkids that you have, and I imagine your wife has

9    hundreds and hundreds of kids she considers as her kids.

10            PROSPECTIVE JUROR GENTILI:   Right.

11            MR. LOCKE:   It would -- you wouldn't be able to

12   get rid of that inside you and decide this case without

13   that having that effect; is that what you are telling us?

14            PROSPECTIVE JUROR GENTILI:   I want the innocent

15   person to be found innocent and I would want the guilty

16   person to be found guilty.

17            MR. LOCKE:   And my example is one defendant

18   clearly did have sex with a minor.  But there is no

19   evidence that he intended it at the time that the minor

20   crossed state lines.  You understand the difficulty of what

21   I am trying to describe to you?  Clearly they molested the

22   child, but technically they didn't violate the federal law.

23            And the question:  Would you have difficulty finding

24   that defendant not guilty?

25            PROSPECTIVE JUROR GENTILI:   I believe so.

CAPITOL REPORTERS (916) 923-5447

155

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

1          MR. LOCKE:   That is based on who you are and --

2          PROSPECTIVE JUROR GENTILI:   Yes.

3          MR. LOCKE:   -- your history?

4          PROSPECTIVE JUROR GENTILI:   Yes.

5          MR. LOCKE:   And there isn't anything that you

6    could do to put that out of your mind, just the effect on

7    you?

8          PROSPECTIVE JUROR GENTILI:   It would, yes.

9          MR. LOCKE:   In a situation where, say, there was

10   a little bit of evidence that the defendant might have

11   intended that, but not evidence beyond a reasonable doubt,

12   you would be inclined to convict them?

13         PROSPECTIVE JUROR GENTILI:   Yes, sir.

14         MR. LOCKE:   I have no further questions.

15         THE COURT:   Ms. Marks, any questions?

16         MS. MARKS:   I do, Your Honor.   Thank you.

17      Good afternoon, sir.   My name is Caro Marks.   I

18   represent Mr. La Brecque over there.   I am going to ramp

19   this up a little bit and get kind of graphic.   I just want

20   to ask you to make me a promise, which is if I say anything

21   that leaves you with haunting, ghastly thoughts or images

22   and you end up on the jury, please don't blame

23   Mr. La Brecque for what I am about to say here today.

24         PROSPECTIVE JUROR GENTILI:   Okay.

25         MS. MARKS:   We have a deal.   I read your

CAPITOL REPORTERS (916) 923-5447

156

1    questionnaire.   I want to now focus for a little bit on

Page 136

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

2      your Bible study.

3                    PROSPECTIVE JUROR GENTILI:   Yes.

4                    MS. MARKS:   I know this is personal, but you

5      understand this whole, unreal scenario we are in is very

6      personal?

7                    PROSPECTIVE JUROR GENTILI:   Yes.

8                    MS. MARKS:   I wouldn't talk to you about this if

9      I met you on the street.   I have to represent my client.

10           I noticed that you go to church every Sunday.

11                   PROSPECTIVE JUROR GENTILI:   Yes.

12                   MS. MARKS:   That you -- your writing is a little

13     hard to read -- but it says, Bible Study Fellowship?

14                   PROSPECTIVE JUROR:   Yes, Bible Study Fellowship

15     International.

16                   MS. MARKS:   What is that?

17                   PROSPECTIVE JUROR GENTILI:   Worldwide

18     Non-Denominational Bible Study.

19                   MS. MARKS:   Then is that the worship team, or is

20     that a second?

21                   PROSPECTIVE JUROR GENTILI:   No, that is separate.

22                   MS. MARKS:   What is that?

23                   PROSPECTIVE JUROR GENTILI:   The worship team is

24     where we play music at church.   So I play percussion.

25                   MS. MARKS:   You have been a church goer most of

CAPITOL REPORTERS (916) 923-5447

157

1      your life?

Page 137

PDF created with pdfFactory trial version www.pdffactory.com

**08-01-02 Vol 2.txt**

2          PROSPECTIVE JUROR GENTILI:   Yes.

3          MS. MARKS:   That is pretty important to you?

4          PROSPECTIVE JUROR GENTILI:   Yes.

5          MS. MARKS:   Have you read the Bible?

6          PROSPECTIVE JUROR GENTILI:   Yes.

7          MS. MARKS:   That is pretty important to you?

8          PROSPECTIVE JUROR GENTILI:   Yes.

9          MS. MARKS:   I'm going to take some of the

10    questions Mr. Lock asked you and ramp them up a little bit.

11    The evidence to be somewhat worse than some of the words

12    that he used.   For instance, I want to run some examples by

13    you.   I am going to ask how you feel about them

14          If there were evidence that in the name of religion,

15    which combined Mormon and Judaism, that adults in this

16    religion have sex with children, with some specific

17    factors, such as after oral sex, children as young as seven

18    or eight were required to drink semen out of condoms or

19    lick semen off an adult male, as an instance; or say there

20    were evidence that, in order to become indoctrinated into

21    this religion, an adult male needed to be masturbating in

22    front of his children, his own children, when they were as

23    young as seven years old.   Or, hypothetically, an adult man

24    in this religion was made to -- well, voluntarily

25    ejaculated on his own children.   Or if there were evidence

158

1    that adult people in this so-called religion had sex with

2    their own children and took pictures of it, including two

Page 138

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

3    of their own daughters having sex with one of their

4    parents, all in the name of religion, all with Biblical

5    overtones or with overtones to a higher power called my

6    lord, who might very well be one of these people in this

7    courtroom  What does that make you feel when you think

8    about sitting on a jury with that kind of evidence?

9

10            PROSPECTIVE JUROR GENTILI:  The fact that that is

11   happening to the children is not right, and the fact that

12   what they believe, according to what I believe, is that

13   their beliefs are not according to my beliefs.  So I am

14   taking it out of context, I guess you would say.

15            MS. MARKS:  How does it make you feel as a

16   spiritual and religious man, the prospect of listening to

17   that kind of evidence and trying to be fair in your

18   deliberating on a verdict with that kind of evidence being

19   heard by you?

20            PROSPECTIVE JUROR GENTILI:  Makes me sad for both

21   the adult and the child.

22            MS. MARKS:  Would it affect your ability to stay

23   neutral when you evaluating the evidence?

24            PROSPECTIVE JUROR GENTILI:  It would be something

25   I would try to do.


CAPITOL REPORTERS (916) 923-5447



                                                        159


1            MS. MARKS:  Would it be very hard?

2            PROSPECTIVE JUROR GENTILI:  I think it would be

Page 139

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

3   difficult, but I would try.

4            MS. MARKS:  Let me ask you this question.   I

5   think Mr. Lock was getting at this a little earlier.

6   Suppose that all of this evidence that I was just talking

7   about came in, evidence of licking semen off penises and

8   drinking semen out of condoms and young children testifying

9   hypothetically they had given their own parents oral sex

10  over 400 times.   Ghastly stuff.

11           Okay?

12           PROSPECTIVE JUROR GENTILI:   Uh-huh.

13           MS. MARKS:   And then the attorney for the

14  defendants said to you, "Look, that did happen.   Clearly it

15  happened."   You believe it happened, but, aha, we have a

16  loophole here.   Because on this one date when one of these

17  defendants sends his children on an airplane to another

18  state, he didn't know that that was going to happen.

19  Right, what you might call a loop hole, a technicality.

20           In the face of all that grotesque evidence, how are

21  you going to handle that technicality when Judge Shubb

22  instructs you on the law?  How are you going to be able to

23  put that technicality in the face of all that horrible

24  evidence?

25           PROSPECTIVE JUROR GENTILI:   I have a question.


CAPITOL REPORTERS (916) 923-5447



160


1            MS. MARKS:   Okay.

2            PROSPECTIVE JUROR:   The way I understand it is

3   that the child and the parents have already committed these

Page 140

08-01-02 Vol 2.txt

4    acts.

5              MS. MARKS:  Let's just pretend that you believe

6    that that is the case.

7              PROSPECTIVE JUROR GENTILI:  If the case is that

8    the parents and children committed these acts and then you

9    are telling me that the same children went across state

10   lines and performed the same act with somebody else, not

11   their parents, but it wasn't intended for them to do that?

12             MS. MARKS:  Yes.  We say to you, well, even

13   though -- say, I say even my client committed those gross

14   acts, he didn't know when he sent those children to the

15   other people that those acts were going to happen, would

16   you be able to neutrally evaluate my saying that when you

17   knew about all these other horrible acts that had happened?

18

19             PROSPECTIVE JUROR GENTILI:  That would be

20   difficult because, if the parents are doing it with their

21   children first, that is wrong, in my opinion,  and that if

22   they are sending their children to somebody that they know,

23   I would think that the people that they know that they are

24   sending their children to know about what's going on, so

25   that would pretty much leave the door wide open.


CAPITOL REPORTERS (916) 923-5447



161

1         MS. MARKS:  So are you saying that it would be -- that

2    you couldn't vote not guilty under those circumstances

3    because of the nature of the acts that I have already

Page 141

08-01-02 Vol 2.txt

4    described, that we were going to assume happened for

5    purposes of my question?

6              PROSPECTIVE JUROR GENTILI:   (No response.)

7              MS. MARKS:   I didn't ask that very well.

8              THE COURT:   Let me understand.   If we just

9    changed the facts a little bit in this hypothetical

10   question.   Bear in mind there is no evidence yet.   We are

11   just hypothetically talking about what might be the

12   evidence.   But suppose the evidence was all these things

13   that Ms. Marks has just described occurred between the

14   parents and their children in Sacramento, and then they

15   sent their children out of state, not to somebody that they

16   knew, let's say, to go to school or to go to vacation, and

17   then it happened.

18         How would you look at the evidence then?   And then

19   would you be able to find the defendants not guilty, if the

20   government hadn't proved that they had the intent for the

21   children to engage in sexual actions when they sent them

22   across the state line?

23             PROSPECTIVE JUROR GENTILI:   Okay.   So I can't --

24   what you are saying is that because the parents sent the

25   children there for vacation or for school or whatever, I

CAPITOL REPORTERS (916) 923-5447

162

1    can't say that the parents are guilty because of what

2    somebody else did, but because the parents weren't there;

3    is that correct?

4              THE COURT:   Well, I'm trying to -- you made a

Page 142

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

5    good observation, and you talked about something that we

6    call circumstantial evidence.  I am trying to get that out

7    of the picture and find out whether the reason that you

8    might have difficulty finding the defendant not guilty is

9    because you think, under the hypothetical, there is

10   evidence that they intended that this occur, or whether you

11   just think that it should be so influenced by what occurred

12   here in California that you'd find them guilty, even if

13   there was no evidence of what they intended the children to

14   do after they left California.

15          PROSPECTIVE JUROR GENTILI:  If there is no

16   evidence that they intended that, I would have to find them

17   not guilty, if there is no evidence.

18          THE COURT:  Even though you knew they had done

19   all these terrible things to the children here in

20   California?

21          PROSPECTIVE JUROR GENTILI:   Yes, sir.

22          THE COURT:  Would you -- you would be able to

23   find them not guilty?

24          PROSPECTIVE JUROR GENTILI:  I would hope that I

25   could.


CAPITOL REPORTERS (916) 923-5447

                                                    163

1           MS. MARKS:  Let me --

2       Can I follow up?

3           THE COURT:  Yes.

4           MS. MARKS:  I am going to try to simplify this,

Page 143

08-01-02 Vol 2.txt

5    although I think Judge Shubb did that well, did simplify

6    it.

7            If the charge against one of these defendants is

8    that on July 15th, he sent a child to another state for

9    sexual purposes, and you knew beyond all doubt that all of

10   these horrible, ghastly things described had already

11   happened.  And the government proved that not on July 15th,

12   but on July 16th is when they sent those kids on those

13   planes, could you still vote not guilty if the Judge told

14   you you have to find this happened on July 16th, but really

15   it happened on July 15th?

16           THE COURT:  Wait, wait.  No, no.  On or about.

17   Remember?

18           MS. MARKS:  Right, of course, Your Honor.

19           THE COURT:  Not a good hypothetical.

20           MS. MARKS:  Jan, do you want to?

21           THE COURT:  Mr. Karowsky.

22           MR. KAROWSKY:  Thank you, your Honor.

23           THE COURT:  Mr. Karowsky is going to ask you some

24   questions now.

25           MR. KAROWSKY:  I think what Ms. Marks is trying

CAPITOL REPORTERS (916) 923-5447



                                                     164


1    to get at, and we are very uncomfortable doing this.

2    Please understand that.  And I understand you're not

3    pleased sitting there; it's very stylized to do this.

4            I think the real question is this:  You work with

5    kids and kids are very important to you?

                        Page 144

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

6          PROSPECTIVE JUROR GENTILI:  Yes, sir.

7          MR. KAROWSKY:  You have children, your own

8     children and grandchildren.  It makes all of us irate to

9     believe and understand that these kinds of acts take place

10    against children.

11         That upsets you, doesn't it?

12         PROSPECTIVE JUROR GENTILI:  Yes, sir.

13         MR. KAROWSKY:  It should.  It upsets all of us.

14    I think the question really is that with that level of

15    upset and that intimacy with children that you have on a

16    positive basis, is that going to sway you so much that you

17    are so upset about the fact that the molest took place,

18    that it doesn't make any difference whether there is

19    evidence or not; you are going to convict them because they

20    committed those disgusting acts?

21         PROSPECTIVE JUROR GENTILI:  That would be a

22    possibility.

23         MR. KAROWSKY:  I understand that.  I appreciate

24    your honesty.  That is the difficulty, is that if this were

25    -- I noticed that you had your house burglarized back in


CAPITOL REPORTERS (916) 923-5447



                                                   165


1     '80s.  So --

2          PROSPECTIVE JUROR GENTILI:  Yes.

3          MR. KAROWSKY:  If you were sitting here on, say,

4     with a DUI, drunk driving, for example, if you have no

5     prior background, no drunk driver's harmed your child, no

Page 145

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

6   burglaries -- you could be neutral and clear, right?

7          PROSPECTIVE JUROR GENTILI:  Yes.

8          MR. KAROWSKY:  You could listen to a drunk

9   driving case and be fair?

10          PROSPECTIVE JUROR GENTILI:  And I would hope I

11  could be neutral and fair in a trial like this.

12          MR. KAROWSKY:  I would hope so, too.  We would

13  all hope so.  We all want to think we are fair and

14  impartial.  There are some things that are not fair and

15  impartial.  I like the Giants baseball team  I am not fair

16  and impartial when it comes to the Giants baseball team

17          THE COURT:  That is a problem

18          MR. KAROWSKY:   I also like the River Cats, Your

19  Honor.

20       What I am trying to get to:  There are certain

21  things in your life that you're a fan of, you're partial

22  to.  You are not neutral or impartial -- you are partial to

23  children.  Appropriate and  understandable.  That

24  partiality is what I think you are telling us is going to

25  sway you.  So it is going to be very, very difficult in

CAPITOL REPORTERS (916) 923-5447



166

1   this case to look at the evidence neutrally, or, whereas,

2   in any other case maybe you could look at much more -- you

3   could look at it neutrally, whereas, in this case you

4   can't.

5       Is that what you are saying?

6          PROSPECTIVE JUROR GENTILI:  What I am trying to

Page 146

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

7      say is that I would try to be as honest as I could.   And

8      like the Judge was saying, what he said about the law.   But

9      granted, I would not feel good about everything that has

10     happened and what I am being told.

11               MR. KAROWSKY:  I understand.   None of us probably

12     are going to feel good about it.   But the question, really,

13     that you have to ask, and I think the -- trying to put

14     yourself in the context, and this following question may be

15     helpful to crystallize it.

16               Imagine yourself, that you're a defendant on trial

17     here, and the question is:   Would you be comfortable with a

18     juror with your state of mind?  From the perspective of the

19     defense and prosecution, would you be comfortable sitting

20     here as a defendant knowing what your state of mind

21     currently is, that you would get a fair and impartial

22     trial?

23               PROSPECTIVE JUROR GENTILI:   I would hope so.

24               MR. KAROWSKY:  Can you tell us, though, that you

25     know that you can do that?


CAPITOL REPORTERS (916) 923-5447



167


1                PROSPECTIVE JUROR GENTILI:   Be fair and

2      impartial?

3                MR. KAROWSKY:   In this case with these kinds of

4      facts.

5                PROSPECTIVE JUROR GENTILI:   Would like to, but it

6      would be difficult.

Page 147

08-01-02 Vol 2.txt

7         MR. KAROWSKY:  Let me ask you this:  You are a

8    man with who is religious?

9         PROSPECTIVE JUROR GENTILI:  Yes, sir.

10        MR. KAROWSKY:  And you read the Bible and you

11   understand some interpretations of the Bible?

12        PROSPECTIVE JUROR GENTILI:  Yes, sir.

13        MR. KAROWSKY:  If you believe the interpretations

14   of the Bible are being perverted, based on the evidence you

15   might hear, is that going to push you further over towards

16   it is difficult and make it even more difficult to vote, on

17   a technical basis, that the defendant is not guilty because

18   a technical element hasn't been proven?

19        PROSPECTIVE JUROR GENTILI:  I would hope not.

20        MR. KAROWSKY:  I would hope not also.  We all

21   want to believe that we are fair and impartial.  There are

22   times that we aren't.  I think the question for you, sir,

23   is:  Is this one of those times?  Is this one of those

24   cases because of your unique combination of positive things

25   you do in your life: help children, teach children, protect


CAPITOL REPORTERS (916) 923-5447



168


1    children, think of children, go to -- treat others the way

2    you would like to be treated, is this going to be so

3    difficult that you just don't want to do it?

4         Just because you are here doesn't mean you have to

5    be here.  You can say I just can't do it in this case.

6    That is really the question.

7         PROSPECTIVE JUROR GENTILI:  I am not saying that

Page 148

08-01-02 Vol 2.txt

8    I don't want to be on the jury, if that is what you are

9    asking.

10           MR. KAROWSKY:  No, no.  I don't think --  if we

11   could all be on a beach, we would all rather be there.  I

12   think the real question is:  Is this going to be so

13   difficult that you are not sure in your own mind right now

14   that you can do it?

15           PROSPECTIVE JUROR GENTILI:  I just know that it

16   would be difficult.

17           MR. KAROWSKY:  So difficult that you prefer not

18   to do it?

19           PROSPECTIVE JUROR GENTILI:  If I prefer not to

20   do, I would tell you I'd rather not do it.  I won't say

21   that.

22           MR. KAROWSKY:  The graphic images that Ms. Marks

23   was talking about, is that something that is going to --

24           PROSPECTIVE JUROR GENTILI:  That is going to be

25   disturbing, as the Judge mentioned.


CAPITOL REPORTERS (916) 923-5447



                                                    169


1            MR. KAROWSKY:  Disturbing, so that it is going to

2    make it even more difficult for you to vote in a fair and

3    neutral and impartial --

4            PROSPECTIVE JUROR GENTILI:  Possibly, yes, sir.

5            MR. KAROWSKY:  May I just have one moment, Your

6    Honor?

7            THE COURT:  Yes.

Page 149

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

8          MR. KAROWSKY:   So let me ask you this question:

9     You understandably and appropriately want to protect and

10    love children, you say?

11             PROSPECTIVE JUROR GENTILI:   Yes, sir.

12             MR. KAROWSKY:   You are religious?

13             PROSPECTIVE JUROR GENTILI:   Yes, sir.

14             MR. KAROWSKY:   And you have a deep and abiding

15    faith?

16             PROSPECTIVE JUROR GENTILI:   Yes, sir.

17             MR. KAROWSKY:   Can you set aside the issues that

18    make it difficult for you to -- make it difficult, as you

19    have described the issues that make it difficult for you to

20    vote, for example, for not guilty on the examples that we

21    have given.  Can you set those aside and assure us that you

22    can be fair and impartial?

23             PROSPECTIVE JUROR GENTILI:   I would think because

24    of my religious beliefs it would make me be fair and

25    impartial.

CAPITOL REPORTERS (916) 923-5447

170

1              MR. KAROWSKY:   Are you going to be able to -- I

2     notice your stepfather is a police officer and somebody

3     else was in Air Force?

4              PROSPECTIVE JUROR GENTILI:   My stepbrother.

5              MR. KAROWSKY:   If -- are you going to find it

6     difficult if you vote, for example, on a hypothetical

7     basis, for not guilty in this case, are you going to have

8     difficulty going back to your church and going back to your

Page 150

**08-01-02 Vol 2.txt**

9  relatives and telling them you had to vote that way because

10  the government, for example, did not prove one of the

11  required requirements of their case?

12          PROSPECTIVE JUROR GENTILI:  That would probably

13  be difficult.

14          MR. KAROWSKY:  That makes it even more difficult

15  because you can live with yourself, but it may be difficult

16  to live with others based on that kind of situation; is

17  that what you are telling me?

18          PROSPECTIVE JUROR GENTILI:  I am not sure on what

19  exactly you are saying that I would have to --

20          MR. KAROWSKY:  How about I rephrase it?  Let's

21  assume that the press describes all these sex acts with

22  kids.  And people you know that are on this jury, and you

23  find because -- that you have to vote for not guilty.  Is

24  that going to then -- and that not guilty vote, you go back

25  and they say, "What are you doing?  What could you possibly

**CAPITOL REPORTERS (916) 923-5447**



171


1  have been thinking?"  Are you going to have difficulty

2  voting not guilty because you're anticipating you are going

3  to take some heat from the people you know and love in law

4  enforcement and the people in your church?

5  PROSPECTIVE JUROR GENTILI:  That is where I guess I would

6  have to ask the Judge for explanation because he mentioned

7  earlier today about not what I think the law says, but what

8  he tells me it says.

**Page 151**

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

9          MR. KAROWSKY:  That gets to it.  Will you be

10    able, when it comes down to crunch time, to follow the law

11    precisely, not let your emotions override what the law

12    tells you to do?

13          PROSPECTIVE JUROR GENTILI:  That would be a

14    difficult thing, but I guess that's what I am supposed to

15    do on a jury.

16          MR. KAROWSKY:  Can you do that?

17          PROSPECTIVE JUROR GENTILI:  I think I could.

18          MR. KAROWSKY:  Will you do that?

19          PROSPECTIVE JUROR GENTILI:  I hope I could.

20          THE COURT:  Ms. White.  Didn't know who is going

21    to stand up first.  Ms. White is going to ask you

22    questions.

23          MS. WHITE:  Good afternoon, sir.  I am Laurel

24    White.  I am with the U.S. Attorney's Office.

25          Mr. Locke and Ms. Marks and Mr. Karowsky have been


CAPITOL REPORTERS (916) 923-5447


                                                       172

1    asking whether it would be difficult for you to make these

2    kinds of decisions with respect to guilt or innocence,

3    based on your history and your wife's history as a

4    kindergarten teacher and your love of children and your

5    faith.  I suspect it is going to be difficult, given the

6    nature of the evidence and the seriousness of the

7    allegations, and perhaps it should be difficult, because

8    these are serious issues.

9          Given the difficulty of it, the question I have,

                          Page 152

08-01-02 Vol 2.txt

10    which we all, I think, will concede, is whether you will

11    bring a fresh mind, given your experiences and your

12    background, to the testimony and have the witnesses and the

13    evidence presented to you and analyze the testimony of the

14    witnesses and that documentary evidence which you will have

15    a chance to review, if is admitted into evidence, and then

16    make factual findings based on that.  Can you do that?

17         PROSPECTIVE JUROR GENTILI:  Yes, ma'am

18         MS. WHITE:  Then you can take those facts that

19    you believe took place in this case, apply them to the law

20    that Judge Shubb is going to give to you?  Do you think you

21    can do that?

22         PROSPECTIVE JUROR GENTILI:  I think so.

23         MS. WHITE:  If the Judge tells you that as to,

24    say, one charge, interstate travel with intent to engage in

25    unlawful sex with a minor, if he tells you as to that

CAPITOL REPORTERS (916) 923-5447

173

1    charge that there are several elements, one of which is

2    that the government has to prove that the defendant who is

3    charged with that offense had the intent that the child

4    engage in sexual conduct before the completion of that

5    transportation, and if the government fails to prove that

6    element, and if he instructs you that you have to find all

7    of the elements of the offense beyond a reasonable doubt,

8    that we failed to do one of those, would you be able to

9    find the defendant not guilty?

Page 153

PDF created with pdfFactory trial version www.pdffactory.com

**08-01-02 Vol 2.txt**

10          PROSPECTIVE JUROR GENTILI:   That would be

11    difficult.

12          MS. WHITE:   Would you be able to follow the law

13    that the Court gave you, even given the difficulty of

14    making that kind of decision, because that is what the law

15    is and you promised to follow the law?

16          PROSPECTIVE JUROR GENTILI:   Yes.   That is what I

17    said earlier.   If he explains it, that is what I would try

18    to do.   Yes, ma'am

19          MS. WHITE:   I have nothing further.

20          Thank you.

21          THE COURT:   Mr. Gentili, if you will step

22    outside.   The marshal will show you a room that you can

23    stay in for about two minutes while the lawyers and I

24    decide whether we are going to ask you to come back on

25    January 15th.


**CAPITOL REPORTERS (916) 923-5447**

174

1          Do you have any of your belongings back in that room

2    there?

3          PROSPECTIVE JUROR GENTILI:   No.   I have

4    everything.

5          THE COURT:   Good.

6          (Prospective Juror Gentili departed courtroom)

7          THE COURT:   Mr. Gentili is outside the courtroom

8    Is there any challenge for cause?

9          MR. LOCKE:   Yes, your Honor.

10         THE COURT:   What is the basis of your challenge?

Page 154

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

11    Can you cite to any specific answers of Mr. Gentili or

12    anything else about his responses that would cause the

13    basis for your challenge?

14            MR. LOCKE:  Yes, your Honor.  First of all, he

15    said that it would be difficult for him to acquit the

16    defendants in a situation where, hypothetically there was,

17    that there was absolutely no evidence on one of the

18    elements of the crime.  When I was questioning him, he said

19    that he would have some difficulty because of his

20    connection to children, through his own children, his

21    grandchildren and his wife being a kindergarten teacher and

22    his religious beliefs and faith.  And he said, when I was

23    questioning him, that he would not be able to divorce that

24    from him.  It is him, that is who he is.  He would not be

25    able to put that aside.  So he has a bias of protection for

CAPITOL REPORTERS (916) 923-5447



175

1    children that is going to make it difficult for him to

2    acquit someone in a hypothetical where there is no evidence

3    on one of the elements.

4            If he is faced with a situation where it is -- there

5    is a little bit of evidence on that other element, he is

6    going to be searching for a reason to convict; and that is

7    precisely the kind of bias that is a basis for removal for

8    cause.

9            THE COURT:  Ms. Marks or Mr. Karowsky, is there

10    anything either of you wanted to add?

Page 155

08-01-02 Vol 2.txt

11          MS. MARKS:   I join with Mr. Locke and I have

12    nothing to add.

13          THE COURT:   Mr. Karowsky, did you want to say

14    something?

15          MR. KAROWSKY:   Yes, please, Your Honor.

16       I thought what Mr. Locke said -- I think it goes one

17    step further.   I think the question in this case that I

18    took a look, United States ex rel. Coleman v. Ryan, 1998 WL

19    292998.

20          MS. WHITE:   Say again.

21          MR. KAROWSKY:   1998, WL 292988.   It is quoting

22    from Reynolds versus United States, 98 U.S. 145 at 156,

23    which is a 1987 case.   It talks about the nature and

24    strength of the juror's opinions.   If the case, the way I

25    understand it, if they have difficulty setting aside that,


                    CAPITOL REPORTERS (916) 923-5447



                                                          176

 1    that raises the presumption of partiality and that

 2    presumption is only overcome when the juror says that they

 3    can set that aside and base their verdict on the evidence

 4    exclusively.   And I don't think that -- when he kept saying

 5    it was difficult, it would be difficult, it would be

 6    difficult, that he is not saying explicitly that he could

 7    set those things aside.

 8          So it is not just a question of difficulty.  That, I

 9    think, we can see.   He is not saying he would set it aside.

10    That is the standard that needs to be looked at.

11          THE COURT:   All right.

                         Page 156

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

12          Ms. White, anything you want to say?

13              MS. WHITE:  Well, Your Honor, the government

14      objects.  We all bring our own experiences and background.

15      I think there are very few people who are going to be --

16      undergo this process who would say that they don't wish to

17      protect children.  That makes Mr. Gentili part of the norm,

18      not the exception.  He did say in response to my questions

19      that he would be able to base a verdict, based on the

20      evidence presented to him in the form of witness testimony,

21      as well as documentary evidence.  Solely on the evidence

22      presented in court.

23          He also said, I quoted this, because of my faith I

24      could be fair and impartial.  And he also said that he

25      would follow the law the Court gave.  He kept coming back

CAPITOL REPORTERS (916) 923-5447



                                                        177

1       to that several times.  I think, as indicated, this is

2       going to be difficult.  The fact that it is a difficult

3       decision, however, should not be the determinative factor.

4       What is critical is whether he could be fair and impartial.

5       He said he could, and he also cited his faith as the basis

6       for his impartiality.  And then said, he looked to you,

7       said, "I would do what you would tell me to do."

8

9               THE COURT:  All right.  This is a difficult

10      decision.  The idea in voir dire should not be to work the

11      potential juror around into saying something that causes

Page 157

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

12    his disqualification.   Nor should the idea on the other

13    side be to work him around into saying that he can be fair

14    so that the record will support your respective positions.

15    I know I can find statements on his part that, when looked

16    at on a cold hard record, would support the decision either

17    to let him go or to keep him

18          I have to look more -- look at more than just the

19    cold record in order to make this decision.   I have to

20    assess the witness' demeanor when he hesitates, his facial

21    expressions and his manner of answering the questions.

22    When the Ninth Circuit sent this back to me, they expressed

23    confidence that I would be fully capable of ensuring that

24    the defendants receive an impartial trial.   They left it to

25    me to use what they call the abundance of tools in the


CAPITOL REPORTERS (916) 923-5447



178


1    Federal Rules of Evidence in criminal procedure, as well as

2    the inherent power of the Court.

3          If you look at the cold hard record of

4    Mr. Sherwood's answers, as I suggested earlier, there are

5    things he said that someone who wasn't sitting here and

6    looking at him and getting a feel for his answers could say

7    would justify excusing him  The difference is, I am here.

8    I do observe him, and I was satisfied from his answers, not

9    only that there was support for keeping him but that he

10    would make a good juror.   And I denied the request.

11          Frankly, I don't have the same feeling about

12    Mr. Gentili  I think he is going to try to be fair.   But

Page 158

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

13    this is where my mindset that I described earlier comes

14    into play.  I have to read between the lines to ferret out

15    inherent prejudice, inherent inability to be totally

16    objective and inherent tendency to be overcome by passion,

17    emotion or sympathy.

18         Here Mr. Gentili, when he was being questioned by

19    Mr. Locke, hesitated many times when the crucial question

20    was put to him  He kept talking about how difficult it

21    would be for him, even though he would ultimately come back

22    to the statement that he would try to be fair.  I must

23    comment that when Ms. Marks got up and for the first time

24    put to one of these potential jurors the graphic details of

25    some of the testimony that might come out, he didn't look

CAPITOL REPORTERS (916) 923-5447

179

1    so bad.  When he was asked how this made him feel, he said

2    it made him feel sad for both the adult and the child.

3    That is not the response I would expect from someone who is

4    going to be sympathetic.  My response wouldn't be that it

5    would make me feel sad.  It would make me feel mad, but not

6    sad.

7         Coming back to my overall impression, I am not

8    comfortable that he is a juror who is going to set aside

9    his emotions, and I reach that from listening to what he

10    had to say.  Not only from his words, but his manner in

11    answering the questions.  And if I am going to accomplish

12    what the Ninth Circuit wanted me to accomplish, I am going

Page 159

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

13    to have to make these kinds of close decisions.   In this

14    case, I am going to exercise the Court's discretion and

15    excuse Mr. Gentili for cause.

16           If you will have him come back, I will tell him

17    And then we will take a short recess.

18           (Prospective Juror Gentili entered courtroom)

19             THE COURT:  Mr. Gentili, you can stay right

20    there.  I want to thank you very much for coming.  It will

21    not be necessary for you to return, and so you are excused

22    with the thanks of the Court.  If you do see any of the

23    other jurors, prospective jurors, before this whole process

24    is over, I am going to instruct you not to talk about any

25    of the questions that were asked to you or your answers to

CAPITOL REPORTERS (916) 923-5447

180

1    any of those questions.   We appreciate your candor.   Thank

2    you for coming.

3             PROSPECTIVE JUROR GENTILI:   Thank you.

4             (Prospective Juror Gentili departed courtroom)

5             THE COURT:   The court will be in recess for 15

6    minutes.

7             MS. MARKS:   Can we have -- are we coming back

8    Monday or is Monday no?

9             THE COURT:   No Monday.   We are coming back

10   Tuesday.

11            MS. MARKS:   Thank you.

12                         (Recess taken.)

13            THE COURT:   The next one is Mr. Cowell.

Page 160

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

14          (Prospective Juror Cowell entered courtroom)

15              THE COURT:  Mr. Cowell, good afternoon.  The

16     lawyers are going to ask you some questions now.  We will

17     start with the attorney for government, Ms. White.

18              MS. WHITE:  Good afternoon, Mr. Cowell.

19              PROSPECTIVE JUROR COWELL:  Good afternoon.

20              MS. WHITE:  You are a transportation engineer.

21     What do you do as a transportation engineer?

22              PROSPECTIVE JUROR COWELL:  Design roadways for

23     CalTrans.

24              MS. WHITE:  You indicated in your questionnaire

25     that you have prior jury experience?


CAPITOL REPORTERS (916) 923-5447


                                                        181


1               PROSPECTIVE JUROR COWELL:  That is correct.

2               MS. WHITE:  I don't know what the verdicts were,

3      but can you tell me what the nature of the cases were, if

4      you recall?

5               PROSPECTIVE JUROR COWELL:  I think it was about

6      20 years ago.  Let's see.  One was a situation where a

7      person was using a vehicle to -- as a weapon to try to run

8      over somebody.  And the other one was a situation where a

9      rock was thrown through a windshield, and they were trying

10     to determine whether the person who is the defendant was

11     guilty or not.

12              MS. WHITE:  Thank you.

13              When you were here last and reading the

Page 161

08-01-02 Vol 2.txt

14  questionnaire, I assume you're somewhat aware of the nature

15  of the allegations and charges facing these defendants,

16  correct?

17              PROSPECTIVE JUROR COWELL:  Yes.

18              MS. WHITE:  They have been charged in nine

19  counts, six of which involve the interstate transportation

20  for the purposes of having sex, unlawful sex, with minors.

21          Is that generally your understanding?

22              PROSPECTIVE JUROR COWELL:  I wasn't aware the

23  interstate transportation part.

24              MS. WHITE:  They are not facing what would

25  otherwise be called lewd and lascivious acts or child

CAPITOL REPORTERS (916) 923-5447

182

1   molestation charges.  The charges allege, at least in some

2   of them, that they transported or aided and abetted the

3   transportation of minors with the intent that those minors

4   engage in unlawful sexual conduct.  There has to be an

5   interstate travel element to prove those offenses.  And you

6   would have to establish -- the government would bear the

7   burden of proving beyond a reasonable doubt that that

8   transportation occurred.  The government would also bear

9   the burden of proving that the defendants formed the

10  intent, that at least one of the purposes of that travel

11  was that these minors engage in unlawful sexual conduct.

12          Do you understand that?

13              PROSPECTIVE JUROR COWELL:  Okay.

14              MS. WHITE:  The government doesn't have to prove

Page 162

**08-01-02 Vol 2.txt**

15   that sex actually occurred.  But the evidence likely will

16   show that after the travel was completed sex acts did

17   occur.  And while I apologize for having to discuss the

18   nature of this, as a prospective juror, you may sit on the

19   jury, you are likely going to hear evidence that the minors

20   were engaged in acts involving vaginal intercourse, sodomy,

21   oral copulation and other like conduct.

22         Now at the close of this case, Judge Shubb will

23   instruct you as to the law to apply to the facts that you,

24   as a juror, find were present in this case.

25         Do you believe that you could follow the instruction

**CAPITOL REPORTERS (916) 923-5447**

183

1   that you may only reply upon evidence and testimony that is

2   offered into evidence as the basis of your fact-finding in

3   this particular case?

4         PROSPECTIVE JUROR COWELL:  Yes, I do.

5         MS. WHITE:  Would you be able to apply those

6   facts to the law that Judge Shubb gives you?

7         PROSPECTIVE JUROR COWELL:  Yes, I could.

8         MS. WHITE:  Even if you were to disagree with the

9   law?

10         PROSPECTIVE JUROR COWELL:  I think that I have to

11   somehow put away what I personally believe and somehow try

12   to follow the Judge's directions.  So it would be

13   difficult, but I would do my best.

14         MS. WHITE:  Let me ask this hypothetical.  As I

Page 163

08-01-02 Vol 2.txt

15 indicated, one of the elements that the government would

16 have to prove beyond a reasonable doubt is that one or two

17 or all of these defendants formed the intent that before

18 the termination of the travel of those children or child,

19 that the purpose of their travel was that they engage in

20 sexual conduct.  And there will be other elements as well.

21  Supposing you were to find that sex acts occurred at

22 the end of the travel, but supposing the government failed

23 to prove this, quote, intent element.  In other words, we

24 failed to show that one or several of the defendants didn't

25 formulate the intent at the appropriate time, before the

CAPITOL REPORTERS (916) 923-5447

184

1 travel was completed.  That means that we would fail to

2 prove that one element beyond a reasonable doubt to your

3 satisfaction.

4  Under that situation would you be able to find them

5 not guilty if the law that Judge Shubb gives you tells that

6 you have to find all four elements?

7  PROSPECTIVE JUROR COWELL:  Yes.  That is what the

8 Judge has told us to do; I would apply it in that way.

9  MS. WHITE:  I have nothing further, Your Honor.

10 Thank you.

11  THE COURT:  Mr. Locke, do you wish to ask any

12 questions?

13  MR. LOCKE:  Yes, sir, please, Your Honor.

14 Mr. Cowell --

15  PROSPECTIVE JUROR COWELL:  Yes.

Page 164

08-01-02 Vol 2.txt

16          MR. LOCKE:  -- my name is Bruce Locke.  I am one

17  of defendants' attorneys here.  I have a few questions for

18  you.

19          PROSPECTIVE JUROR COWELL:  Okay.

20          MR. LOCKE:  I think you told Ms. White that, in

21  answer to one of her questions about how this case would

22  go, "I have to somehow put aside what I believe."

23      What did you mean by that?

24          PROSPECTIVE JUROR COWELL:  Well, I think we all

25  have personal convictions, whether it is from our

CAPITOL REPORTERS (916) 923-5447

185

1  background, spiritual background, and so I need to follow

2  what the Judge has ordered us to do and go about it that

3  way, to apply the law as the Court stands, I guess.

4          MR. LOCKE:  Well, let me ask you about it in this

5  way because the Judge is going to tell you what the law is.

6          PROSPECTIVE JUROR COWELL:  Uh-huh.

7          MR. LOCKE:  If you are on the jury, you are going

8  to be the one that determines what the facts were.

9      Okay?

10          PROSPECTIVE JUROR COWELL:  Okay.

11          MR. LOCKE:  So my question to you is, that if

12  you're faced with a situation, and I am only going to talk

13  as if there is just one defendant, because it's easier to

14  keep in mind.  You're faced with a situation where this one

15  defendant transported a child from Texas to California, and

Page 165

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

16    then in California, sometime afterwards, had oral and

17    vaginal and anal sex with that child.  The child is 14

18    years old.  Okay.  But there is no evidence, the government

19    doesn't introduce any evidence that the defendant intended

20    that to happen at the time that he transported the child

21    from Texas to California.

22           Would you find it difficult to vote not guilty in

23    that case, given your beliefs?

24              PROSPECTIVE JUROR COWELL:  Could you repeat?

25    Because it sounds like there was -- I don't know.  Could

CAPITOL REPORTERS (916) 923-5447

186

1     you repeat that again?

2              MR. LOCKE:  Sure.  The defendant transports the

3     child.

4              PROSPECTIVE JUROR COWELL:  Okay.

5              MR. LOCKE:  The child is 14.  From Texas to

6     California.

7              PROSPECTIVE JUROR COWELL:  Uh-huh.

8              MR. LOCKE:  Sometime after the child gets to

9     California, someone has sex with the child.

10             PROSPECTIVE JUROR COWELL:  Is that the evidence?

11    Is that proven?

12             MR. LOCKE:  This is a hypothetical question.

13             PROSPECTIVE JUROR COWELL:  Okay.

14             MR. LOCKE:  You assume that that is the evidence.

15

16             PROSPECTIVE JUROR COWELL:  Okay.

Page 166

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

17              MR. LOCKE:  But there is no evidence that the

18      defendant intended that to happen at the time that he

19      transported the child.  Okay.  So for example, it could be

20      a situation where a family moves from Texas to California.

21      But at the time that they are moving, the defendant --

22      there is no evidence that he intended to have sex with the

23      child.  But then when they get there, sometime later, he

24      has sex with the child.

25              You will be faced -- you would be faced with a


CAPITOL REPORTERS (916) 923-5447



                                                        187


1      situation where you clearly understand and know that the

2      molestation occurred.

3              PROSPECTIVE JUROR COWELL:  Uh-huh.

4              MR. LOCKE:  If the judge says, "Well, another

5      element that the government has to prove is they have to

6      prove that the defendant intended that to happen at the

7      time that he transported the child."

8              PROSPECTIVE JUROR:  So although it did occur, you

9      are saying he didn't intend it to -- for it to happen?

10              MR. LOCKE:  There is no evidence that he intended

11      it to happen.

12              PROSPECTIVE JUROR COWELL:  Okay.

13              MR. LOCKE:  Would you find it difficult to acquit

14      the defendant, to find the defendant not guilty in a

15      situation where the defendant actually had sex with the

16      child?

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

17        PROSPECTIVE JUROR COVELL:   Yes, I would.

18            MR. LOCKE:   And the example that I have given you

19    is one where there is no evidence of that intent.   So even

20    where there is no evidence of intent, you would find it

21    difficult to put aside your beliefs and find the defendant

22    not guilty?

23        PROSPECTIVE JUROR COVELL:   I guess if it actually

24    occurred, I know that it occurred, it sounds like what you

25    are saying to me is that it was not intended at first, but


CAPITOL REPORTERS (916) 923-5447


188

1    it did occur.   So it seems like because there is an

2    occurrence of this event happening, then it would lead me

3    to think that the person was guilty.

4            MR. LOCKE:   So the way you feel, and everybody

5    here wants you to tell us 100 percent the truth --

6        PROSPECTIVE JUROR COVELL:   Uh-huh.

7            MR. LOCKE:   -- as to how you feel.

8        Based upon how you feel and your feelings about

9    children, you would be looking for a way to find that that

10    intent did exist so that you could find this person guilty?

11        PROSPECTIVE JUROR COVELL:   I don't know if I

12    would say that.

13            MR. LOCKE:   How would you say it?

14        PROSPECTIVE JUROR COVELL:   I would think that --

15    I guess this is complicated --

16            THE COURT:   Let him finish.   Go ahead.

17        PROSPECTIVE JUROR COVELL:   Because it seems to me

Page 168

08-01-02 Vol 2.txt

18    that if some sort of crime occurred, does it matter if

19    there was an original intent or not?  Could that be

20    explained?

21              MR. LOCKE:  Let me explain, try to explain it to

22    you.  We're in a federal court that applies federal law.

23    So the sex that occurred in the state of California would

24    be a violation of California law.  But it is only a

25    violation of federal law if there was interstate


CAPITOL REPORTERS (916) 923-5447



189

1    transportation --

2              PROSPECTIVE JUROR COWELL:  I see.

3              MR. LOCKE:  -- element to it.

4              PROSPECTIVE JUROR COWELL:  That makes sense.

5              MR. LOCKE:  So then the question to you is: You

6    said it would be difficult for you to acquit people when

7    you know what they have done.  Right?

8              PROSPECTIVE JUROR COWELL:  It would be difficult,

9    yes.

10             MR. LOCKE:  Is it fair to say that when you -- if

11   you were on the jury, when you went into the jury box, the

12   way that you feel, if you knew the crime occurred, the

13   molestation, if you know the molestation occurred, you

14   would be looking for, trying to find a way to find that

15   that intent existed at the time that they crossed state

16   lines?

17             PROSPECTIVE JUROR COWELL:  Can I say this?  What

Page 169

08-01-02 Vol 2.txt

18    I would like to do as a juror member is to talk it over

19    with everyone and to come up with something that we would

20    feel would be the right decision rather than my own

21    convictions.

22           MR. LOCKE:  But let me just leave it at this.  If

23    there is no evidence of intent, no evidence that the

24    defendant intended that at the time the transportation

25    occurred, you would find it difficult to find that

CAPITOL REPORTERS (916) 923-5447

190

1     defendant not guilty?

2            PROSPECTIVE JUROR COWELL:  Yes.  I guess you are

3     right.

4            THE COURT:  Explain what you mean by that.

5     Explain why it would be difficult.

6            PROSPECTIVE JUROR COWELL:  Because I would think

7     that if there has been any crime that has been -- that has

8     occurred, then -- I guess you would think that there was

9     some sort of pre- -- some intent.  And so I guess I would

10    think that there really was some sort of intent to make

11    that interstate transportation issue, I guess.

12           MR. LOCKE:  That comes from who you are and --

13           PROSPECTIVE JUROR COWELL:  Yes.

14           MR. LOCKE:  -- and your beliefs and your

15    religious belief?

16           PROSPECTIVE JUROR COWELL:  That is true.

17           MR. LOCKE:  Thank you.

18           THE COURT:  I need to discuss this with the

Page 170

08-01-02 Vol 2.txt

19     lawyers.   Why don't you step outside here, Mr. Cowell.   And

20     go out in the back area there.   We may have some more

21     questions when you come back.   But essentially I am going

22     to tell you whether you come back on the 15th or not.

23            (Prospective Juror Cowell departed courtroom)

24              THE COURT:   Mr. Cowell is outside the courtroom

25            This is an example of what I was talking about.   I

CAPITOL REPORTERS (916) 923-5447

191

1      don't want anybody working these jurors into a situation

2      where you put words in their mouth and they say something.

3      On the other hand, I want to get at their honest views.

4             It sounds to me like what he says from a layperson

5      perspective is that when something happens, there is --

6      there can be circumstantial evidence of intent to make it

7      happen.   And he keeps coming back to the fact that, and I

8      don't have a transcripts of this because we don't have real

9      time anymore today, but how he would tend to find intent

10     rather than he wouldn't require that the element of intent

11     be proved.   And that is entirely different.

12            We haven't told the jurors how intent is proved.

13     The instruction on intent says intent may be proved by

14     circumstantial evidence.   It rarely can be proved in any

15     other way.   That is the way we instruct the jury.   We tell

16     them that you can infer someone's state of mind by looking

17     at what they say and what they do.   And so it is not

18     prejudice or it is not improper for a juror to tell you

Page 171

PDF created with pdfFactory trial version www.pdffactory.com

**08-01-02 Vol 2.txt**

19    that he could infer intent from what the people did.

20         And you keep saying, "Assume there is no evidence of

21    intent." Well, I don't know whether he is saying there is

22    no direct evidence of intent or whether he is saying I

23    infer intent from what the person did.

24         So, again, looking at the cold hard record.

25    Absolutely, Ninth Circuit says throw him out because he

**CAPITOL REPORTERS (916) 923-5447**

192

1    said the magic words. But you put the magic words in his

2    mouth after he said what I think was an entirely

3    appropriate explanation from a layperson's point of view.

4         Now if I was doing this voir dire, I would look into

5    this a little further. And that is why I had him go out.

6    Before I grant your motion, I am going to want somebody to

7    explore this further. Either me or you or the government

8    attorneys. Because I don't want to throw him out just

9    because you worked him around into saying what the Ninth

10    Circuit is going to love to put their fingers on and say

11    that you should kick him off the jury.

12         MR. LOCKE: But, Judge, I don't think -- let me

13    -- what I am trying to do in the voir dire is to find out

14    if they have a difficulty in deciding a case that is a

15    hypothetical, that is a hundred percent clear.

16         THE COURT: But your hypotheticals aren't a

17    hundred percent clear. That is my problem. You're not

18    making them clear. You are always leaving an inference

19    there of intent from the evidence. There is never evidence

**Page 172**

08-01-02 Vol 2.txt

20    of intent.   There is never direct evidence of intent.   It

21    is always circumstantial evidence.   And your hypotheticals

22    are always giving some circumstantial evidence from which a

23    jury could reach a conclusion of the defendant's intent.

24          MR. LOCKE:   I could make the hypothetical better

25    by making the person sending the child, different than the


CAPITOL REPORTERS (916) 923-5447


                                                193

1    person who has sex with the child.

2          THE COURT:   That is what I did in the

3    hypothetical I gave the other juror.   Remember, remember

4    that hypothetical?   I was trying to do it.   I don't know if

5    I did it perfectly, but I was trying to create a situation

6    where there was a total dearth of any evidence from which

7    you could infer intent.

8          MR. LOCKE:   I didn't catch it, but now I've got

9    it.

10          THE COURT:   So let's bring him back.   I want to

11    explore this.   I don't want to excuse him unless I am

12    really comfortable that he has some reason to be biased.

13          MR. LOCKE:   Let me just add one thing, Judge, in

14    terms of putting words into their mouth.   I am trying not

15    to put words into their mouths at the beginning.   But when

16    they said what they've said, then I am trying to summarize

17    it.

18          THE COURT:   I know.   But that is where you are

19    putting words in his mouth.   The best example was what we

Page 173

08-01-02 Vol 2.txt

20   got to towards the end of this examination.   When he was

21   saying what I could interpret as there was circumstantial

22   evidence of intent and, therefore, he would likely find

23   intent.   And then you came back and said, "To summarize,

24   because of your experience and because of your religion,

25   you would want to find intent."   It wasn't because of his

CAPITOL REPORTERS (916) 923-5447

194

1   experience or because of his religion, it was because of

2   the facts that you gave him in the hypothetical.

3            MR. LOCKE:   It could be either one, I think.

4            THE COURT:   When you ask that leading question,

5   we never know.   Because you wear them down and they say,

6   "Yes, yes, yes."   Then you've got the magic words.   What

7   just irks me is three judges are going to look at this

8   thing on a cold hard record, take something out of context

9   and tell me what I should have done.   I don't want that to

10   happen.

11            Now that we understand, let's bring him in here and

12   find out what he's really saying.

13            (Prospective Juror Cowell entered courtroom)

14            THE COURT:   Mr. Cowell, I was just talking to the

15   lawyers while you were gone about what questions they might

16   be able to ask to get at what they really want to find out.

17   Hopefully, they will be able to ask the questions a little

18   more clearer for you, and then you can answer those

19   questions.

20            PROSPECTIVE JUROR COWELL:   I appreciate that,

Page 174

08-01-02 Vol 2.txt

21     Your Honor.

22              MR. LOCKE:   Mr. Cowell, let me try again with the

23     hypothetical.

24              PROSPECTIVE JUROR COWELL:   Okay.

25              MR. LOCKE:   The hypothetical is that adult A is


CAPITOL REPORTERS (916) 923-5447


195


1      in Texas and sends a child 14 years old to California where

2      adult B has sex with that child.   And that's the fact, and

3      it is clear about the sex occurred.

4              THE COURT:   Did it occur in Texas or California?

5              MR. LOCKE:   In California.   And that's the

6      evidence.

7              PROSPECTIVE JUROR COWELL:   That was -- I'm glad

8      you clarified that.   I thought adult A was the one who had

9      sex.

10             MR. LOCKE:   Let's make adult A just the person

11     who sent.   Would you have any difficulty acquitting adult A

12     if there was no evidence that adult A knew that sex was

13     going to occur?

14             PROSPECTIVE JUROR COWELL:   If there was no

15     evidence, I would have no -- I wouldn't have any problems

16     with acquitting.

17             MR. LOCKE:   And that is -- okay.

18             THE COURT:   If you're finished, I just want to

19     make sure I understand this.   It was not clear to me before

20     we took the recess what he was asking and what you were

Page 175

08-01-02 Vol 2.txt

21    saying.

22           Intent is something that rarely can be proven by

23    direct evidence.   And if you are selected as a juror, I am

24    going to instruct the jury on how intent can be proved and

25    what kind of evidence you can look at in order to determine

**CAPITOL REPORTERS (916) 923-5447**

196

1     whether the government has proved intent.

2     PROSPECTIVE JUROR COVELL:   Uh-huh.

3            THE COURT:   One of the things we talk about is

4     circumstantial evidence.   We can determine intent sometimes

5     by looking at what people say and what they do.   Then we

6     can infer what they intended from what they say or from

7     what they do.   That is one of the ways intent can be

8     proved.   But it still has to be proved beyond a reasonable

9     doubt.

10           PROSPECTIVE JUROR COVELL:   Okay.

11           THE COURT:   It is one thing to say that you would

12    be willing to look at what somebody does to determine what

13    they intended and that you might make a finding that they

14    intended something by looking at the evidence of what they

15    did.   It is quite another thing to say that what they did

16    was so bad that you don't care about whether the government

17    proved that they intended to do it or not; you are just

18    going to find them guilty.

19           PROSPECTIVE JUROR COVELL:   I understand that.

20           THE COURT:   Those are two different things.

21    Which are you saying you would do?

**Page 176**

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

22          PROSPECTIVE JUROR COVELL:   I think I am with the

23   first the one.   As you gather evidence and if it seems

24   compelling that the person did it, then logical assumption

25   would be they would be guilty.


CAPITOL REPORTERS (916) 923-5447


197

1          THE COURT:   You would look to all the evidence in

2   order to determine the intent?

3          PROSPECTIVE JUROR:   Yeah.

4          THE COURT:   You wouldn't go so far as to say that

5   you are not going to require the government to prove their

6   intent just because what they did was so bad?

7          PROSPECTIVE JUROR COVELL:   No, your Honor.

8          THE COURT:   I understand.

9          MR. LOCKE:   If I might, just a few more

10   questions.

11          Given the way you feel and the way your religious

12   beliefs are and your personal beliefs, would you be more

13   inclined to find in the government's favor, given the

14   nature of these charges?

15          PROSPECTIVE JUROR COVELL:   That was a question

16   that I had addressed when was filling out the affidavit in

17   December.   Because one of the questions, I think, dealt

18   with would you regard the witness or testimony of an

19   officer to be above that of another common person.   And I

20   believe at this time I would try to weigh the evidence on

21   all sides and try to make a just and right decision,

Page 177

PDF created with pdfFactory trial version www.pdffactory.com

**08-01-02 Vol 2.txt**

22    regardless.  So as far as whether to align with the

23    government or with the defendant side, I think I would take

24    into consideration the evidence and try to make the best

25    decision possible.


CAPITOL REPORTERS (916) 923-5447

198

1                MR. LOCKE:  That wasn't exactly the question that

2    I asked.

3                PROSPECTIVE JUROR COWELL:  Okay.

4                MR. LOCKE:  Let's say the government is required

5    to prove each element beyond a reasonable doubt.

6                PROSPECTIVE JUROR COWELL:  Uh-huh.

7                MR. LOCKE:  Let's say that it's more like the

8    evidence is even.

9                PROSPECTIVE JUROR COWELL:  Uh-huh.

10               MR. LOCKE:  Would you not overwhelming, but

11   questionable?

12               THE COURT:  In order for him to answer that I

13   think I have to tell him a little about burden of proof.

14        Have you sat on a jury before?

15               PROSPECTIVE JUROR COWELL:  Yes, Your Honor.

16               THE COURT:  In a criminal case?

17               PROSPECTIVE JUROR COWELL:  Yes.

18               THE COURT:  So you have been told previously

19   about the burden of proof before and --

20               PROSPECTIVE JUROR COWELL:  It's been a while.  If

21   you could refresh.

22               THE COURT:  The government has the burden of

Page 178

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

23    proving every element of the charges by proof beyond a

24    reasonable doubt.

25              PROSPECTIVE JUROR COVELL:   That's right.


                    CAPITOL REPORTERS (916) 923-5447



                                                         199


1              THE COURT:   Go ahead, Mr. Locke.

2              MR. LOCKE:   In a case where it is about child

3    molestation, and you are convinced that the child

4    molestation occurred, but the evidence is more iffy on the

5    element of the intent at the time the child was

6    transported, because of the way you feel, you would be

7    inclined to give the government a break and find them

8    guilty even though the evidence doesn't rise to beyond a

9    reasonable doubt?

10             PROSPECTIVE JUROR COVELL:   No, sir.   Because of

11   just what the judge has told us, that it has to be beyond a

12   reasonable doubt.   So I think I would go with that

13   criteria.

14             MR. LOCKE:   What you are telling me, if the

15   evidence is not beyond a reasonable doubt, even though the

16   way you feel about kids and your religious feelings, you

17   would vote not guilty for the defendant in that case?

18             PROSPECTIVE JUROR COVELL:   This is as a jury?

19             MR. LOCKE:   Yes.

20             PROSPECTIVE JUROR COVELL:   Yeah.   Yeah.   If it's

21   not beyond a reasonable doubt, then it would have to be not

22   guilty.

                        Page 179

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

23            MR. LOCKE:   You would be able to face yourself

24   and face your family and face the people in your church?

25            PROSPECTIVE JUROR COWELL:   Yes, sir.


CAPITOL REPORTERS (916) 923-5447


200

1            MR. LOCKE:   In that situation.

2            PROSPECTIVE JUROR COWELL:   Uh-huh.

3            MR. LOCKE:   You can promise me that you can do

4   that?

5            PROSPECTIVE JUROR COWELL:   I will do that.

6            THE COURT:   Ms. Marks, do you have any questions?

7            MS. MARKS:   May I have a moment, please?

8            THE COURT:   Yes.

9            MS. MARKS:   I do, Your Honor.

10        Hello, Mr. Cowell.

11            PROSPECTIVE JUROR COWELL:   Hi.

12            MS. MARKS:   I am Caro Marks.  I represent Mr. La

13   Brecque over here.  I want to follow up on a few questions

14   and comments, in fact, Mr. Locke and Judge Shubb said to

15   you.  I am going to ramp this up a little.  Before I do, I

16   want to warn you I am going to get graphic here.

17            PROSPECTIVE JUROR COWELL:   Okay.

18            MS. MARKS:   The only think I ask is, if you end

19   up on the jury and I say something right now that offends

20   you or haunts you or bothers you, please don't take it out

21   on Mr. La Brecque.  I have to do this because he's my

22   client.  I know this is sort of an unreal scenario, but I

23   have to ask you these questions.  I hope you can bear with

Page 180

08-01-02 Vol 2.txt

24      me when I do that.

25                  PROSPECTIVE JUROR COVELL:    Okay.


CAPITOL REPORTERS (916) 923-5447


201

1                   MS. MARKS:   I want you to suppose hypothetically

2       that there is evidence in this case that you are about to

3       hear that is not disputed evidence, that you know for sure

4       happened.   Two of the adult defendants here started a

5       religion.   As part of the religion, they indoctrinated very

6       young children into sex with them, their own children and

7       each other's.   I want you to think about this hypothetical.

8       That there were sort of ritualistic aspects to the sex with

9       children, such as maybe some of these defendants

10      hypothetically had the children lick semen off their

11      penises, drink semen out of condoms, masturbate in front of

12      their own children when their children very young, seven,

13      eight years old; that hypothetically a person might testify

14      that she is the child of one of these defendants and that

15      she was made to orally copulate her own father 500 times in

16      her childhood; that children were made to have sex with one

17      another, with the adults; that pictures might have been

18      taken; and that even more graphic and more deviant sex

19      practices were done with children from when they were seven

20      years old up to when they were 15.   Furthermore, in my

21      hypothetical I want you to assume that all these deviant

22      sex practices were done in the -- ostensibly in the name of

23      this religion.   And that the children were taught I have to

PDF created with pdfFactory trial version www.pdffactory.com

**08-01-02 Vol 2.txt**

24    have anal sex with you in the name of religion.    I am your

25    Lord and I am going to have sex with you, even though I am

**CAPITOL REPORTERS (916) 923-5447**

202

1    40 and you are seven, because I am God and this is our

2    religion.

3          Assume you hear a lot of graphic testimony from the

4    people who suffered this, and it is testimony about sex

5    practices that you might never have even heard of before.

6          I want to know whether, assuming that you hear that

7    testimony and that you believe it, just assume for a minute

8    that you believe it, how will that affect your ability to

9    deliberate on the guilt or not of my client?

10   PROSPECTIVE JUROR COVELL:  I suppose that I have to weigh

11   all the evidence, take it all in to account and then make a

12   decision.

13          MS. MARKS:  Would you, if you believe that all of

14   that vile sex happened, how would you handle wanting to

15   convict these people of what they are charged with, even if

16   it isn't perfectly proved, simply because you know all of

17   this other bad stuff happened?

18          PROSPECTIVE JUROR COVELL:  I guess you would go

19   on what is the evidence and try to just focus on that.

20   That is the way my approach would be.

21          MS. MARKS:  Now I notice that you are a religious

22   person and you go to church and you read the Bible.  And if

23   you hear evidence about another religion or a group that

24   calls itself a religion, and you felt that their doctrine

**Page 182**

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

25    essentially perverted the Bible that you read, how are you

CAPITOL REPORTERS (916) 923-5447

203

1    going to be neutral in the face of believing that your

2    Bible has been perverted by these people?

3            PROSPECTIVE JUROR COWELL:   Well, I believe that

4    we are all sinners, and myself included, and it's part of

5    the way we are as human beings.   And so, as much as

6    possible, I'll have my beliefs that I contain, but I'll try

7    to judge this or make a decision about this case in a way

8    that it would be fair and just, taking all sides into

9    consideration.

10           MS. MARKS:   And will you be able to disregard

11   your own personal religious convictions even if the

12   evidence is what I told you it could be, hypothetically?

13           PROSPECTIVE JUROR COWELL:   I think the

14   convictions actually are there all the time.   I mean, there

15   is no way I can really separate them  But as we come

16   together as a group of jurors, I think we will be able to

17   come up with the right decision.   And I am a person who has

18   been involved in different groups, whether it's meetings at

19   work where we have to come with a consensus for decision,

20   and I am, like, a team player.   So I believe I will be able

21   to, should I been on a panel, I will be able to make the

22   right decision based also on my Biblical convictions, yes.

23   But also taking into consideration everybody's view

24   points.

Page 183

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt
25              MS. MARKS:   Suppose the rest of the team who

CAPITOL REPORTERS (916) 923-5447

204

1   would be your fellow jurors are so horrified by some of

2   this evidence I hypothetically described, that that their

3   feelings are, or you get the sense that their feelings are,

4   regardless if the government proves the actual charges

5   perfectly, that this other behavior is so just so vile that

6   these guys just need to be convicted.  Won't that be hard

7   for you?

8              PROSPECTIVE JUROR COVELL:   Hard for me to what?

9              MS. MARKS:   To stand your ground in the face of

10  11 other people having a really hard time with this graphic

11  evidence.

12             PROSPECTIVE JUROR COVELL:   And they are wanting

13  to convict?

14             MS. MARKS:   Just because they believe all this

15  other stuff happened.

16             PROSPECTIVE JUROR COVELL:   I think I would --

17  again, we would look at the evidence and focus on the

18  important issues and make sure that it is beyond a

19  reasonable doubt, and then come up with a decision.

20             MS. MARKS:   I want to ask you one more question.

21  You said your Biblical convictions are always with you.

22             PROSPECTIVE JUROR COVELL:   Yeah.

23             MS. MARKS:   Won't having to hear this evidence of

24  other people's perverted Biblical convictions make you very

25  uncomfortable sitting in judgment on these people?

Page 184

08-01-02 Vol 2.txt

CAPITOL REPORTERS (916) 923-5447

205

1          PROSPECTIVE JUROR COWELL:   No.   I wouldn't be
2    uncomfortable only because I think we all, in some ways
3    kind of stray, diverge, from the truth now and then.   I
4    would see it as that is the way we are as human beings.
5          MS. MARKS:   Thank you.
6          THE COURT:   Mr. Karowsky, any questions?
7          MR. KAROWSKY:   No, thank you, your Honor.
8          THE COURT:   Mr. Cowell, if you will step outside
9    for about two minutes, we will let you know when to come
10   back.   I will tell you at that time if you can return on
11   the 15th.
12       (Prospective Juror Cowell departed courtroom)
13          THE COURT:   Mr. Cowell I think is outside the
14   courtroom   Is there any challenge for cause?
15          MS. WHITE:   No, your Honor.
16          MR. LOCKE:   Yes, your Honor.
17          THE COURT:   What is the basis?
18          MR. LOCKE:   The basis that his beliefs and his
19   religion would make it difficult for him to decide this
20   case and that he would have some difficulty.   And I think
21   somebody who is going to have difficulty deciding the case
22   because of their beliefs means that their own personal
23   biases are going to affect their deliberations in the
24   jury.
25          THE COURT:   I don't see that with him   We don't

Page 185

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

CAPITOL REPORTERS (916) 923-5447

206

1   want a jury of individuals who have no beliefs or no

2   religious convictions.   Anyone who does have moral beliefs

3   or religious convictions is going to be appalled by the

4   conduct that you lawyers have described to these

5   prospective jurors.

6          But I did not take from anything that he said that

7   he could not reach a verdict fairly, based on the evidence

8   and the law in the case.   So the challenge for cause is

9   denied.

10          Have Mr. Cowell come back in and I will instruct him

11   to report here on the 15th.

12          (Prospective Juror Cowell entered courtroom)

13          THE COURT:   Mr. Cowell, you can stand right

14   there.   I am instructing you to come back here in this

15   court at 9:00 a.m., on Tuesday, January the 15th for

16   further proceedings.   In the mean time, I am instructing

17   you not to seek or receive any information about this case,

18   or any of the issues that you think may be involved in this

19   case, not to talk to anybody about the case until you come

20   back here on the 15th.

21          The clerk is going to give you a card with her

22   telephone number on it, if you need to talk to her in the

23   meantime.   Also, she would like to have a telephone number

24   from you if we need to get in touch with you before January

25   the 15th.

Page 186

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

CAPITOL REPORTERS (916) 923-5447



207

1              PROSPECTIVE JUROR:   Thank you, your Honor.

2          (Prospective Juror Cowell departed courtroom)

3              THE COURT:   Bring in the next juror.   Did he

4    pronounce his name Tosh or Toch?

5              MS. WHITE:   Toch.

6              THE COURT:   Toch.

7          (Prospective Juror Toch entered courtroom)

8              THE COURT:   Mr. Toch, come in and have a seat her

9    in the jury box.   We are going to put you in the witness

10   box, and the lawyers are going to ask you some questions

11   now.   So we will start with one of the lawyers for the

12   defendants.   This is Mr. Locke, who is going to be asking

13   you some questions first.

14             MR. LOCKE:   Good afternoon, Mr. Toch.

15             PROSPECTIVE JUROR:   Afternoon.

16             MR. LOCKE:   My name is Bruce Locke.   As the Judge

17   said, I am one of the defense attorneys.   And I have some

18   questions for you, and some of them can be a little

19   difficult.   But we need to know exactly what you feel like

20   and what you think like so we can judge, we can decide

21   whether it would be appropriate for you to be in the jury

22   in case.   So, be brutally frank with me when you answer the

23   questions.

24             Do you have brothers and sisters?

25             PROSPECTIVE JUROR TOCH:   I do.

Page 187

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

CAPITOL REPORTERS (916) 923-5447

208

1              MR. LOCKE:   What are their ages?

2              PROSPECTIVE JUROR TOCH:   I have one younger

3    sister who is 22 right now.   She is a teacher at an

4    elementary school.

5              MR. LOCKE:   I notice from your questionnaire that

6    you are a swim coach?

7              PROSPECTIVE JUROR TOCH:   I am

8              MR. LOCKE:   What age group do you coach?

9              PROSPECTIVE JUROR TOCH:   All over.   I have from

10   eight-year-olds to 18-year-old.

11             MR. LOCKE:   So you deal with young children?

12             PROSPECTIVE JUROR TOCH:   Yes.

13             MR. LOCKE:   And in this case, what I want to talk

14   to you about is how you feel about young kids and how it

15   would affect your being on the jury on this case.

16          You know generally what this case is about?

17             PROSPECTIVE JUROR TOCH:   Yes.

18             MR. LOCKE:   And that the allegation is that the

19   defendants engaged in oral, anal and vaginal sex with young

20   girls, right?

21             PROSPECTIVE JUROR TOCH:   Hmm

22             MR. LOCKE:   Would the facts that this is about

23   this case --

24             MS. WHITE:   I am going to object.   That actually

25   misstates the charges.

08-01-02 Vol 2.txt

CAPITOL REPORTERS (916) 923-5447

209

1           THE COURT:  Well, It's not so much the charges as
2       it is what Mr. Locke thinks the evidence might be.  So why
3       don't you rephrase that, Mr. Locke.  That does not state
4       the charges, but if you think that is what the evidence is
5       going to consist of, you may ask the question.          MS.
6       WHITE:  Thank you.
7           MR. LOCKE:  There will be evidence in this case
8       that the male defendants had sex, as I described, with
9       girls as young as seven for oral sex, and 14 for oral, anal
10      and vaginal sex.  Now, would the way you feel about
11      children, in particular young children, would that make it
12      difficult for you to be on this case?
13          PROSPECTIVE JUROR TOCH:  I would like to think
14      that I am capable of being fair in thinking about the case,
15      but honestly I do have strong connection with kids that age
16      and being around them every day, but I would like to think
17      that I would be able to stay fair.
18          MR. LOCKE:  Fair enough.
19       You are concerned that your connection -- let me say
20      I'm concerned that your connection with the young children
21      that you have might influence you to favor the government
22      in this case.
23          PROSPECTIVE JUROR TOCH:  I wouldn't say influence
24      me.  I think, like I said, I think I can remain fair.
25          MR. LOCKE:  Let me pose to you a situation where

Page 189

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt
CAPITOL REPORTERS (916) 923-5447

210

1    the evidence that comes in during the case convinces you

2    that one of the defendants did have sex with 14-year-olds,

3    and the evidence is that the other defendant was the one

4    who transported the minor from Texas to California.   And

5    let me add that the Judge is going to tell you, he is going

6    instruct you, that the law is that the government has to

7    prove beyond a reasonable doubt that the defendant who

8    transported the child from Texas to California did so with

9    the intent that the child engage in the illegal sex.

10          And let me add a further element, factor.  That

11   there is -- the government doesn't produce any evidence

12   that the individual who did the transportation intended

13   that to happen.

14          Would you be able to, even though you know that the

15   molestation occurred, would you have any difficulty in

16   acquitting the defendant who did the transportation?

17          PROSPECTIVE JUROR TOCH:  You are stating that the

18   law says that even if the government has to prove beyond a

19   reasonable doubt that the defendant knew that that is what

20   he was transporting the girl for?

21          MR. LOCKE:  Yes.

22          PROSPECTIVE JUROR TOCH:  I think I might have a

23   tough time believing that.  Like I said, I would like to

24   believe that I could follow the law if that is what was

25   instructed.

CAPITOL REPORTERS (916) 923-5447

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

211

1              MR. LOCKE:  We all would like to believe that we
2    can follow the law.  There are some situations where it's
3    very difficult to follow the law.  And what I am posing to
4    you is a situation where you know that child molestation
5    took place.  And knowing that, it is going to affect you.
6    Right, You are going to be angry that that occurred.
7         Would that be right?
8              PROSPECTIVE JUROR TOCH:  Yes.
9              MR. LOCKE:  And then if the Judge says, "But in
10   order to convict the defendant, the government has to prove
11   this other thing, too."  And you are saying that it would
12   be difficult for you to vote not guilty for that defendant?
13             PROSPECTIVE JUROR TOCH:  I am saying it would be
14   difficult, but I think I could do it.  I think the rational
15   side of me would be able to do that.  I can't give you a
16   100 percent answer.
17             MR. LOCKE:  I posed a situation to you where
18   it's, the hypothetical is structured so that person is, in
19   fact, not guilty.  So you're telling me that in a situation
20   where the defendant is, in fact, not guilty, you would
21   still want to vote guilty?  That's what you would want to
22   do, right?
23             PROSPECTIVE JUROR TOCH:  Probably, yeah.
24             MR. LOCKE:  And would you have difficulty in
25   putting those feelings aside?

CAPITOL REPORTERS (916) 923-5447

Page 191

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

1          PROSPECTIVE JUROR TOCH:  I mean, I honestly don't

2     know because this is pretty far afield from anything I used

3     to be exposed to.  I would like to think that I'm would be

4     able to do that.  Because I consider myself to be able to

5     be rationale about these sort of things.

6               MR. LOCKE:  Do you think it would be rational to

7     let that defendant go in that situation?

8               PROSPECTIVE JUROR TOCH:  If that is what the law

9     states, yes.

10              MR. LOCKE:  You would follow the law even though

11    it didn't appear to be the result you would want?

12              PROSPECTIVE JUROR TOCH:  Well, yeah.  It is not

13    about what I want; it is about the law.

14              MR. LOCKE:  And you are telling me you would try

15    to do that, or you are sure you could do that?

16              PROSPECTIVE JUROR TOCH:  I don't think I could be

17    sure of anything.  I will say I'm fairly sure.  I couldn't

18    tell you I am 100 percent sure.

19              MR. LOCKE:  Okay.  You can't tell me that your

20    100 percent sure that you would vote not guilty for the

21    person that I described in that hypothetical?

22              PROSPECTIVE JUROR TOCH:  Yeah.

23              MR. LOCKE:  That is all the questions I have.

24              THE COURT:  Why is it you are not sure?

25              PROSPECTIVE JUROR TOCH:  I just don't think I

CAPITOL REPORTERS (916) 923-5447

Page 192

08-01-02 Vol 2.txt

213

1    could be a hundred percent sure of anything I may or may

2    not do in the future.   I'd say I'm reasonably sure.

3              THE COURT:   Since you can't be sure of anything

4    you would do, I can appreciate that.   How sure are you that

5    you could do it?

6              PROSPECTIVE JUROR TOCH:   I would say in the high

7    nineties.   If the letter of the law is what it states, the

8    government has to prove beyond a reasonable doubt, and they

9    can't prove it, that would be my vote.   Like I said,

10   barring -- I don't know what I am going to hear in the

11   course of this trial.   That might temper how I feel right

12   now.

13             THE COURT:   Let's talk about -- I don't know what

14   the evidence is going to be either.   Because I am just a

15   judge, and I come after the lawyers have prepared their

16   cases and they are ready for trial.   But imagine, if you

17   can, the worst kind of sexual misuse or abuse of a child.

18   Just try to think the worst thing you can.   And then ask

19   yourself whether, if you heard about that evidence, you

20   would still be able to listen to the rest of the evidence

21   to determine whether that element that Mr. Locke talked

22   about, of intent at the time the child was transported in

23   interstate commerce, whether you would be able to listen to

24   the evidence and decide dispassionately whether that

25   element had been proved

CAPITOL REPORTERS (916) 923-5447

Page 193

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

214

1    beyond a reasonable doubt.

2              PROSPECTIVE JUROR TOCH:   I believe so.   Yes, I

3    believe so.   Yes.

4              THE COURT:   Ms. Marks, do you have any questions?

5              MS. MARKS:   Yes, I do.

6         Hello, Mr. Toch.

7              PROSPECTIVE JUROR TOCH:   Afternoon.

8              MS. MARKS:   I am Caro Marks.   I represent Michael

9    La Brecque over here.   I am going to follow up on Judge

10   Shubb's question to you.   I will be a little more

11   graphically, probably more graphically than you would like.

12         I want to ask you one thing, which is: If what I say

13   offends you or bothers you or haunts you, and you end up on

14   our jury, please don't take anything I say today out on my

15   client over there because I'm doing my job.   Okay?   Because

16   I know you understand.

17             PROSPECTIVE JUROR TOCH:   I understand.

18             MS. MARKS:   Let's say, hypothetically, that some

19   of the evidence Judge Shubb just mentioned, the worst kind

20   of sexual evidence you can imagine, of acts against

21   children includes stuff like this: Seven-year-old girls

22   being forced to orally copulate their own fathers and two

23   adult men, one of whom is the father of each of the girls.

24   Young girls being made to lie under their parents who are

25   having sex on top of them  Girls being told when they are

CAPITOL REPORTERS (916) 923-5447

Page 194

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

215

1    seven or eight years old to lick the ejaculate off of grown

2    men's penises after performing oral sex on them  Some of

3    the girls sometimes forced to drink semen out of the

4    condoms that were used.  A minor victim might,

5    hypothetically, testify she was told to perform oral sex on

6    her father, who, hypothetically, could be sitting here,

7    over 400 times while she was still a child.  Grown men

8    masturbating in front of their own children when their

9    children were six- or seven-year-olds.  Ejaculating on

10   their own children when the children were at the same age.

11   Taking pictures of the same children having sex with adults

12   and with each other's children, and, hypothetically, all of

13   this ghastly sexual misconduct is done in the name of a

14   religion.  That there are Passover seders that involve oral

15   sex.  There are days of rejoicing and of worshipping that

16   involve sex with these children.

17           My question to you is, assume you hear that

18   evidence.  I'm saying, hypothetical, I want you to assume

19   you hear it, and assume you believe it all happened, for

20   years it happened.  Isn't that going to affect your ability

21   to deliberate dispassionately, as Judge Shubb said, on that

22   hypothetical that Mr. Locke brought up about the intent of

23   adult A who sends a child to adult B in a different state?

24           PROSPECTIVE JUROR TOCH:  I don't think it would

25   because it sounds like those are two -- obviously, what you

CAPITOL REPORTERS (916) 923-5447

216

08-01-02 Vol 2.txt

1   just described is kind of beyond the pale.   But those are

2   separate facts that I think I can view as dispassionately

3   as possible.

4             MS. MARKS:   You don't think those facts that I

5   just narrated are so beyond the pale that they would

6   interfere or just influence you, your assessment of the

7   charges?

8             PROSPECTIVE JUROR TOCH:   No, not the trafficking

9   charges you stated, no.

10            MS. MARKS:   Are you sure?

11            PROSPECTIVE JUROR TOCH:   Like I said, fairly

12  sure.

13            MS. MARKS:   Thank you, your Honor.

14            THE COURT:   Mr. Karowsky?

15            MR. KAROWSKY:   No, thank you, Your Honor.

16            THE COURT:   Did I ask the government?

17            MS. WHITE:   We have nothing to ask, Your Honor.

18            THE COURT:   Mr. Toch, if you will just step out

19  that door for about two minutes, I am going to discuss with

20  the lawyers whether we have you come back on the 15th or

21  not.

22            PROSPECTIVE JUROR TOCH:   Okay.

23            THE COURT:   We will call you back in and we'll

24  let you know.

25        (Prospective Juror Toch departed courtroom)


CAPITOL REPORTERS (916) 923-5447



217

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

1          THE COURT:  Mr. Toch is outside the room
2      Is there any challenge for cause?
3          MS. WHITE:  No, Your Honor.
4          MR. LOCKE:  Yes, your Honor.
5          THE COURT:  What is the reason for your
6  challenge?
7          MR. LOCKE:  Again, Your Honor, that he said that he
8  can't be sure, that he cannot guarantee and he says, "I
9  believe so."  In terms of being able to be fair and
10  impartial.  And I don't think that somebody who can't
11  guarantee that they would vote not guilty.  In a situation
12  where the hypothetical is that the person is not guilty,
13  should be allowed on the jury.
14          THE COURT:  The only thing he said that caused me
15  some pause was in response to one of your questions.  When
16  he said he would want to vote guilty under certain
17  circumstances, that standing alone would trouble me.  But
18  on the whole I think he explained that.  And I just didn't
19  get the feeling that he could not be fair.  When he said
20  that he couldn't be sure, he was speaking in generalities
21  by saying that he could never be sure that he would or
22  wouldn't do anything in the future.  That's somewhat akin
23  to what we hear lawyers say all the time when one lawyer
24  will ask a witness whether something is possible.  It is
25  one of those buzz words.  Even if the other lawyer is

CAPITOL REPORTERS (916) 923-5447

218

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

1  asleep, he pops up.   "Objection.   Anything is possible."

2         I think that is no more or no less than what this

3  witness is saying.   He said he could be sure in the high

4  nineties, and that is as sure as he can be of anything that

5  he might or might not do in the future.

6         What persuades me the most is his answers to the

7  questions that I asked.   I am comfortable and satisfied

8  that he would not be swayed by passion or prejudice in this

9  matter, and that he can reach a verdict based on the

10  evidence.   So I am going to deny the challenge for cause.

11         Have Mr. Toch come back in, and I will instruct him

12  to return on the 15th.

13         (Prospective Juror Toch entered courtroom)

14         THE COURT:   Mr. Toch, you can stay there.   I am

15  ordering you to return here to this court at 9:00 a.m., on

16  January the 15th.   In the meantime, I am instructing you

17  not to discuss this case with anyone and not to seek or

18  receive any information about this case, or any issues that

19  you think may be involved in the case from any source.

20         The clerk is going to give you her card that has her

21  phone number on it if you need to be in touch with us at

22  anytime between now and the 15th.   She would like you to

23  give her a phone number in we need to get in touch with

24  you.   Give her a phone number.

25         Thank you.

CAPITOL REPORTERS (916) 923-5447

219

1         Please bring in the next juror.

Page 198

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

2              (Prospective Juror Sadler entered courtroom)

3              THE COURT:  Ms. Sadler.

4              PROSPECTIVE JUROR SADLER:  Yes, sir.

5              THE COURT:  You will have a seat there.

6    Ms. Sadler, I am going to allow the lawyers to ask you some

7    questions now.  The first lawyer who will ask you questions

8    will be Ms. Endrizzi, who represents the government.

9              MS. MARKS:  I can't see that person anymore.

10   There is a screen.  I don't remember ever seeing all day.

11             THE COURT:  That screen has been there all day.

12   I think she is sitting a little further back.

13             MS. MARKS:  Thank you very much.

14             THE COURT:  If you can see her, she can see you.

15             Ms. Endrizzi, you may proceed.

16             MS. ENDRIZZI:  Good afternoon, Ms. Sadler.   I am

17   going to ask you a completely irrelevant question that I am

18   sure people want to know.  What team does your son play

19   for?

20             PROSPECTIVE JUROR SADLER:   My son plays for

21   Chicago Russia Arena Pro Ball.

22             MS. ENDRIZZI:  Getting to your questionnaire and

23   your life.  You said that you work for Army Air Force

24   Federal Exchange Services?

25             PROSPECTIVE JUROR SADLER:   Yes, ma'am

CAPITOL REPORTERS (916) 923-5447

220

1              MS. ENDRIZZI:  What is that?

Page 199

08-01-02 Vol 2.txt

2          PROSPECTIVE JUROR SADLER:    That is a government

3    supply building.   We ship out orders to all of the Armed

4    Forces all over the world.   That is the main headquarters

5    for ordering supplies for Marines, Air Force, all the

6    federal -- all the servicemen.

7          MS. ENDRIZZI:   And you are a supervisor there; is

8    that correct?

9          PROSPECTIVE JUROR SADLER:   Yes, ma'am

10          MS. ENDRIZZI:   Have you ever had to fire someone?

11          PROSPECTIVE JUROR SADLER:   Yes, ma'am

12          MS. ENDRIZZI:   Let me give you a hypothetical

13    here.   You are still in your position as you still are, a

14    supervisor.   One of your subordinates is a friend of yours.

15    And let's make her a close friend.   She goes to your

16    church.   You know her very well.   There is a situation

17    where your friend has been stealing supplies and, as a

18    supervisor, you talked to her.   "You got to stop.   You

19    can't do it anymore.   You're a friend.   Cut it out."

20          Yet she still keeps stealing supplies.   What do you

21    do?

22          PROSPECTIVE JUROR SADLER:   I goes to my manager.

23    I goes to my boss with it because that is not tolerant

24    there.   I'm not going to get caught up in that.   So in

25    order to keep me clear of any punishment, especially when I

CAPITOL REPORTERS (916) 923-5447

221

1    am aware of the situation and I know that it is wrong, yes,

2    I will report it to my boss.

Page 200

08-01-02 Vol 2.txt

3          MS. ENDRIZZI:   And your boss says to you, "Ms.

4     Sadler, you have to fire Ms. Jones.   I want her

5     identification card in 15 minutes."   Could you fire your

6     friend?

7          PROSPECTIVE JUROR SADLER:   Yes.   Yes.

8          MS. ENDRIZZI:   Part of what we are looking for

9     here is to find people who are so emotionally entangled

10    that they can't look at the facts for what they are, in a

11    situation where they have too much bias.   Like, for

12    instance, just to go back to that religious example.

13    Completely irrelevant case.   Hypothetical.

14          You live in Stockton.   Someone burns down the

15    Baptist church in the next town over, in Lodi, wherever is

16    close, and you are potentially going to be called for that

17    jury.   If it is such a situation that you knew people at

18    the church, or because of your religious convictions that

19    you think you couldn't be fair to that person as a member

20    of the jury, would you tell us?   If you couldn't be fair,

21    if you were so upset by the charges that you would ignore

22    the facts and you'd just vote guilty, would you say to us,

23    "I shouldn't be on this jury"?

24          PROSPECTIVE JUROR SADLER:   Yes.   I would tell you

25    if I couldn't judge the case equally.


CAPITOL REPORTERS (916) 923-5447


222


1          MS. ENDRIZZI:   You couldn't tell us fairly?

2          PROSPECTIVE JUROR SADLER:   Yes.

Page 201

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

3     MS. ENDRIZZI:  Part of this is criminal charges

4    of two parts, a mental part where there is intent and an

5    act.  So you need both.  And six of the nine charges that

6    we have here fall under this title.  Transportation of a

7    minor with intent to engage in criminal sexual activity.

8    You've got the act of transportation and you also have to

9    prove intent, that the person intended that they engage in

10    criminal sexual activity before that transport.  Okay.

11     No element is greater or less than another.  So I

12    have four elements: one, two, three, four.  One is equal to

13    four.  The criminal sexual act, whether it occurs, whether

14    it is horrific, is the same weight as the intent.

15     You with me?

16     PROSPECTIVE JUROR SADLER:  Yes.

17     MS. ENDRIZZI:  I keep talking.  I need to get

18    that question so you can answer.  You are back in the jury

19    room  You have been selected here.  You are considering

20    the guilt or innocence of one defendant.  You might have a

21    white board back there, and you are write element one,

22    element two, element three, element four.  Defendant Jones.

23     You look at element one, and it says minor.  And

24    there's been proof beyond a reasonable doubt for the minor.

25    Would you be confident in saying we have proof beyond a

CAPITOL REPORTERS (916) 923-5447

223

1    reasonable doubt.  That is one element.  Next element

2    criminal, sexual act, whatever it is, however horrible it

3    could be.  Proof beyond a reasonable doubt.  For element B.

Page 202

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

4    Element C, transport.  These are all acts.  You have proof

5    beyond a reasonable doubt for that.  You have A, B and C;

6    one, two, three.  That last part, the intent, which is just

7    as important as any other element.  We didn't prove that

8    there was intent for that child to travel from one state to

9    another for the purpose of criminal sexual activity.  There

10   might be a little bit of evidence, but there it is not

11   proof beyond a reasonable doubt.

12          Could you acquit or vote not guilty in that

13   situation?

14          PROSPECTIVE JUROR SADLER:  I would say not

15   guilty.

16          MS. ENDRIZZI:  You're sure about that?

17          PROSPECTIVE JUROR SADLER:  Uh-huh.

18          MS. ENDRIZZI:  So if you have one, two, three,

19   but you don't have four.

20          PROSPECTIVE JUROR SADLER:  I wouldn't acquit him

21   of --

22          MS. ENDRIZZI:  You don't know what acquit means?

23   That is our fault for using legalese.  Acquit means to find

24   not guilty, and the Judge will instruct you that in order

25   to find somebody guilty, every single element must be

CAPITOL REPORTERS (916) 923-5447

224

1    proven by the government beyond a reasonable doubt.

2          The situation that I am giving you here is element

3    one, element two, element four, beyond a reasonable doubt.

Page 203

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

4    Horrific stuff.  Drinking semen, anal, sexual, all that

5    kind of nastiness.

6          PROSPECTIVE JUROR SADLER:   Yes.

7          MS. ENDRIZZI:  But we don't prove intent beyond a

8    reasonable doubt to you.  How do you vote, guilty or not

9    guilty?

10          PROSPECTIVE JUROR SADLER:  Guilty as charged.  I

11    would say guilty because you've proven three and the other

12    one is little.  I would say guilty.

13          MS. ENDRIZZI:  That is a little different from what

14    you said before.  Every element has to be proven beyond a

15    reasonable doubt.  The Judge will tell you that.

16          PROSPECTIVE JUROR SADLER:  Okay.

17          MS. ENDRIZZI:  You are confident that one is

18    beyond a reasonable doubt.  You are confident two is beyond

19    a reasonable doubt.  You are confident three is beyond a

20    reasonable doubt three.

21          Let me give you this hypothetical.  You know the

22    government did not prove intent.  You know it.  There is no

23    evidence of intent, so we haven't met that fourth element

24    that you are required to find.  But these crimes are so

25    horrible, it is child molestation.  What would you do?

CAPITOL REPORTERS (916) 923-5447

225

1    Would you find them guilty or find them not guilty because

2    you are told you have to follow the law?

3          PROSPECTIVE JUROR SADLER:  I would find them

4    guilty.  I would still say he is guilty.

Page 204

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

5              MS. ENDRIZZI:  Even though we didn't prove the

6    last element?

7              PROSPECTIVE JUROR SADLER:  Yes.  I would still

8    say guilty.

9              THE COURT:  Why is that?

10             PROSPECTIVE JUROR SADLER:  Why I say because I am

11   looking at the mental state of the children and the effect

12   that has been taken on these children, that their lives

13   have been ruined for the rest of their lives.  And, you

14   know, to subject them to any more harm, and I feel they

15   would be harm to society because they are still coming in

16   society.  They are still in contact with other children.  I

17   wouldn't want that to happen to nobody else's children.

18             THE COURT:  So the right thing to do, you believe

19   under those circumstances, would be to make sure that the

20   defendants can't do this to any other children.

21   PROSPECTIVE JUROR SADLER:  Yes.

22             THE COURT:  Now, if I were to tell you in my

23   instructions to the jury that you are not to be concerned

24   with punishment.  What if I were to tell you the

25   punishment, if any, is for the Court to determine and not

CAPITOL REPORTERS (916) 923-5447

226

1    for the jury to determine?  What if I were to tell you that

2    your job as jurors and your only job as jurors is to decide

3    what the facts are and then to apply the law that I give

4    you to those facts?

Page 205

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

5          PROSPECTIVE JUROR SADLER:   I would agree.   I

6   understand what you say.

7          THE COURT:   What if you found the fact to be that

8   the government had not proved one of the elements of the

9   crime that they had to prove, would you find the defendant

10   guilty or not guilty?

11          PROSPECTIVE JUROR SADLER:   With your instruction

12   to me, I would go with what the law say and your

13   instruction to me to do.

14          THE COURT:   Now I add one more thing.

15          PROSPECTIVE JUROR SADLER:   Yes.

16          THE COURT:   That is, the proof of the case was

17   just what Ms. Endrizzi said it was.   Horrific abuse of

18   minors.   Terrible abuse.   And if you know the consequences

19   would be that the defendants would be free to go out and do

20   that again if you found them not guilty, would you still be

21   able to follow my instructions and find them not guilty?

22          PROSPECTIVE JUROR SADLER:   I would be able to

23   follow your instructions as you had given them to me.

24          MS. ENDRIZZI:   Your Honor, I will sit down.

25   You're far clearer than I am

CAPITOL REPORTERS (916) 923-5447



                                                    227


1          THE COURT:   I am going to let Mr. Locke ask some

2   more questions.

3          MR. LOCKE:   Ms. Sadler, when you filled out the

4   questionnaire and answered question number 74 on the

5   questionnaire, the question was that the prosecution always

Page 206

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

6    has the burden of proof in a criminal trial; that is, the

7    prosecution must prove each defendant's guilt beyond a

8    reasonable doubt.  If the prosecution does not prove a

9    defendant's guilt beyond a reasonable doubt, will you

10    acquit the defendant of the charges against him or her?

11    And you said no.

12        Why did you say no?

13            THE COURT:  She said she doesn't know what acquit

14    means; that may be the explanation.

15            MR. LOCKE:  I would like to hear.

16            THE COURT:  Right.

17            MR. LOCKE:  Why did you say no?

18            PROSPECTIVE JUROR SADLER:  I was still going back

19    to my statement as to I would not acquit if all other

20    points had been proven and there is proof that, that the

21    case has been shown to show that it was intent.  I don't

22    know if whether intent or not, but it was my intention that

23    I would not allow them to be roam free, as I stated before,

24    not to give harm to somebody else's children because the

25    children's lives are -- they're destroyed now.  Mentally,

CAPITOL REPORTERS (916) 923-5447

                                                    228

1    physically and emotionally.  That is a hardship that they

2    have to deal with the rest of their lives.

3            THE COURT:  Do you think you are saying two

4    different things?

5            PROSPECTIVE JUROR SADLER:  I might be saying two

Page 207

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

6    different things.

7           THE COURT:   How do you reconcile those two

8    different things, or do you reconcile them?

9           PROSPECTIVE JUROR SADLER:   How would I reconcile?

10          THE COURT:   How do you think they are consistent?

11   Are they consistent or inconsistent?  On the one hand what

12   you just said and you said that earlier, and on the other

13   hand what you told me that you'd follow my instructions

14   even if it meant that the defendants go free.

15          PROSPECTIVE JUROR SADLER:   I will follow the

16   judge's instructions to me as I stated I will.

17          THE COURT:   How is that consistent with what you

18   are saying?  Is it inconsistent?

19          PROSPECTIVE JUROR SADLER:   You said that it is

20   not -- it won't be my duty to worry about the punishment?

21          THE COURT:   Right.

22          PROSPECTIVE JUROR SADLER:   I would have to put

23   that in the back shelf and stick with what the facts are in

24   the case of what we are doing.

25          THE COURT:   Could you really put it on the back

CAPITOL REPORTERS (916) 923-5447

229

1    shelf, or would you forget about the instructions and go in

2    the jury room and do what you think is right?  That is my

3    question.   Would you really put it on the back shelf?

4           PROSPECTIVE JUROR SADLER:   I would put it in the

5    back shelf and do what is right.

6           THE COURT:   Two different things.  Sometimes not

Page 208

08-01-02 Vol 2.txt

7    everybody agrees with the law.  I don't always agree with

8    the law, but I took an oath to follow the law and that is

9    what I do.  If you disagree with the law, are you still

10   going to be able to follow it?

11           PROSPECTIVE JUROR SADLER:  If I disagree, would I

12   still be able to follow it?  Yes.

13           THE COURT:  Even if it means that your verdict

14   may result in the defendant being free to go out and do

15   this to other children?

16           PROSPECTIVE JUROR SADLER:  Yes.

17           THE COURT:  Explain to me how that is consistent?

18   The reason this is a problem is because you haven't thought

19   about this before, because you haven't been a juror before,

20   have you?

21           PROSPECTIVE JUROR SADLER:  No, sir.

22           THE COURT:  This is the first time you have to

23   think about it.  You are being asked to make some decision

24   here, right?

25           PROSPECTIVE JUROR SADLER:  Yes, sir.


CAPITOL REPORTERS (916) 923-5447



230


1            THE COURT:  You are going to have to make a

2    decision now about what you promise us that is going to

3    bind you three four, five, six weeks down the road when you

4    actually have to deliberate on the verdict.  You have to

5    think about what the consequences of that verdict might be.

6    So this is the time to think it through and to be honest

Page 209

08-01-02 Vol 2.txt

7    with the lawyers and me and tell us exactly how you are

8    going to look at this.  Think about it.  That is what we

9    need to know now.  It is going to be too late if you are

10   selected as a juror for you to come back and tell

11   Mr. Locke, "Well, I was wrong when I answered your

12   question."

13          Tell me now.  Suppose the law, as I give it to you

14   and the facts as you find them, require you to find the

15   defendant not guilty, even though all of these terrible

16   acts that have just be described to you may have been

17   shown, may have been proven.  You may find that they were

18   committed.  What is going to happen?  What are you going to

19   do?  Tell us how you feel.

20          PROSPECTIVE JUROR SADLER:  Well, when it come

21   down to children, I am very sensitive.  And I don't put my

22   emotions in front of my decision even with the scenario you

23   gave with the job.  I would still say that --

24          THE COURT:  There is no wrong answer, as long as

25   you tell us honestly what is in your heart and on your

CAPITOL REPORTERS (916) 923-5447



231


1    mind.

2          PROSPECTIVE JUROR SADLER:  When it come down, I

3    am very sensitive towards children and violence against

4    children because I feel that their lives are ruined for the

5    rest of their lives; and here we are going to acquit, find

6    somebody not guilty, for circumstances that have already

7    been placed in front of me.  How do I not know that they

Page 210

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

8   are not going to commit those same acts gain?  I don't.  I

9   don't want to take the chance.

10          THE COURT:  You don't want to take the chance?

11          PROSPECTIVE JUROR SADLER:  Putting them back on

12   the street to hurt nobody else's children because it could

13   be nines.  It could be my child.  That child have to live

14   with that the rest of their lives.  The pain, the agony,

15   the shame and all of these things.  And here we have people

16   that supposed to care for them, love them, and ruin their

17   lives.  I don't have no feeling for that.  I don't feel

18   sorry for them.  If they do the crime, let them do the

19   time.

20          THE COURT:  This isn't the right case for you.

21          PROSPECTIVE JUROR SADLER:  I'm very sensitive.

22          MS. WHITE:  Your Honor, we are prepared to

23   stipulate.

24          THE COURT:  Thank you.

25      I want to thank you, Ms. Sadler, for your honesty.


CAPITOL REPORTERS (916) 923-5447



                                              232


1   It's refreshing to have somebody tell us what is actually

2   on their mind and in their heart.  Thank you.

3          PROSPECTIVE JUROR SADLER:  I am sorry.  Crimes

4   against children is not nature.

5          THE COURT:  You did the right thing by telling us

6   the way you feel.  I am going to excuse you.  You can go

7   home now, and you don't have to come back.

Page 211

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

8          PROSPECTIVE JUROR SADLER:   Thank you.   Appreciate

9   it.

10          (Prospective Juror Sadler departed courtroom)

11          THE COURT:   All right.

12          Counsel, I am going to have the clerk bring in Ms.

13   Masty first, even though she is not next.   She has to be

14   out of here by five.   You never know how long these things

15   are going to take.   This will be Janice Masty next.

16          (Prospective Juror Masty departed courtroom)

17          THE COURT:   Ms. Masty, I understand you have to

18   be out by 5:00.   We will never go beyond 5:00 once this

19   trial starts.   I want you to know that.

20          PROSPECTIVE JUROR MASTY:   I don't have to be out

21   by five.   I just take my insulin.

22          THE COURT:   Thereabouts.   Also, we are not going

23   to keep jurors waiting around once this trial starts.   This

24   is a unique experience, bringing the jurors in one at the

25   time, and it's just the only way I know to do it right now.

CAPITOL REPORTERS (916) 923-5447

233

1   I appreciate your waiting around.

2          And the lawyers are going to ask some questions now.

3   We are going to begin with Mr. Locke who represents one of

4   the defendants in the case.

5          MR. LOCKE:   Good afternoon, Ms. Masty.

6          PROSPECTIVE JUROR MASTY:   Hi.

7          MR. LOCKE:   I've got your questionnaire in front

8   of me.   I noted that in response to question 51, which

Page 212

08-01-02 Vol 2.txt

9    said: Is there anything about the nature of allegations in

10   this case that would effect your ability to be a fair and

11   impartial juror?  You put a question mark, and then you

12   wrote in, "If any of the defendants have even a small

13   connection to exploiting children, I would find it

14   extremely repugnant!"

15            PROSPECTIVE JUROR MASTY:  Yes.

16            MR. LOCKE:  That is how you feel?

17            PROSPECTIVE JUROR MASTY:  I am a teacher, working

18   with children my whole life.

19            MR. LOCKE:  You feel protective of children?

20            PROSPECTIVE JUROR MASTY:  Very much so.

21            MR. LOCKE:  So even -- you know, the government

22   is by law required to prove that these defendantS committed

23   the acts with the intent, and they have to prove it beyond

24   a reasonable doubt.  But what you are saying is you

25   wouldn't require beyond a reasonable doubt if --


CAPITOL REPORTERS (916) 923-5447


234

1            PROSPECTIVE JUROR MASTY:  I guess what I was

2    saying is that, if there is going to be some sort of

3    technicality, something that is going to release people

4    that should not be, that would be very, very difficult for

5    me.  I was on a -- put it on the questionnaire also, that I

6    was on a jury once before.  It was just a piddly trial.  It

7    was marijuana.  We all knew that person was guilty, but

8    because of shoddy police work we had to release them

Page 213

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

9    Again, it wasn't a big deal.   This is a much bigger deal.

10           MR. LOCKE:   If there were shoddy police work or

11   the government didn't prove one of the elements of the

12   crime, because of the way you feel about children and the

13   nature of the charges here, you would be inclined to find

14   the person guilty anyway?

15           PROSPECTIVE JUROR MASTY:   I think I would be, to

16   tell you the truth.   I don't know what else to say.

17           MR. LOCKE:   The truth is perfect.   Some people --

18   the nature of the charges of this case, some people react

19   to it in a way that they wouldn't be a fair and impartial

20   juror, and that is what you are telling us, right?

21           PROSPECTIVE JUROR MASTY:   That is basically how I

22   feel.   Yes, yes.

23           MR. LOCKE:   Even if the Judge instructed you that

24   you have to follow the law?

25           PROSPECTIVE JUROR MASTY:   Well, I certainly want


CAPITOL REPORTERS (916) 923-5447



                                                         235


1    to trust the Judge, obviously.   But, again, I go back to my

2    other experience, and I think, you know, the judge had to

3    follow the law, of course.   It still meant releasing

4    somebody that shouldn't be released.   I have a little

5    difficulty with that part of the law.

6            MR. LOCKE:   In this case one element that the

7    government has to prove beyond a reasonable doubt is that

8    the defendant transported the child from one state to

9    another with the intent that the child engage in illegal

Page 214

08-01-02 Vol 2.txt

10    sex in the state that they arrived in.

11            PROSPECTIVE JUROR MASTY:   Right.

12            MR. LOCKE:   If the evidence was clear that

13    somebody had sex with the child, but there was no evidence

14    that the defendant who did the transportation intended that

15    to occur, you would still be inclined to find that person

16    guilty, given the nature of charge?

17            PROSPECTIVE JUROR MASTY:   That is a pretty tough

18    questions because, obviously, I have no details, no

19    history, and we have all that later, obviously.

20            MR. LOCKE:   Right.   But you did say if any of the

21    defendants had even a small connection --

22        PROSPECTIVE JUROR MASTY:   I guess I feel like, if

23    people were arrested for this, there must have been pretty

24    good reason.

25            MR. LOCKE:   So these feelings you have, they are


                    CAPITOL REPORTERS (916) 923-5447


                                                            236


1    feelings that you would not be able to put aside?

2            PROSPECTIVE JUROR MASTY:   No.

3            MR. LOCKE:   Thank you, your Honor.

4            THE COURT:   Ms. Marks, do you have any questions?

5            MS. MARKS:   No.

6            THE COURT:   Mr. Karowsky?

7            MR. KAROWSKY:   No.

8            THE COURT:   Does the government have any

9    questions?

                        Page 215

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

10          MS. WHITE:  Yes.

11      Good afternoon.

12          PROSPECTIVE JUROR MASTY:  Good afternoon.

13          MS. WHITE:  I am Laurel White with the

14  government.  You would, of course, be able to consider the

15  evidence of actual sex acts as evidence of intent --

16          PROSPECTIVE JUROR MASTY:  Yes.

17          MS. WHITE:  -- if you so chose?

18          PROSPECTIVE JUROR MASTY:  Yes.

19          MS. WHITE:  I guess what I really need to know is

20  would you be able to set aside the repugnance that I think

21  most people share that you described and consider only that

22  evidence that is introduced at trial and the testimony of

23  the witnesses, whether you like the law or not, be able to

24  follow the law that Judge Shubb gives you?

25  PROSPECTIVE JUROR MASTY:  I think I understand all along

CAPITOL REPORTERS (916) 923-5447

237

1   that is what is being asked.  I am trying to be honest in

2   that.

3           THE COURT:  We want you to be.

4           PROSPECTIVE JUROR MASTY:  It would be difficult,

5   yes.  It would be very difficult.

6           MS. WHITE:  Sitting there today?

7           PROSPECTIVE JUROR MASTY:  Yes.

8           MS. WHITE:  Difficulty aside.

9           PROSPECTIVE JUROR MASTY:  Yeah.

10          MS. WHITE:  Even if it is difficult, would you be

Page 216

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

11    able to find one of the defendants not guilty if the

12    government failed to carry its burden of proving all the

13    elements of a particular offense beyond a reasonable doubt?

14

15              PROSPECTIVE JUROR MASTY:  I think I would feel

16    like I would have to.

17              MS. WHITE:  Because?

18              PROSPECTIVE JUROR MASTY:  Because if there really

19    were no proof if it was not just some little glitch, then

20    that would be a different case.  It's little glitches I

21    don't like.

22              THE COURT:  Somebody's proof may be somebody

23    else's glitch.  Depends on where you are looking at it

24    from

25              PROSPECTIVE JUROR MASTY:  How would I know?

CAPITOL REPORTERS (916) 923-5447

238

1              THE COURT:  I think as the lawyers have indicated

2    to you, crimes have elements.

3              PROSPECTIVE JUROR MASTY:  Right.

4              THE COURT:  Some of the elements may be, to the

5    average person, more significant than the others.  But all

6    of them have to be proved before the defendant can be found

7    guilty.  One of those elements might be viewed by somebody

8    as a technicality.  For example, interstate commerce.  That

9    is what makes a case federal.              PROSPECTIVE

10    JUROR MASTY:  Right.

Page 217

08-01-02 Vol 2.txt

11          THE COURT:   That is important to some people

12   because it is the only reason that the case is in federal

13   court.   But to other people it may be a technicality.

14   Because the more serious allegations have to do with what

15   the defendant did, not just the interstate commerce

16   element.

17          Now, if you saw one of the elements as a

18   technicality, but that element still wasn't proved:  A, how

19   would you feel about it and, B, what would you do about it?

20          PROSPECTIVE JUROR MASTY:   Tough questions.   Boy,

21   I feel like I am an intelligent person.   And I can

22   certainly listen to all the evidence given and, hopefully,

23   use my intelligence to make a good choice, to make a good

24   decision and try not to let other things influence it.

25   That is about the best answer I can give you for that.


CAPITOL REPORTERS (916) 923-5447



239


1          THE COURT:   Let's go back to the other case you

2   had.   And you felt that it was a technicality, but it was

3   something you could live with because the charges were not

4   --

5          PROSPECTIVE JUROR MASTY:     Stable.

6          THE COURT:   -- big.   Let's take that same case.

7   Let's say the charges were big.

8          PROSPECTIVE JUROR MASTY:   Then it would have been

9   really hard.

10          THE COURT:   Then what would you do?

11          PROSPECTIVE JUROR MASTY:   I think it would have

Page 218

08-01-02 Vol 2.txt

12    been hard for everybody.

13              THE COURT:  Let's imagine the biggest charge you

14    could, the most horrific sexual abuse case you can think

15    of, the most repugnant conduct you can even imagine.

16              PROSPECTIVE JUROR MASTY:  But because of some

17    technicality?

18              THE COURT:  Well, wasn't that other case, that

19    kind of technicality.

20              PROSPECTIVE JUROR MASTY:  That would be very

21    difficult, to overlook that.

22              THE COURT:  So what would you do?  What would you

23    have done in that case if you viewed the charges as very,

24    very serious rather than minor?

25              PROSPECTIVE JUROR MASTY:  I probably would not have

CAPITOL REPORTERS (916) 923-5447

240

1     gone along with the rest of the jury members as I did.

2               THE COURT:  You might have voted not guilty?

3               PROSPECTIVE JUROR MASTY:  No, I might have voted

4     guilty.

5               THE COURT:  I'm sorry.  You might have voted

6     guilty?

7               PROSPECTIVE JUROR MASTY:  I might have, yeah.

8     Makes me sort of a wishy-washy person, I guess.

9               THE COURT:  Do you think that would have been

10    following the judge's instructions in that case?

11              PROSPECTIVE JUROR MASTY:  No.  Because our

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

12    instructions were to go by the letter of the law, and

13    that's is what we happened to do.

14            THE COURT:   You see what I'm getting to?

15            PROSPECTIVE JUROR MASTY:   I do see what you are

16    saying.   I think there is a lot more at stake here.

17            THE COURT:   Where you think there is a lot at

18    stake, where you think the charges are serious, might you

19    be inclined to overlook or to disregard what you perceive

20    as a technicality in the judge's instructions?

21            PROSPECTIVE JUROR MASTY:   I might.

22            MS. WHITE:   Let me ask you this, Ms. Masty, you

23    indicated at the very end of the questionnaire that you're

24    a teacher and that being out of class for a length of time

25    would cause a problem  Could you elaborate on the nature

CAPITOL REPORTERS (916) 923-5447

241

1    of the problem that would be caused?

2            PROSPECTIVE JUROR MASTY:   Sure.   It became an

3    even greater problem than I realized.   Because the court

4    session goes Tuesday through Friday, I was told by my

5    district that I would be responsible. Because I would be

6    there on Mondays, I would be responsible for all the

7    planning and grading and everything else.   That I'm

8    thinking that's not good for my kids.   I have second

9    graders; they are young.   Not good for my kids at all.

10    It's not good for the sub, who wouldn't get long-term  Be

11    horrible stress on me.   I am there till five or 5:30.   Not

12    being there every day, I can't imagine doing that, all that

Page 220

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

13    in one day.  That is huge.  That is huge for me.  On top of

14    that my medical problems.  I hate using that stuff

15         THE COURT:  I think this problem that you have with

16    students, they come first.  Any objection --

17              MS. WHITE:  Absolutely not.

18              THE COURT:  -- to excusing her?

19              MS. MARKS:  No objection.

20              THE COURT:  That answers the question.

21         Ms. Masty, I do this all the time for teachers

22    because I think education is important.  The other thing is

23    when you get a short trial --

24              PROSPECTIVE JUROR MASTY:  I have done a short

25    trial.


CAPITOL REPORTERS (916) 923-5447


242

1              THE COURT:  I have teachers comment in here who

2    don't want even to take a short trail.  One of the things I

3    try to impress upon them, and you might impress upon

4    others, how important it is to have that experience, to be

5    able to impart that to your students.

6              PROSPECTIVE JUROR MASTY:  Right.

7              THE COURT:  Especially teachers that get up in

8    junior high or high school.  And you can draw on your own

9    personal experience.

10             PROSPECTIVE JUROR MASTY:  I have done that.

11             THE COURT:  Where it's something you'd never know

12    unless you've been.

Page 221

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

13          PROSPECTIVE JUROR MASTY:   Right.

14          THE COURT:   You're excused.   Thank you.

15          PROSPECTIVE JUROR MASTY:   Thank you.

16      (Prospective Juror Masty departed courtroom)

17          THE COURT:   The next juror will be Mr. Siemsen.

18          MS. MARKS:   Is it always this cold up here?

19          THE COURT:   Last time you were complaining it was

20   too hot.

21          MS. WHITE:   Don't change a thing, Your Honor.   It

22   is just right.

23          THE COURT:   The papa bear says it's too hot, and

24   the mama bear says it's too cold.   The baby bear says it's

25   just right.   I am the baby bear or you're the baby bear, I


CAPITOL REPORTERS (916) 923-5447


243

1    guess.

2          (Prospective Juror Siemsen entered courtroom)

3          THE COURT:   Mr. Siemsen, thank you for waiting

4    around.   I am glad we got to you here.

5          PROSPECTIVE JUROR SIEMSEN:   Thank you.

6          THE COURT:   The lawyers are going to ask you some

7    questions.   So we are going to begin with Ms. White, who

8    represents the United States government in this case.

9          MS. WHITE:   Good afternoon, sir.

10         Just a couple of preliminary questions.   You

11   indicated that -- on the questionnaire that you didn't know

12   what your father did.   Did you grow up with your dad?

13         PROSPECTIVE JUROR SIEMSEN:   No, I did not.

Page 222

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

14          MS. WHITE:   I am guessing that from your previous

15    appearance here in federal court at the time when the

16    questionnaire was handed out to you and filling out the

17    questionnaire, you were advised of the nature of the

18    allegations facing these defendants.

19          PROSPECTIVE JUROR SIEMSEN:   That's true.

20          MS. WHITE:   You understand that they have been

21    charged with nine counts: various different allegations,

22    six of which involve the interstate transportation of

23    minors for the purpose of engaging in unlawful sexual

24    conduct, six of the counts involving different defendants.

25          As a juror, it would be your job to sit there,

CAPITOL REPORTERS (916) 923-5447

244

1     listen to the evidence, examine the documents that either

2     party is able to introduce, and then make a determination

3     as to the facts that are present in this particular case.

4     At the end of the trial, Judge Shubb is going to provide to

5     you the law that is a applicable to these different charges

6     against the defendants.   You would need to then be able to

7     determine the facts and apply those facts to the law that

8     Judge Shubb gives you.

9          As I indicated, six of the charges involve

10    allegations that the defendants transported minors across

11    state lines for the purpose of engaging in unlawful sexual

12    conduct.   And as to that particular charge, there are

13    several elements that you will be instructed that the

Page 223

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

14  government must prove beyond a reasonable doubt before you

15  can find the defendant guilty.

16       We carry the burden.  If we don't carry the burden

17  beyond a reasonable doubt as to even one of those elements,

18  the Judge will instruct you that you can't find the

19  defendant guilty.  Now, as the allegations would probably

20  suggest, you likely will be hearing some fairly graphic

21  testimony from victims, witnesses, about the sexual abuse

22  that they endured at the hands of some of the defendants.

23  The government has to prove that the sexual abuse occurred.

24  But you will likely hear that these victims, witnesses, had

25  to subject to oral sex, vaginal intercourse and anal

CAPITOL REPORTERS (916) 923-5447

245

1  intercourse.

2       If we were able to establish to your satisfaction

3  beyond a reasonable doubt that a particular defendant

4  committed at least three of those elements, that we met

5  three of those elements of a particular offense, but failed

6  to establish a fourth element, would you be able to follow

7  the law and find that defendant not guilty?

8       PROSPECTIVE JUROR SIEMSEN:  Yes, I would.

9       MS. WHITE:  You indicated at Page 12 of your

10  questionnaire, and I realize that you don't have it in

11  front of you.  The question was: Is there anything about

12  the nature of the allegations in this case that affect your

13  ability to be a fair and impartial juror?  And your

14  response was, "I am extremely sensitive to the abuse of

Page 224

08-01-02 Vol 2.txt

15    children in most forms.  I have never been in the position

16    to test myself in this regard."  I submit that probably

17    most people haven't.  But I have concerns about my ability

18    to remain open-minded.

19          Can you elaborate a little bit on what you were

20    saying there, sir?

21                PROSPECTIVE JUROR SIEMSEN:  It is interesting to

22    hear it read back.  I may have gone a little far in the

23    last part of that statement.  But I would say that I am

24    sensitive to the plight of children that have not had it so

25    good.


**CAPITOL REPORTERS (916) 923-5447**

⬜

246

1                MS. WHITE:  I don't think that makes you

2     unusual.  That makes you part of the vast majority of human

3     kind.  But the issue is would your sensitivity to the abuse

4     of children, particularly the evidence that I described,

5     may likely occur in this particular case, 'cause you to be

6     so overcome by passion and the abhorrence that you're

7     feeling, that you would disregard the law and perhaps

8     determine that, well, if the government met three of the

9     elements, that's good enough for me; I'm going to ignore

10    the fourth element, and I'm going to find them guilty

11    although we are required to find all four elements beyond a

12    reasonable doubt?

13                PROSPECTIVE JUROR SIEMSEN:  That would not be my

14    nature to have that problem

Page 225

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

15          MS. WHITE:   I have nothing further, Your Honor.

16          THE COURT:   Mr. Locke.

17          MR. LOCKE:   Thank you, your Honor.

18      Is it Mr. Siemsen?

19          PROSPECTIVE JUROR SIEMSEN:   Siemsen.

20          MR. LOCKE:   Siemsen, sorry.   Probably happens to

21   you --

22          PROSPECTIVE JUROR SIEMSEN:   Quite frequently.

23          MR. LOCKE:   -- more than once.   I hope that I am

24   not the only one.

25          My name is Bruce Locke.   I am one of the defense

CAPITOL REPORTERS (916) 923-5447

247

1    attorneys.   What we are trying to do is we are trying to

2    determine if the various jurors, given the nature of the

3    charges in this case, if they would be able to be perfectly

4    fair and impartial in deciding the case.

5          You have told us in your questionnaire that you are

6    very sensitive to young children, to the plight of young

7    children; is that right?   You have children of your own,

8    four children, and you have four grandchildren?

9          PROSPECTIVE JUROR SIEMSEN:   Yes.

10          MR. LOCKE:   Your grandchildren are ages one to

11   21.

12          PROSPECTIVE JUROR SIEMSEN:   Yes.

13          MR. LOCKE:   Good range.   Particularly the younger

14   ones.   You agree that parents have an obligation to protect

15   their children?

Page 226

PDF created with pdfFactory trial version www.pdffactory.com

**08-01-02 Vol 2.txt**

16          PROSPECTIVE JUROR SIEMSEN:   Absolutely.

17          MR. LOCKE:   What we want to know is:   Given how

18  you're sensitive to children and how you your way of living

19  is to protect young children, in a case where the evidence

20  is going to involve testimony that oral, anal and vaginal

21  sex with children as young as 14, and as young as seven

22  with respect to oral sex, and if the government is required

23  to prove that a defendant transported a child across state

24  lines with the intent that the child be engaged in sex, and

25  there was no evidence that the defendant had an intent at

**CAPITOL REPORTERS (916) 923-5447**

                                                            248

1  the time he took the child across state lines, would you be

2  able to acquit, to vote not guilty, for a defendant like

3  that?

4          PROSPECTIVE JUROR SIEMSEN:   If the evidence did

5  not support it, did not prove it?

6          MR. LOCKE:   It proves the sex occurred, and it

7  proves that it was a 14-year-old having sex with an adult,

8  but there was no proof that the person, the defendant who

9  transported her, intended that that was going to occur.

10          PROSPECTIVE JUROR SIEMSEN:   I understand.

11          MR. LOCKE:   You understand?

12          PROSPECTIVE JUROR SIEMSEN:   I do now.

13          MR. LOCKE:   Given the way you feel about

14  children, would you be able to vote not guilty in that

15  case?

**Page 227**

08-01-02 Vol 2.txt

16          PROSPECTIVE JUROR SIEMSEN:   Based on the evidence

17   or lack of evidence, yes, I would.

18          MR. LOCKE:   You seem to be pretty certain of that

19   now.   Why did you check that, in answer to the question:

20   Is there anything about the nature of the allegations that

21   affect your ability to be a fair and impartial?   You

22   checked yes.   Why did you do that?

23          PROSPECTIVE JUROR SIEMSEN:   I am not sure why I

24   did that at the time.

25          MR. LOCKE:   Do you think that at that time you

CAPITOL REPORTERS (916) 923-5447

249

1   felt that, having heard this for the first time, that you

2   wouldn't be -- you were afraid that you wouldn't be fair

3   and impartial?

4          PROSPECTIVE JUROR SIEMSEN:   I think at that time

5   I probably didn't have a clear grasp on just what it meant,

6   to examine the evidence and base it on that.

7          MR. LOCKE:   But now you feel -- what caused you

8   to change your opinion?

9          PROSPECTIVE JUROR SIEMSEN:   The explanations I've

10   heard today.

11          MR. LOCKE:   What explanations?

12          PROSPECTIVE JUROR SIEMSEN:   About the evidence

13   and instructions of the Judge.

14          MR. LOCKE:   If the evidence was 100 percent -- if

15   there was no evidence of intent, you understand what I am

16   saying, no evidence that this defendant intended the sex to

Page 228

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

17    occur at the time this defendant transported the child,

18    then you would vote not guilty?

19              PROSPECTIVE JUROR SIEMSEN:  Yes.

20              MR. LOCKE:  What about if there was a little bit

21    of evidence, but not proof beyond a reasonable doubt?  How

22    would you vote then?

23              PROSPECTIVE JUROR SIEMSEN:  Based on my

24    understanding, I would have to think that it would have to

25    be evidence beyond a reasonable doubt.


CAPITOL REPORTERS (916) 923-5447



                                                          250


1              MR. LOCKE:  It does.

2              PROSPECTIVE JUROR SIEMSEN:  I would vote

3    accordingly.

4              MR. LOCKE:  You would even vote not guilty, even

5    if the result was that a defendant, who you knew was

6    involved in these kinds of situations,  would walk out the

7    door free?

8              PROSPECTIVE JUROR SIEMSEN:  Yes.

9              MR. LOCKE:  No further questions.

10             THE COURT:  Ms. Marks, any questions.

11             MS. MARKS:  Yes, I do, Your Honor.

12        Hello, Mr. Siemsen.  I'm Caro Marks.  I represent

13    Mr. La Brecque.  I am going to ask you some questions of a

14    graphic nature.  I apologize for that in advance.  I just

15    want you to make me the promise that if you do end up on

16    the jury, anything I say to you upsets you or haunts you or

Page 229

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

17    bothers you or offends you, and you end up on the jury, you

18    are not taking it out on Mr. La Brecque sitting over there.

19    I am just doing what I have to do.

20              PROSPECTIVE JUROR SIEMSEN:  I understand.

21              MS. MARKS:  You did write in your questionnaire

22    that you were extremely sensitive to the abuse of children

23    in most forms.  Never been in a position to test yourself

24    in this regard, but have concerns about your ability to

25    remain open-minded.


CAPITOL REPORTERS (916) 923-5447


251

1         Do you have fewer concerns about your ability to

2    remain open-minded today?  Is that what happened here?

3              PROSPECTIVE JUROR SIEMSEN:  Yes.

4              MS. MARKS:  What I want to do is give you some

5    idea, hypothetically, of some of the evidence that might

6    come in in this case to see whether -- to see where that is

7    on the barometer of your concerns about your ability to

8    remain open-minded.  So I want to tell you that,

9    hypothetically, meaning it's possible, but not for sure,

10    but maybe, there might be some evidence of some really

11    deviant and outrageous sexual practices on children here,

12    including the routine making of girls, age seven and up, to

13    perform oral sex on their fathers, the required licking of

14    ejaculate off their fathers' penises, drink ejaculate from

15    condoms, grown men masturbating in front of their own

16    children when their own children were only seven years old.

17    There may be a witness to testify, hypothetically, that she

                         Page 230

08-01-02 Vol 2.txt

18  had to perform oral sex on her father 400 times, starting

19  when she was seven years old.  There may be,

20  hypothetically, evidence that two adults, defendants, had

21  sex along with two of their own children.  That during that

22  group sex one of the children was forced to lick the

23  ejaculate off an adult male's penis and lick it off the

24  woman's vagina at the same time, and then was forced to

25  kiss another one of the minors, and that this and other


CAPITOL REPORTERS (916) 923-5447

252

1  deviant sexual acts were all done in the name of a

2  religion.  A religion that the adult people in the

3  scenarios I've described prescribe to, that one of them

4  referred to himself as the lord, the other a bishop, and

5  that all of these deviant sexual acts and more were done in

6  the name of religion, for religious purposes and were

7  taught to these children at seven years old as part of a

8  religion.

9           Now with that as your hypothetical background, I

10  want to know how are you going to be able to balance what

11  you wrote before was your concern about your ability to

12  remain open-minded, if you hear that evidence that I just

13  described, and if you believe it.  If it absolutely

14  happened that way, how are you going to balance your

15  ability to remain open. --  minded with my client's rights

16  to have an impartial and neutral jury?

17           PROSPECTIVE JUROR SIEMSEN:  Are you asking me how

Page 231

**08-01-02 Vol 2.txt**

18    I will remain open-minded or -- in the beginning you asked

19    me if I would find it disturbing or offensive?  Which one

20    of those am I supposed to answer?

21              MS. MARKS:  Why don't you answer the second one

22    first.  I don't remember that I asked that.  Would you find

23    that disturbing and offensive?

24              PROSPECTIVE JUROR SIEMSEN:  Yes.

25              MS. MARKS:  The second question is:  How will you


**CAPITOL REPORTERS (916) 923-5447**



253


1    balance that -- how do you fit that into your concern about

2    your ability to remain open-minded?  Is that going to make

3    you less likely to be open-minded, if you believe that that

4    evidence all occurred?

5              PROSPECTIVE JUROR SIEMSEN:  I don't think so,

6    because I still have to go based on irrefutable evidence

7    and the burden of proof that was explained earlier.

8              MS. MARKS:  Say it is all irrefutable, it

9    happened, it definitely happened, that evidence that I just

10    said happened.  If you believe that, how are you going to

11    -- I am going to move back to Mr. Locke's example for a

12    minute.  If you believe all the evidence I said happened,

13    irrefutable beyond a reasonable doubt it happened, isn't

14    that going to make it hard for you to consider what

15    Mr. Locke described to you as sort of technical defense or

16    a loophole defense?  Is that evidence I just described to

17    you going to make you want to convict the people no matter

18    what?

**Page 232**

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

19          PROSPECTIVE JUROR SIEMSEN:  No matter what?

20          MS. MARKS:  Yeah.  Let's say the government --

21  let's say the evidence is certain that I just described,

22  but the government doesn't prove its case on one of the

23  counts.  What are you going to do?

24          MS. WHITE:  Excuse me, Your Honor.  I think Ms.

25  Marks meant one of the elements, not one of the counts.


CAPITOL REPORTERS (916) 923-5447


                                                    254

1           THE COURT:  Did you mean one of the counts or one

2   of the elements?

3           MS. MARKS:  On either one.  On one of the

4   elements.  So you believe all of that stuff I said

5   happened, but on the charged defenses the government

6   doesn't prove its case on one of the elements, and the

7   defense lawyers come out saying, "Oh, no, no. You have to

8   acquit our people because they didn't prove one of the

9   elements."

10          You are sitting over there knowing all this other

11  stuff happened.

12          PROSPECTIVE JUROR SIEMSEN:  As a juror, don't we

13  get some sort of instruction on how we are supposed to deal

14  with that?  I think that is what I heard earlier.

15          THE COURT:  You do.  An at the end of the trial

16  if you are selected as a juror, I will instruct you on all

17  of the applicable law, not just what Ms. Marks is asking

18  you about now.

Page 233

08-01-02 Vol 2.txt

19        You can assume for answering her question that the

20   Court's instructions would be that, before you may find the

21   defendant guilty, the government must prove all of the

22   elements of the charge beyond a reasonable doubt.

23        So now she wants you to assume you find the

24   government has not proved one element, even though the

25   government presented all this other evidence that she has

CAPITOL REPORTERS (916) 923-5447

255

1    described.  Do you find the defendant guilty or not guilty?

2              PROSPECTIVE JUROR SIEMSEN:  Not guilty.

3         MS. MARKS:  How do you -- so we -- Strike that.

4         So when you wrote that you weren't sure if you have

5    any strong opinions that would keep you from fulfilling

6    your responsibility as a juror in a criminal trial, has the

7    information I've given you helped you understand what your

8    responsibilities as a juror in a criminal trail are?

9              PROSPECTIVE JUROR SIEMSEN:  Yes.

10             MS. MARKS:  And now do you feel for sure that you

11   can execute your role as a juror?

12             PROSPECTIVE JUROR SIEMSEN:  Yes.

13             MS. MARKS:  Even if you believed all that

14   horrendous stuff that I told you to be true, you would be

15   able to acquit all three of these defendants, let them walk

16   free, if you found that the government didn't prove one of

17   the elements?

18             PROSPECTIVE JUROR SIEMSEN:  I believe so.

19             MS. MARKS:  You're sure?

Page 234

08-01-02 Vol 2.txt

20          PROSPECTIVE JUROR SIEMSEN:  I believe so, yes.

21          MS. MARKS:  Thank you.

22          THE COURT:  Mr. Karowsky, do you have any

23  questions?

24          MR. KAROWSKY:  Just a couple brief ones.

25        Do you find the examples that Ms. Marks just gave

CAPITOL REPORTERS (916) 923-5447

256

1  you relative to the conduct against the children to be as

2  disgusting as the rest of us do?

3          PROSPECTIVE JUROR SIEMSEN:  Yes, I do.

4          MR. KAROWSKY:  This stuff isn't spoken in polite

5  company.  We have to talk about it here.  That is pretty

6  revolting stuff.

7          PROSPECTIVE JUROR SIEMSEN:  Uh-huh.

8          MR. KAROWSKY:  You follow the law.  You are a law

9  abiding citizen.  You were a State Farm agent for 35

10  years.

11          PROSPECTIVE JUROR SIEMSEN:  Correct.

12          MR. KAROWSKY:  Do you understand that this

13  process is called voir dire.  That is French for to speak

14  the truth, to tell us the truth.  You get a freebie on this

15  one.  Even though sitting in front of a powerful person, a

16  federal judge appointed for life with huge powers, you can

17  tell us the truth and have a freebie on this one.

18        Do you understand that?

19          PROSPECTIVE JUROR SIEMSEN:  Yes.

Page 235

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

20        MR. KAROWSKY:   I would never sit in front of a

21   cop and tell him, you know, "I will try to follow this

22   speed limit if you let me go."  But you can sit and tell us

23   that you can't follow the law and you get a freebie on

24   that.

25        Do understand that?


CAPITOL REPORTERS (916) 923-5447


257

1        PROSPECTIVE JUROR SIEMSEN:   I believe I do.

2        MR. KAROWSKY:   When I am sitting there and the

3   officer has my driver's license, he says, "I am going to

4   give you a warning; you are going to slow down."

5        And, you know, I say, "I think I'm going to try to

6   do that."  There is no way I would have the  guts to do

7   that.  But you can today, if you really can't follow the

8   law, but you want to think you can.

9        Can you really follow the law that says even with

10   these disgusting, revolting acts, you will vote for not

11   guilty if a technicality requires you to do that?

12        PROSPECTIVE JUROR SIEMSEN:   Yes.

13        THE COURT:   Did we start with the government on

14   this one?

15        MS. WHITE:   You did, Your Honor.

16        THE COURT:   Then everybody has had an opportunity

17   to ask Mr. Siemsen questions.

18        Mr. Siemsen, I am going to ask you to step out that

19   door in the back for two minutes.  I am going to talk to

20   the lawyers.  We are going to let you know if we are going

*Page 236*

08-01-02 Vol 2.txt

21       to want you to come back on the 15th or not.

22              Mr. Siemsen is outside the courtroom

23              (Prospective Juror Siemsen departed courtroom)

24              THE COURT:   Any challenge for cause?

25              MS. WHITE:   No, your Honor.


CAPITOL REPORTERS (916) 923-5447


258

1               MS. MARKS:   Yes, Your Honor.

2               THE COURT:   And your challenge is based on the

3        questionnaire?

4               MS. MARKS:   Yes.

5               THE COURT:   Is there anything else he said that

6        you think supports your challenge?

7               MS. MARKS:   That he said here today?

8               THE COURT:   Or in the questionnaire.

9               MS. MARKS:   There are two things he said on the

10       questionnaire.   One is his answer to question number 51.

11       Should I say what that is?

12              THE COURT:   No.   I'm looking at that one.

13              MS. MARKS:   The other one is his answer to

14       question 77:   Do you have any strong opinions regarding

15       these principles that would keep you from fulfilling the

16       responsibilities as a juror in a criminal trail?

17              He didn't check yes; and he didn't check no.   He

18       wrote not sure.

19              THE COURT:   You didn't ask him about that.

20              MS. MARKS:   I did ask him

Page 237

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

21          THE COURT:   What did he say?

22          MS. MARKS:   I don't know.

23          THE COURT:   You are not sure.

24          MS. MARKS:   But I did ask him about it.

25          THE COURT:   Does anybody know what he said.


CAPITOL REPORTERS (916) 923-5447

259

1              MR. KAROWSKY:   I think he said that he changes

2     his mind because of what he heard here in the court.

3              THE COURT:   Right.

4              MS. MARKS:   Right.   It is not only his answers on

5     the  questionnaire, but it is that they are different

6     today, and that I don't know anything he heard today,

7     especially from the defense attorneys, would logically not

8     have made him more open-minded.   I think what he wrote in

9     the questionnaire is sufficient grounds for a challenge for

10    cause, especially question number 51.

11             THE COURT:   Question number what?

12             MS. MARKS:   Fifty-one.

13          Mr. Locke may have something to add.

14             THE COURT:   Does anybody have anything to add?

15             MR. LOCKE:   I just don't believe him when he say

16    he's changing his thing.   I'm afraid that he is a volunteer

17    trying to get on the jury.

18             THE COURT:   I would be concerned, too.   But I

19    don't know if he is a volunteer trying to get on the jury.

20    Why would he have answered 51 in the way he did in the

21    first place?   Because nothing has happened in the interim

Page 238

08-01-02 Vol 2.txt

22    period of time, other than their coming to court the first

23    day, and the very brief discussions that he had at that

24    time, and their coming here today and the very brief voir

25    dire I had with him whether they could follow the law

CAPITOL REPORTERS (916) 923-5447

260

1    without regard to whether they thought it was good law or

2    bad law.   This is one of the advantages of the individual

3    voir dire that you have asked me to do.   He has not been

4    influenced or had a chance to be influenced by the

5    questions and answers addressed to the other jurors.   I

6    would be concerned about what you say if he had sat here

7    all day and listened to the discussion that you have been

8    having with the other jurors and decided that he wanted to

9    be on this jury.   So he was going to change his views.   I

10    just don't know why he would not tell the truth here in

11    court.

12              MS. MARKS:   Maybe he found out something about

13    the case.

14              MS. WHITE:   You didn't ask.

15              THE COURT:   Do you want to bring him back and ask

16    him if he knows anything about the case?  I want to find

17    out if for some reason the jurors are talking to each other

18    or if somehow they learned something about the case that we

19    don't know.

20         (Prospective Juror Siemsen entered courtroom)

21              THE COURT:   Mr. Siemsen, before you -- you can

Page 239

**08-01-02 Vol 2.txt**

22      stand there.  I want to ask you, have you talked to any of

23      the other prospective jurors about this case at all since

24      we were here last time?

25                  PROSPECTIVE JUROR SIEMSEN:   No, I haven't.


**CAPITOL REPORTERS (916) 923-5447**



                                                                **261**


1                   THE COURT:  Like today, you haven't talked to

2       them about the case?

3                   PROSPECTIVE JUROR SIEMSEN:   No.

4                   THE COURT:  Have you learned anything about the

5       case, either from the Internet or your recollection or

6       talking to anybody since the last time you were here?

7                   PROSPECTIVE JUROR SIEMSEN:   No.

8                   THE COURT:  Thank you.  Step outside again.

9                   MS. WHITE:  Your Honor, may I be heard?

10                  THE COURT:  Yes.

11                  MS. WHITE:  It strikes me as not an unusual thing

12      for some one to respond to question 51 as did Mr. Siemsen

13      do.  I am extremely sensitive to the abuse of children in

14      most forms.  That would be a normal response.  I think at

15      the time, this was a month ago, he'd never been a position.

16      He was just being honest at that time.  I did explain to

17      him, during my opportunity to speak with him, what his

18      obligation would be with respect to following the law and

19      the burden that the government has with respect to proving

20      all elements beyond a reasonable doubt.  It was that basis

21      upon which he explained to Ms. Marks that he understood and

22      this is different today.

                        **Page 240**

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

23          So I think put in the context of what his obligation

24     would be, there is really nothing inconsistent with his

25     responses today from what he said earlier in his

CAPITOL REPORTERS (916) 923-5447

262

1     questionnaire.

2          THE COURT:   I am looking for the part of his form

3     where he talked about previous jury experience.  Has he had

4     experience before?  No, he has not.

5          This is my take on it.  I have listened to what he

6     had to say today, and he was asked several times in several

7     different ways whether he could follow the Court's

8     instructions and reach a verdict that was not based upon

9     emotion.  And his answers were convincingly  that he could.

10    The only thing that he's learned, in the meantime of any

11    significance, was the two or three questions that I asked

12    when they were in the box.  And one of those had to do with

13    following the law as I give it to them, whether they would

14    agree with it or not.

15          A lot of people who haven't had jury experience may

16    come here thinking along the lines of what Ms. Sadler had

17    to say.  That somehow they have the responsibility of

18    passing judgment, of exercising some independent

19    determination of what is good or not good and what ought to

20    happen or not ought to happen.  And when they learn that

21    their job does not involve passing moral judgment, but

22    rather simply following the law and applying it to the

Page 241

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

23    facts as they find them, it makes their job a lot simpler.

24          If Mr. Siensen had some idea that he was going to

25    have to play God, so to speak, and pass judgment on people,


CAPITOL REPORTERS (916) 923-5447


263

1    then I could see how he might say I have concern about my

2    ability to remain open-minded.  And that might be the best

3    explanation that I can think of for the reason that he said

4    what he did.

5          With regard to question number 77, that is not a

6    good question and maybe it shouldn't have been asked.  It

7    says:  Do you have strong opinions regarding these

8    principles that would keep you from fulfilling your

9    responsibilities as a juror in a criminal trial?  But we

10   don't tell them what their responsibility as a juror in a

11   criminal trail are.  So he said he is not sure because he

12   didn't know his responsibility.  That is consistent with

13   what I'm thinking he must have been concerned about in

14   answer to question number 51.  If he thought his

15   responsibility as a juror in a criminal trial involved more

16   than applying the law as the judge gives it to him, but

17   rather thought that it was his responsibility to come up

18   with laws or to devise laws that he thought was fair, than

19   he might answer the question that way.  But his answers

20   here in court have not given the Court any concern about

21   his ability to be fair and to divest himself of any emotion

22   or prejudice or passion in the process of arriving at the

23   verdict.

Page 242

**08-01-02 Vol 2.txt**

24          So I'm going to deny the challenge for cause with

25     respect to Mr. Siemsen.   I am going to observe here, that


**CAPITOL REPORTERS (916) 923-5447**



                                                                264

1     in case I forget about it, my decisions here so far have

2     resulted in only male jurors.   I am not basing my decision

3     on the gender of the jurors.   I am fully aware of the

4     court's responsibility to assure that neither challenge for

5     cause nor peremptory challenge are exercised on the basis

6     of gender.

7          I know the government, the first time that we talked

8     about the defendants waiving jury trial, said one of

9     reasons they wanted to have a jury trail was because the

10    victims like to look out into the jury and see a lot of

11    female faces.   I am aware of that, but I am not taking it

12    into account one way or another.   If this jury process

13    results in women on the jury, so be it.   If it results in

14    no women on the jury, so be it.   I'm making my decisions

15    based entirely upon the responses of the jury and not their

16    gender.

17          Bring in the next juror.   Brought him back in.

18    Forget that I didn't.

19          (Prospective Juror Siemsen entered courtroom)

20          THE COURT:   Mr. Siemsen, I'm going to instruct

21    you to come back to court on January the 15th, which is

22    Tuesday, at 9:00 a.m for further proceeding.   In the

23    meantime, I will instruct you not to seek or obtain any

**Page 243**

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

24   information about the case, or anything that you may think

25   is an issue in the case from any source, and not to talk to

CAPITOL REPORTERS (916) 923-5447

265

1   anybody about the case.

2          The clerk is now going to come back to give you a

3   card with her telephone number on it in case you need to

4   get in touch with us before the 15th.  And I will ask that

5   you give her a telephone number that she can reach you at

6   in case we need to talk to you before then.

7          PROSPECTIVE JUROR SIEMSEN:  Thank you.

8       (Prospective Juror Siemsen departed courtroom)

9          THE COURT:  Also, counsel, if you notice any

10  grounds for excusing any of those jurors, or in the next

11  batch, if you notice any grounds like the one with the

12  teacher, you might bring it to everybody's attention before

13  we ask a lot of questions.  It will save some time.

14  Because I would have let her go on that ground alone

15  without the need to go into that other subject.

16      (Prospective Juror Cushman entered courtroom)

17         THE COURT:  Ms. Cushman, I am going to allow the

18  lawyers to ask you some questions.  Now the first lawyer

19  who is going to address you is Mr. Locke.

20         MR. LOCKE:  Good afternoon, Ms. Cushman.

21         PROSPECTIVE JUROR CUSHMAN:  Hi.

22         MR. LOCKE:  How are you?

23         PROSPECTIVE JUROR CUSHMAN:  Very good.  How are

24  you?

Page 244

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

25              MR. LOCKE:  Good.  Long day.  Let me try to get


**CAPITOL REPORTERS (916) 923-5447**



                                                              266

1    straight to the point.

2          You are 22 years old; is that right?

3              PROSPECTIVE JUROR CUSHMAN:  Uh-huh.

4              MR. LOCKE:  Do you have brothers and sisters?

5              PROSPECTIVE JUROR CUSHMAN:  I do.

6              MR. LOCKE:  How many?

7              PROSPECTIVE JUROR CUSHMAN:  One sister and two

8    brothers.

9              MR. LOCKE:  How old are they?

10             PROSPECTIVE JUROR CUSHMAN:  My sister is going to

11   be 26.  My brother will be 24, and my youngest brother will

12   be 21.

13             MR. LOCKE:  Any nieces and nephews?

14             PROSPECTIVE JUROR CUSHMAN:  I have two nieces and

15   one nephew.

16             MR. LOCKE:  They are obviously very young?

17             PROSPECTIVE JUROR CUSHMAN:  Yes.

18             MR. LOCKE:  You feel protective of them?

19             PROSPECTIVE JUROR CUSHMAN:  Oh, yeah.

20             MR. LOCKE:  You know the nature of the charges in

21   this case?

22             PROSPECTIVE JUROR CUSHMAN:  I do.

23             MR. LOCKE:  They involve allegations and evidence

24   in the case that will be -- evidence that some of the male

**Page 245**

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt
25    defendants engaged in oral and anal and vaginal sex with

CAPITOL REPORTERS (916) 923-5447

267

1    children at the age of 14.

2              PROSPECTIVE JUROR CUSHMAN:   Okay.

3              MR. LOCKE:   Oral sex, even at the age of seven.

4    The testimony will be very graphic and involve testimony

5    about requiring seven-year-olds to lick the semen off a

6    penis and drink the semen out of a condom

7              And knowing that, how does that make you feel, those

8    facts?  What is the first word that comes to your mind?

9              PROSPECTIVE JUROR CUSHMAN:   I am disgusted.

10             MR. LOCKE:   In this case the government is

11   required to prove that a defendant transported the minors

12   across state lines with the intent that the minors engage

13   in illegal sex; in other words, have sex with an adult.

14             If, in this case, the evidence were clear to you

15   that the sex occurred, but there was no evidence that the

16   adult who did the transportation intended that to occur at

17   the time that he did the transportation -- you understand

18   what I am saying?  That, say, he took the child from Texas

19   to California on June 1, and that somebody else assaulted

20   the children; somebody he knows assaulted the child on June

21   22, but there is no evidence that the one who did the

22   transportation intended that.  Would you be able to acquit

23   that person, vote not guilty?

24             PROSPECTIVE JUROR CUSHMAN:   Yeah.

25             MR. LOCKE:   Would it be difficult for you?

Page 246

08-01-02 Vol 2.txt

CAPITOL REPORTERS (916) 923-5447

268

1              PROSPECTIVE JUROR CUSHMAN:  It depends on the
2    circumstances.
3              MR. LOCKE:  What do you mean by that?
4              PROSPECTIVE JUROR CUSHMAN:  If they had no idea
5    that it was going on, then how are they supposed to stop
6    it?
7              MR. LOCKE:  What about if the person who had sex
8    with the child was their good friend?
9              PROSPECTIVE JUROR CUSHMAN:  That doesn't mean
10   that they know it is happening.
11             MR. LOCKE:  What about if the reason for -- the
12   alleged reason for this occurring was because it was part
13   of a religious rite, and these two men were engaged in the
14   same religion?  You would still vote not guilty?
15             THE COURT:  This is same kind of problem we had
16   with one of these other witnesses, where you are creating
17   circumstantial evidence in your hypothetical.  If you want
18   to get a clear answer, you are going to have  different
19   hypotheticals.
20             MR. LOCKE:  You said if the person had no idea
21   that that was going to happen, then you would vote not
22   guilty?
23             PROSPECTIVE JUROR CUSHMAN:  Uh-huh.
24             MR. LOCKE:  What if you thought that there was
25   some evidence that he might have known what was going to

Page 247

08-01-02 Vol 2.txt

CAPITOL REPORTERS (916) 923-5447

269

1    happen, but that the evidence wasn't evidence beyond a

2    reasonable doubt?  The Judge at the end of the case will

3    instruct you that, in order to convict the defendants, you

4    have to find that the evidence as to everything was proved

5    beyond a reasonable doubt.

6         But now I'm asking you if there was a little bit of

7    evidence, but you still had a doubt as to whether or not

8    that that person knew, would you vote not guilty?

9         PROSPECTIVE JUROR CUSHMAN:  Yeah.  If I didn't

10   believe that he knew, if there is a little bit of evidence

11   that it could --

12        MR. LOCKE:  What I am suggesting is evidence that

13   he might have known, but not beyond a reasonable doubt, not

14   conclusive.

15        THE COURT:  Not conclusive is not the test.

16        MR. LOCKE:  I know.  It is the wrong word.

17        If the evidence wasn't beyond a reasonable doubt,

18   but there was evidence that he might have known, would the

19   fact the way you feel about kids and how disgusting this

20   was, would that make you want to find these people guilty?

21        PROSPECTIVE JUROR CUSHMAN:  Yes.

22        MR. LOCKE:  If the Judge said, "No, you've got to

23   put your feelings aside and just decide it based upon the

24   facts as you find them"

25        And then you say, "Well, I didn't find it beyond a

Page 248

08-01-02 Vol 2.txt

CAPITOL REPORTERS (916) 923-5447

270

1    reasonable doubt."

2             Would you be able to acquit the defendants?

3             PROSPECTIVE JUROR CUSHMAN:   If I didn't

4    believe -- it's kind of black and white to me.   Either I'm

5    going to -- if there is evidence, if I think that is

6    enough, than I don't know.

7             MR. LOCKE:   What I am asking you is because of

8    the nature of the case.   Would you accept less evidence and

9    still find somebody guilty?   In other words, evidence that

10   isn't beyond a reasonable doubt, but less evidence, a

11   little evidence would be enough for you to convict them?

12            PROSPECTIVE JUROR CUSHMAN:   No.

13            MR. LOCKE:   A little evidence.

14            PROSPECTIVE JUROR CUSHMAN:   I guess it depends on

15   what it is.   It would really --

16            MR. LOCKE:   Say there is a little evidence that

17   he might have known, but it is not evidence that rises up

18   to where you can say, "Well, I know that he knew?"

19            THE COURT:   Beyond a reasonable doubt.

20            MR. LOCKE:   Beyond a reasonable doubt.

21        What we are afraid of is that people -- this is

22   disgusting stuff, and people love little kids, and people

23   want to protect little kids.   But the law says that if the

24   government doesn't prove their case beyond a reasonable

25   doubt, then you have to vote not guilty.   It has to be not

Page 249

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

CAPITOL REPORTERS (916) 923-5447

271

1    guilty.  But there is very real risk in this case that,

2    because of the way people feel about it, that they are

3    going to say, "Well, a little bit of evidence will be fine.

4    I will convict them"

5            What I am asking you:  Is that how you feel?

6            PROSPECTIVE JUROR CUSHMAN:  Yes.

7            THE COURT:  Would you tell us how you feel?  He

8    said is that you how you feel.  You paraphrase, you tell us

9    how you feel about what he just said.

10           PROSPECTIVE JUROR CUSHMAN:  If there is -- I

11   guess it is going to my opinion, correct?

12           THE COURT:  Go ahead.  He wants to know how you

13   feel.

14           PROSPECTIVE JUROR CUSHMAN:  I know.

15           THE COURT:  You said the way he described it is

16   how you feel.  Put it in your own words.

17           PROSPECTIVE JUROR CUSHMAN:  He is asking me if

18   there is a little bit of evidence, where it is not beyond a

19   reasonable, if I could acquit them and say they are not

20   guilty.

21           THE COURT:  And your answer is?

22           PROSPECTIVE JUROR CUSHMAN:  No.

23           THE COURT:  You couldn't?

24           PROSPECTIVE JUROR CUSHMAN:  I don't think so,

25   no.

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

CAPITOL REPORTERS (916) 923-5447

272

1      THE COURT:  Explain why.

2              PROSPECTIVE JUROR CUSHMAN:  If there is any

3      evidence at all that would -- it would be hard to look

4      over.

5              THE COURT:  That is because of the seriousness of

6      the crime?

7              PROSPECTIVE JUROR CUSHMAN:  Yes.

8              THE COURT:  And the nature of the evidence that

9      Mr. Locke has suggested you might hear?  Kind of kinky sex.

10     Is that the reason that you are not going to require the

11     government to prove beyond a reasonable doubt?

12             PROSPECTIVE JUROR CUSHMAN:  What is not beyond a

13     reasonable doubt?

14             THE COURT:  I will explain that, if you are

15     selected as a juror.  Just a doubt based upon reason

16     doesn't mean beyond all possible doubt; it means beyond a

17     reasonable doubt.

18             PROSPECTIVE JUROR CUSHMAN:  I don't think so.

19             THE COURT:  Let's say you had two cases.  One is

20     a minor case, spitting on the street.

21             PROSPECTIVE JUROR CUSHMAN:  Uh-huh.

22             THE COURT:  A criminal case.  So the government

23     has to prove beyond a reasonable doubt.  You have another

24     case which is serious, disgusting sexual acts against

25     minors.  Are you going to require the government to prove

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt
CAPITOL REPORTERS (916) 923-5447

273

1    something less than beyond a reasonable doubt when the
2    charges are so serious?  Or are you going to make the
3    government prove the same thing, same standard in both
4    those cases.
5              PROSPECTIVE JUROR CUSHMAN:  It would have to be
6    the same standard.
7              THE COURT:  Do you think that is consistent with
8    the answer you gave Mr. Locke?
9              PROSPECTIVE JUROR CUSHMAN:  No.
10             THE COURT:  Which is it now?  This is the first
11   time you're coming here.  You didn't know you were going to
12   be asked these questions?
13             PROSPECTIVE JUROR CUSHMAN:  No.
14             THE COURT:  It requires some soul searching.
15   This is the time we need to know.  If you don't tell us
16   now, it could be too late later when you say, "I answered
17   those questions wrong."  So now you think about it.
18             What do you think?  What is your answer?
19             PROSPECTIVE JUROR CUSHMAN:  When he is saying
20   there could be some evidence, it is just -- I just think it
21   would be based on how serious you think that evidence is.
22             THE COURT:  How strong you think the evidence is?
23             PROSPECTIVE JUROR CUSHMAN:  Yeah.
24             THE COURT:  But is it based on how serious you
25   think the charge is?

CAPITOL REPORTERS (916) 923-5447

Page 252

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

274

1          PROSPECTIVE JUROR CUSHMAN:   No.

2          THE COURT:   It's based on how strong you think

3     the evidence is.

4          PROSPECTIVE JUROR CUSHMAN:   Yes.

5          THE COURT:   Whether you think it rises to the

6     level of proof beyond a reasonable doubt?

7          PROSPECTIVE JUROR CUSHMAN:   Yes.

8          THE COURT:   Did you ask her about the elements

9     yet?  You can ask her about the element.

10          MR. LOCKE:   At this point in the day, I don't

11     know, Your Honor.

12          THE COURT:   We've been questioning so many other

13     jurors that sometimes it is hard for both of us to remember

14     what questions have already been asked.

15          Go ahead and proceed.

16          MR. LOCKE:   If there is a case where it's -- I

17     think I have asked her, Your Honor -- where it is clear

18     that the abuse occurred, but there is very little evidence

19     that the defendant, who transported the child to the next

20     state, intended that the sex occur.  There is some

21     evidence, but not very much.  It is less than beyond a

22     reasonable doubt.  But it is clear that the sex occurred,

23     and the sex is as horrific as I described it to a very

24     young girl.

25          Would you tend to find that person guilty because of

CAPITOL REPORTERS (916) 923-5447

Page 253

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

275

1    the way you feel about these particular crimes and the harm

2    to the children?

3                   PROSPECTIVE JUROR CUSHMAN:  Would I?

4                   MR. LOCKE:  Would you tend to find those people

5    guilty even though there was little evidence of intent?

6                   PROSPECTIVE JUROR CUSHMAN:  Little evidence of

7    intent?

8                   MR. LOCKE:  Right.  In other words, it is enough

9    evidence to say, well, they might have known, but I have a

10   reasonable doubt he may not have known.  I could reasonably

11   conclude that he may not have known.

12                  PROSPECTIVE JUROR CUSHMAN:  Then he wouldn't be

13   guilty.

14                  MR. LOCKE:  Then you would find him not guilty?

15                  PROSPECTIVE JUROR CUSHMAN:  Yeah, if he

16   wasn't.

17                  MR. LOCKE:  Even if the sex occurred?

18                  PROSPECTIVE JUROR CUSHMAN:  He didn't know that

19   it is going on.

20                  MR. LOCKE:  Well, there was some evidence that he

21   knew what was going on.

22                  PROSPECTIVE JUROR CUSHMAN:  There was little

23   evidence you said, and if I would be able to find him not

24   guilty if there was very little evidence?

25                  MR. LOCK:  Uh-huh.

CAPITOL REPORTERS (916) 923-5447

Page 254

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

276

1              PROSPECTIVE JUROR CUSHMAN:   Yeah, if there

2    was.

3              MR. LOCKE:   Would you, because of the way you

4    feel about this case, would you be inclined to find him

5    guilty with more evidence but evidence that is less than

6    beyond a reasonable doubt?  I am asking how -- the way you

7    feel, when you get in there would you say, "Well, it's not

8    beyond a reasonable doubt, but I think he's a bad person,

9    so I am going to find him guilty"?

10             PROSPECTIVE JUROR CUSHMAN:   No.

11             MR. LOCKE:   No?

12             PROSPECTIVE JUROR CUSHMAN:   No.

13             MR. LOCKE:   Thank you for answering the

14   questions.

15             PROSPECTIVE JUROR CUSHMAN:   You're welcome.

16             THE COURT:   Ms. Marks?

17             MS. MARKS:   No.

18             THE COURT:   Mr. Karowsky?

19             MR. KAROWSKY:   It's late.  It's been a long day

20   for all of us.  Let me ask you a few more questions.   I

21   think what we are really trying to get at is this.  This is

22   going to be a trial with some very graphic evidence.  And

23   please forgive me; I am going to tell you what we

24   anticipate, hypothetically, is going to be the evidence.

25   Okay?  That there were a number of children in both

CAPITOL REPORTERS (916) 923-5447

Page 255

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

277

1    families and that, as part of these religious practices

2    that were sort of put together by the males, they forced

3    their own daughters to start orally copulating them as

4    young as age seven.  That went on for years and years and

5    years.  As part of that oral copulation these seven-,

6    eight-, nine-, ten-year-old girls were required to do this

7    to their fathers, almost on a daily basis.  Being told to

8    lick the ejaculate from their own father's penis.  Being

9    told and required to swallow the ejaculate from condoms

10   that were used.  Having their feces measured to see if

11   their anus was ready to have the father insert his penis

12   into it.  And then children from one family were sent to

13   another family, and those children were then

14   ritualistically abused for years.

15           That is the minimal nature of the graphic evidence

16   that you are going to hear 22-, 23-year-old young women,

17   who were victimized for years, close to a decade, testify

18   to.

19           Does that make you upset?

20           PROSPECTIVE JUROR CUSHMAN:  (Witness nods head.)

21           MR. KAROWSKY:  So upset that you can't -- can you

22   say yes?  Is that emotionally upsetting to you?  It is

23   emotionally upsetting to all of us.

24           This young lady is shaking her head, Your Honor.

25           THE COURT:  The record will reflect she is

CAPITOL REPORTERS (916) 923-5447

Page 256

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

278

1    nodding her head to each of those questions --

2                    MR. KAROWSKY:  I understand.

3                    THE COURT:  -- in the affirmative to all the

4    questions.

5                    MR. KAROWSKY:  You also look like you are going

6    to cry.  I'm sorry.  I don't mean to do this.

7              What we are trying to do is tell you what is going

8    to happen, so that when you are sitting here you don't say,

9    "Boy, did I make a mistake sitting on this one.  This was

10   not the one for me."

11             May the record reflect this young lady is crying,

12   Your Honor.

13                    THE COURT:  Yes.

14             Take a minute here, Ms. Cushman, and then I want to

15   ask you a question.

16             Some cases aren't the right cases for even the

17   fairest jurors to sit on.  What Mr. Karowsky has just done

18   is to give you an idea what you might be subjected to if

19   you are required to hear the evidence in this case.  It is

20   not because we don't think you are fair.  It is because we

21   want to know whether you can stand to sit through it.  And

22   you are shaking your head that you can't.

23             Any objection to excusing her?

24                    MS. WHITE:  No.

25                    MR. KAROWSKY:  Yes, we agree, Your Honor.


CAPITOL REPORTERS (916) 923-5447


279

Page 257

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

1          THE COURT:   Thank you, Ms. Cushman.   Hate to put

2    you through it.   We need to know.   You are excused.   Thank

3    you.

4          PROSPECTIVE JUROR CUSHMAN:   Thank you.

5          THE COURT:   Leave this way.   If you leave that

6    way, it won't get you to the hall.

7          (Prospective Juror Cushman departed courtroom)

8          (Prospective Juror Wells entered courtroom)

9          THE COURT:   Ms. Wells, didn't think we were going

10   to get to you today?  Thank you for waiting.   You are the

11   next to last.   You got one more sitting in that room, I

12   think then we will be finished for the day.   I am going to

13   let the lawyers ask you some questions, and I don't think

14   it will take too long.   We will begin with the attorney for

15   the government, Ms. White.

16         MS. WHITE:   Thanks for being so patient.   I want

17   to get to one part of your questionnaire that I think may

18   settle things.   In your physical health and disabilities

19   section you indicated in response to the question, "Do you

20   have any health problem that would make it difficult or

21   impossible for you serve on jury at this time," you

22   indicated you have a tendency to forget details given you

23   in recent instructions and you're easily distracted.

24         Can you share a little bit what it was you meant by

25   that?


**CAPITOL REPORTERS (916) 923-5447**

                                                        280

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

1           PROSPECTIVE JUROR WELLS:   I'm getting old.

2           MS WHITE:   So am I.

3           PROSPECTIVE JUROR WELLS:   Basically, I have a

4    hard time sometimes remembering a lot of details,

5    particularly over time, and that type of thing.  I mean, I

6    can be -- well, to give you an instance.  Coming to court,

7    I couldn't remember what floor the court was on.  I had my

8    husband drive me here because I can't remember how to get

9    here.  That type of thing.  It's just trying to remember a

10   lot of details.  Particularly, if I am under pressure, it

11   is hard to remember.  I have a history of Alzheimer's in my

12   family.

13          THE COURT:  Where do you live?

14          PROSPECTIVE JUROR WELLS:  Paradise.

15          THE COURT:  When you did this questionnaire, I

16   notice it says, the third question, where were you born;

17   and the next question, what city, what part of Sacramento

18   do you live in, she answered correctly.  She said she

19   didn't live in Sacramento.  You live in Paradise?

20          PROSPECTIVE JUROR WELLS:  Yes.

21          THE COURT:  Your husband drove you down here?

22          PROSPECTIVE JUROR WELLS:  Yes.

23          THE COURT:  If you're selected as a juror, would

24   he drive you down every day or would you stay down here?

25          PROSPECTIVE JUROR WELLS:  No.  He just,

CAPITOL REPORTERS (916) 923-5447

281

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

1   fortunately, was able to get off work to be able to bring

2   me down for this.

3              THE COURT:   What would happen if you're selected

4   as a juror?

5              PROSPECTIVE JUROR WELLS:   If I am selected as a

6   juror, I'd probably have to get lost in driving down every

7   day.

8              THE COURT:   After the second or third day you

9   wouldn't get lost, but that is long ways to come down,

10  right?

11             PROSPECTIVE JUROR WELLS:   Yes.

12             THE COURT:   How long does it take you to get from

13  Paradise?

14             PROSPECTIVE JUROR WELLS:   For the time the court

15  convenes and dismisses, with the traffic it takes me about

16  three hours.   Took me three hours today to get here.

17             THE COURT:   Did they explain, if you're selected

18  as a juror, you would be allowed -- you receive some money

19  to stay over?

20             PROSPECTIVE JUROR WELLS:   Yes, yes.

21             THE COURT:   Would you be able to do that or would

22  you still commute?

23             PROSPECTIVE JUROR WELLS:   I don't know which I

24  would choose to do at this point in time.   I don't know.   I

25  don't know Sacramento.   I wouldn't want to stay here.


CAPITOL REPORTERS (916) 923-5447

1              THE COURT:   You are not that old.   I am looking

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

2      at the date of birth.   You are not that old.  Do you think

3      that your memory problem may be early onset of some

4      dementia, or do you think it is the normal aging process?

5                PROSPECTIVE JUROR WELLS:   I really don't know.   I

6      forget more than I think I should be forgetting, a lot, and

7      stuff like that.   I don't really know.   I know my mother

8      was stricken with Alzheimer's at an early age.   So I really

9      don't know.

10               MS. WHITE:   This trial is going to last anywhere

11     from four to six weeks, a lot of witnesses and a lot of

12     testimony.   I just wanted to ask you, be very candid with

13     us, how you feel you are going to be able to handle that.

14               PROSPECTIVE JUROR WELLS:   That is one of the

15     reasons I put that down for that question, because I don't

16     know if I would be able to remember all the details of

17     everything presented.

18               MS. WHITE:   Your Honor -- I thank you for your

19     candor.   I think the parties are willing to stipulate.

20               THE COURT:   Everybody agrees that Ms. Wells may

21     be excused?

22               MR. LOCKE:   Yes.

23               MR. KAROWSKY:   Yes.

24               MS. MARKS:   Yes.

25               MS. WHITE:   Yes.

CAPITOL REPORTERS (916) 923-5447

283

1                THE COURT:   You are excused.   Thank you for

Page 261

**08-01-02 Vol 2.txt**

2  coming.  You can leave out the back door; it would be

3  easier.  Did you leave anything in the jury room?

4          PROSPECTIVE JUROR WELLS:  That one?

5          THE COURT:  Yes.  Is your husband here?

6          PROSPECTIVE JUROR WELLS:  He's downstairs

7  somewhere.

8        (Prospective Juror Wells departed courtroom)

9        (Prospective Juror Konvalin entered courtroom)

10          THE COURT:  Mr. Konvalin, you are the last one

11  today.  So I am going to allow one of the attorneys to ask

12  you some questions.  The first attorney who will be

13  addressing you is Mr. Locke, who represents Mr. Harrod, one

14  of the defendants.

15          MR. LOCKE:  Good afternoon.

16          PROSPECTIVE JUROR KONVALIN:  Good afternoon.

17          MR. LOCKE:  I'm going to go right to the

18  questionnaire that you filled out for us.  And you answered

19  question number 51, which asked if there was any reason --

20  "Is there anything about the nature of the allegations in

21  this case that would affect your ability to be fair, to be

22  a fair and impartial juror?"  And you said, "I'm not sure.

23  It is an issue I do not like."

24          PROSPECTIVE JUROR KONVALIN:  That's true.

25          MR. LOCKE:  The nature of the charges in this

**CAPITOL REPORTERS (916) 923-5447**



284

1  case, which are basically child abuse and molesting

2  children by requiring them to have sex with adults, is an

**Page 262**

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

3    issue that upsets you?

4            PROSPECTIVE JUROR KONVALIN:  It does; it  really

5    does.

6            MR. LOCKE:  As a result of that, you are not sure

7    that you would be able to be an impartial juror in the

8    case?

9            PROSPECTIVE JUROR KONVALIN:  I think it is a

10    subject that I don't like from the standpoint of discussing

11    or being involved with, in a sense that I would have to

12    think about it.  To be honest, I don't think it would

13    prevent me from trying to be a fair and honest juror.  It's

14    just a subject I really don't care for.

15            MR. LOCKE:  Right.  Here's the thing, we are

16    trying to find people that would guarantee us that they

17    would be a fair and impartial juror.  And when people say,

18    "Well, I can try," that is not the same as, "I can

19    guarantee it."

20        You're saying you'd try, correct, but you can't

21    guarantee it?

22            PROSPECTIVE JUROR KONVALIN:  By profession I am

23    an analyst, so I would be able to take a look at all the

24    facts and information and try to come to an impartial

25    decision on that.  Children affect all of us.  So I have to

CAPITOL REPORTERS (916) 923-5447

285

1    be honest and say I would be impacted by it.

2            MR. LOCKE:  You would be impacted.  Would you be

Page 263

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

3   impacted in such a way that, if the evidence was close,

4   then you would be more inclined to find people guilty,

5   rather than to find them not guilty?

6           PROSPECTIVE JUROR KONVALIN:   I will put it this

7   way:  I will look at what is presented as facts to me and,

8   based on my best ability, I would try to make a choice

9   based on those facts.  The fact that we're dealing with

10  child abuse and whatnot, I think I can probably be

11  impartial, to be honest.  But like you said, that is a

12  subject that all of us have to deal with.

13          MR. LOCKE:   What you're saying is that you can't

14  guarantee that you would be impartial; is that correct?

15          PROSPECTIVE JUROR KONVALIN:   Well, that is

16  correct.

17          MR. LOCKE:   I mean it's because there are some

18  things that people believe in or feel about and you say,

19  "Well, I don't like that.  I hate that kind.  I am so --

20  that conduct is so abhorrent that if anybody engaged in it

21  or came close to engaging in it, I would be inclined to

22  finish them"  Is that an accurate statement of where you

23  are?

24          PROSPECTIVE JUROR KONVALIN:   Well, I do have

25  strong feelings in that area, yes.

CAPITOL REPORTERS (916) 923-5447

286

1           MR. LOCKE:   And you also checked the answer to

2   the question that you would give greater weight to police

3   officers who would testify?

Page 264

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

4           PROSPECTIVE JUROR KONVALIN:   I don't think I did.

5   I don't remember.  I don't necessarily think I did.

6           MR. LOCKE:   Would you tend to give greater weight

7   to the testimony of a law enforcement officer just because

8   she is an officer?  You checked yes.

9           PROSPECTIVE JUROR KONVALIN:   I did check yes?

10           MR. LOCKE:   Yes.

11           PROSPECTIVE JUROR KONVALIN:   I don't recall that.

12   Obviously, at the time I must have felt that that was

13   true.

14           MR. LOCKE:   You have relatives who work at

15   Susanville jail or friends?

16           PROSPECTIVE JUROR KONVALIN:   I have a niece and

17   her husband, they both work at the county jail up in

18   Susanville.  Actually, not now.  They have since

19   transferred over to Idaho.  They work there at Idaho State

20   Penitentiary.

21           MR. LOCKE:   Is that possibly why you said you

22   would give greater weight to law enforcement people?

23           PROSPECTIVE JUROR KONVALIN:   I don't remember

24   checking that, to be honest.

25           MR. LOCKE:   Let me give you an example, a

CAPITOL REPORTERS (916) 923-5447

287

1   hypothetical.  If there was testimony that -- well, let me

2   say the government is required to prove in this case that a

3   defendant transported a minor across state lines with the

Page 265

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

4    intent that the minor engage in sex when they got to the

5    new state.  If the evidence was clear that the minor was

6    required to have sex with an adult when she got to the new

7    state, but the evidence was -- there was no evidence that

8    the person who transported her there intended that to

9    occur, would you have trouble acquitting that person,

10   finding them not guilty?

11           PROSPECTIVE JUROR KONVALIN:  Based on the facts

12   given, I don't see how I would have any trouble

13   distinguishing between the two.

14           MR. LOCKE:  What if there was a little bit of

15   evidence that the individual who did the transportation

16   knew what was going to happen, but the Judge says, "Well,

17   you can only find them guilty if you find that that

18   defendant intended that, you got to find that from -- you

19   got to find the evidence was beyond a reasonable doubt."

20       Do you understand what "beyond a reasonable doubt

21   is"?

22           PROSPECTIVE JUROR KONVALIN:  I think so.

23           MR. LOCKE:  You conclude, well, that the evidence

24   isn't beyond a reasonable doubt, but there is a little bit

25   of evidence that he might have known.  Would you been

CAPITOL REPORTERS (916) 923-5447

288

1    inclined to find that person guilty then?

2            PROSPECTIVE JUROR KONVALIN:  Not necessarily.  I

3    am sure the Judge will have given us instructions and

4    clarifications.  I would follow whatever the Judge gives to

                        Page 266

08-01-02 Vol 2.txt

5    us to debate on.   I can distinguish different levels, if

6    that is what you are asking me.

7              MR. LOCKE:   Given your feelings about the

8    charges, would you be inclined, you think -- and I want

9    your honest answer -- that you would give the government a

10   break and find people guilty, even though the evidence

11   didn't get to beyond a reasonable doubt?

12             PROSPECTIVE JUROR KONVALIN:   I don't see -- I

13   will say no.   In the sense that I would consider all the

14   evidence, and I would not give the state or policeman more

15   credence or weight than not.   Does that answer your

16   question?

17             MR. LOCKE:   Not exactly.   Because what I am

18   asking, let's say the evidence is just equal on the

19   question of intent.   You say, you look at it, you say,

20   "Well, he could have known, but maybe he didn't know."   But

21   the crime is so abhorrent, and you've said that you find it

22   abhorrent, and you are not sure that it wouldn't affect

23   you.   I am asking, if it's like, would you be, "ell, I'll

24   find him guilty because he could have?"   That is what I am

25   asking.   Would you react that way?


                    CAPITOL REPORTERS (916) 923-5447



                                                          289


1              PROSPECTIVE JUROR KONVALIN:   I don't believe I

2    would, to be honest.

3              MR. LOCKE:   Can you guarantee that you wouldn't?

4              PROSPECTIVE JUROR KONVALIN:   At this point I

                         Page 267

08-01-02 Vol 2.txt

5    could guarantee it, but, again, the case facts would help

6    determine that decision.

7         MR. LOCKE:  What you are telling me, even though

8    you told me previously that it would affect you and that

9    you couldn't guarantee that it wouldn't affect you, you are

10   now telling me that you can guarantee the way you feel

11   about it won't affect how you make the decision?

12        PROSPECTIVE JUROR KONVALIN:  If your question is

13   can I make a decision whether I should give more weight to

14   the government versus the individual, when you have a fact

15   which is really imbalanced, I can make that decision and

16   say, "No, I won't give more weight to the government versus

17   the individual."  But I am going to depend on the Judge to

18   kind of give me guidance there.

19        MR. LOCKE:  The Judge can you tell you the law,

20   but you are the one that has to apply the facts to the law.

21   The Judge is going to say, "You have to find -- in order to

22   find these people guilty, you have to find each element was

23   proved beyond a reasonable doubt."  And what I am asking,

24   given how you feel about this, these offenses, these child

25   molestations, and there is going to be graphic gross

CAPITOL REPORTERS (916) 923-5447

290

1    evidence of requiring a young child to swallow the semen

2    out of a condom, about having a seven-year-old lick her

3    father's penis clean.  When you hear that, are you going to

4    be able to say, "Well, the evidence is they didn't prove it

5    beyond a reasonable doubt, so I'm going to vote not guilty.

Page 268

08-01-02 Vol 2.txt

6        Let these defendants go free"?  Are you going to be able to

7        do that?

8                    PROSPECTIVE JUROR KONVALIN:   I want to say yes,

9        but I don't know that I can.

10                   MR. LOCKE:   And that is your truthful answer,

11        right?  I appreciate that.   Thank you very much.

12                   THE COURT:   Ms. Marks, any questions?

13                   MS. MARKS:   No, thank you.

14                   THE COURT:   Mr. Karowsky?

15                   MR. KAROWSKY:   Judge, I am going to ask a couple.

16             You started out by saying that these kinds of facts

17        upset you, correct?  And they upset us.   They are going to

18        be really very graphic facts.  Mr. Locke was talking about

19        a couple of instances.  We are talking about three, four,

20        five children, girls, starting at age seven with both men,

21        being required to give oral sex to their fathers on almost

22        a daily basis for up to ten years.   Being required to

23        literally lick their father's penis clean of the ejaculate,

24        swallow the ejaculate from condoms.   Go through ritualistic

25        ceremonies involving other children and parents.   Having

CAPITOL REPORTERS (916) 923-5447

291

1        feces measured to see if their anus was ready to have the

2        penis inserted into their anus.

3                    None of us want to listen to this.   You told us that

4        you don't want to be involved with this to start with,

5        didn't you?

Page 269

08-01-02 Vol 2.txt

6           PROSPECTIVE JUROR KONVALIN:   It's something that

7    I don't want to be involved with.

8           MR. KAROWSKY:   Really, to the point that it is

9    going to be pushing you to a level you don't want to be at.

10   You don't have to be here.   Do you understand, do you

11   understand that you can say, "I can be fair in every other

12   aspect of life, but this one is just a little bit more than

13   I choose to be involved with"?

14          THE COURT:   Wait, wait, no.   You can't get out of

15   jury duty because you choose not to be involved.   And it is

16   not right to tell a juror he can get out jury duty --

17          MR. KAROWSKY:   I misspoke.

18          THE COURT:   -- by saying certain things.

19          MR. KAROWSKY:   I misspoke.

20       You said also that you do not want to think about

21   these kinds of things?

22          PROSPECTIVE JUROR KONVALIN:   Correct.   No one

23   should have to think about these things.   We all prefer

24   they not happen in life, but they obviously do.

25          MR. KAROWSKY:   Not only are you going to have to


CAPITOL REPORTERS (916) 923-5447



292


1    think about them for six to eight weeks, but you are going

2    to have sit in the jury box and listen to 20-, 21-, 22-,

3    23-year-old girls testify to everything that I have just

4    said and more.   In other words, you are not only going to

5    be thinking about it, you are going to be living it.   Is

6    that something that you're capable of doing?

Page 270

08-01-02 Vol 2.txt

7          PROSPECTIVE JUROR KONVALIN:   If you select me as

8  juror, sure I will.

9          MR. KAROWSKY:   You will?

10          I have nothing else, Your Honor.

11          THE COURT:   Ms. Endrizzi, the government

12  attorney, is now going to ask you some questions.

13          MS. ENDRIZZI:   Afternoon.

14          PROSPECTIVE JUROR KONVALIN:   Good afternoon.

15          MS. ENDRIZZI:   Has Mr. Locke and Mr. Karowsky

16  thoroughly grossed you out?

17          PROSPECTIVE JUROR KONVALIN:   They certainly tried

18  their best.

19          MS. ENDRIZZI:   If I were to tell you that this

20  trial is about horrific serial murders, would that be an

21  issue that you did not like to hear about?

22          PROSPECTIVE JUROR KONVALIN:   Don't like to hear

23  about any violent crime or anything of that nature.

24          MS. ENDRIZZI:   You did touch on some things that

25  are important.   And one of the sections in here says


CAPITOL REPORTERS (916) 923-5447



                                                     293


1  responsibilities.   You are a senior computer systems

2  analyst for the Franchise Tax Board.

3          PROSPECTIVE JUROR KONVALIN:   Correct.

4          MS. ENDRIZZI:   Pretty detailed work?

5          PROSPECTIVE JUROR KONVALIN:   Yes.

6          MS. ENDRIZZI:   You have been with the Franchise

Page 271

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

7   Tax Board 35 years?

8           PROSPECTIVE JUROR KONVALIN:   Correct.

9           MS. ENDRIZZI:   I can't think of a more detailed

10  kind of life.   What you are going to be asked to do, and

11  you've been picked for two juries; isn't that correct?

12          PROSPECTIVE JUROR KONVALIN:   Correct.

13          MS. ENDRIZZI:   One was a criminal jury?

14          PROSPECTIVE JUROR KONVALIN:   Correct.

15          MS. ENDRIZZI:   What you will hear, and might have

16  heard, is that the government bears the complete burden of

17  proving guilt on all elements beyond a reasonable doubt.

18          PROSPECTIVE JUROR KONVALIN:   Correct.

19          MS. ENDRIZZI:   In a sense, you're a systems

20  analyst, and like you said, you analyze facts?

21          PROSPECTIVE JUROR KONVALIN:   That is correct.

22          MS. ENDRIZZI:   That is what we are asking you to

23  be able to do here.   Now can you tell me, despite the fact

24  that the facts will be disturbing, they are what they are,

25  can you look at each element of the crime and, if the

CAPITOL REPORTERS (916) 923-5447

294

1   government has proved every single element beyond a

2   reasonable doubt, can you find the defendant guilty?

3           PROSPECTIVE JUROR KONVALIN:   I believe I could,

4   yes.

5           MS. ENDRIZZI:   Let me tell you.   In a sense we

6   need to really figure this out.   If we prove all the

7   elements beyond a reasonable doubt, can you find the person

Page 272

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

8    guilty?

9             PROSPECTIVE JUROR KONVALIN:   Yes.

10            MS. ENDRIZZI:   If the government has proved three

11   of the elements beyond a reasonable doubt, but hasn't

12   proved the fourth one, to your mind, beyond a reasonable

13   doubt, no matter how close or far the evidence is, if we

14   have not proven that element beyond a reasonable doubt to

15   your mind, you would have to find the defendant not guilty

16   and acquit.   Could you do that?

17            PROSPECTIVE JUROR KONVALIN:   That is my

18   understanding, yes.

19            MS. ENDRIZZI:   Even if the facts are as Mr. Locke

20   and Mr. Karowsky have intimated they will be.   Drinking

21   semen, oral sex, things like that.   If we haven't met our

22   burden, and met every single element, could you acquit the

23   defendants?

24            PROSPECTIVE JUROR KONVALIN:   Yes.

25            MS. ENDRIZZI:   Nothing further, Your Honor.


CAPITOL REPORTERS (916) 923-5447


295

1             THE COURT:   Mr. Konvalin, I need to know whether

2    you are the right juror to stay on this panel.   And I have

3    gotten somewhat conflicting signals from you here.   And it

4    is nothing -- it is not failure to say this is not the

5    right kind of a case for you.   But on the one hand, I have

6    heard you say what you just said to Ms. Endrizzi.   If the

7    government didn't prove all elements beyond a reasonable

Page 273

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

8    doubt, you would have no hesitancy to find a defendant not

9    guilty.  But I did hear you say in response to some other

10   questions earlier, such things as you don't know whether

11   you could be fair, you can't guarantee you can be

12   impartial.  And at one point you said if the evidence came

13   even close to some of the things that you have heard, that

14   you would be inclined to find the defendant guilty.

15           So I am getting conflicting signals.  I need to

16   know, really, whether you are the right person to keep on

17   this jury in this case.  I want to ask you one question

18   that might help you answer that for me.  If you were any of

19   the defendants in this case charged with these crimes, or

20   if you were the government attorney charged with the

21   responsibility of presenting the case on behalf of the

22   government, would you be satisfied to have your case heard

23   by 12 jurors who were in the frame of mind that you

24   presently have?  And only you know what your state of mind

25   is.


CAPITOL REPORTERS (916) 923-5447

1            PROSPECTIVE JUROR KONVALIN:  Maybe help clarify a

2    little bit.  I don't like the subject matter at all,

3    because it really does upset me.  Whether I could be a fair

4    juror, I think I can.  I think I can listen to the facts

5    and, based on the evidence given, I can probably make a

6    very clear decision based on the evidence given.

7            THE COURT:  If you were on either side of this

8    case, would you be satisfied to have the case heard by 12

Page 274

08-01-02 Vol 2.txt

9      jurors who were in your state of mind?

10              PROSPECTIVE JUROR KONVALIN:  In my mind, yes.

11              THE COURT:  No question about it?

12              PROSPECTIVE JUROR KONVALIN:  No.  I just don't

13     want you to think I want to get out of this for whatever

14     reason.  I want to be a fair and honest person.

15              THE COURT:  I want you to understand that every

16     one of us, myself included, would want to do something

17     else.  So you are not the only one.

18              If you will step outside, we will let you know in

19     just a couple of minutes whether you are to come back on

20     the 15th.

21         (Prospective Juror  Konvalin departed courtroom)

22              THE COURT:  Is there a challenge for cause?

23              MR. LOCKE:  Yes, your Honor.

24              THE COURT:  Would you state the reason for the

25     challenge, please?


                    CAPITOL REPORTERS (916) 923-5447



                                                            297


1              MR. LOCKE:  The last three things that he said in

2      the answer to your question was, "I don't like these facts,

3      but I think I can, and I can probably be fair and

4      impartial."

5              We shouldn't be saddled with a jury of people who

6      think they can be fair or are going to try to be fair.

7      What that says is this stuff upsets me, and I have doubt as

8      to whether I can be fair, and so I am hedging by saying

                            Page 275

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

9      that I can be fair, or I can probably be fair.  It is like

10     somebody, you have said before, well, it is 90 percent

11     chance I can be fair.  We ought not to be stuck with those

12     people.  We need people who say, "I can put this aside.  It

13     will not affect me.  I can guarantee you that."

14              THE COURT:  Well, this is another difficult

15     decision.  It is only difficult for me because of the

16     mindset that I have explained to you earlier that I come

17     here with.  I want to call the close cases of these jurors

18     in favor of excusing them, because I want to resolve any

19     doubt that I have about whether they can be fair in favor

20     of excluding them from this jury.

21          That is why I put the last question that I did to

22     Mr. Konvalin, because I was getting some mixed signals.

23     And depending on how he answered that question, I could

24     have gone either way.  He is an analyst.  He thinks in

25     terms of probabilities and numbers.  To me when he says he

CAPITOL REPORTERS (916) 923-5447

298

1      probably can be fair and impartial, that is the best answer

2      you can expect out of an analyst.  He is always dealing

3      with probabilities and never excludes the possibility of

4      anything.  To me that makes a good juror.

5               I know this isn't the test that I am supposed to

6      apply, but I have seen a number of trails and I have been

7      on both sides of the table as a lawyer.  This is a juror

8      that I would keep if I were either a prosecutor or a

9      defense attorney.  This is not the test, but this is not a

**Page 276**

08-01-02 Vol 2.txt

10  juror that I would exercise a peremptory challenge to

11  excuse, if I were the lawyer on either side of this case.

12      So even though I came out here with the idea of

13  exercising the close calls in favor of excluding jurors, I

14  think it would be wrong, and it would be a poor judgment on

15  my part to excuse Mr. Konvalin.  I think, from everything

16  he has told us, he will be a fair juror in the case.  He

17  doesn't like this kind of case, but you are not supposed to

18  like crimes.  As I told one of the other jurors, Congress

19  presumably speaks for the people when they make something a

20  crime.  It is usually because it repugnant to most of the

21  people.  This has to be a crime that is more repugnant than

22  most crimes to most people.  But still the fact that he's

23  telling me he doesn't want to sit on this case and doesn't

24  like to hear about this kind of conduct doesn't cause me so

25  much concern as to excuse him from the jury.

CAPITOL REPORTERS (916) 923-5447

299

1       So I am going to deny that challenge for cause.

2       Bring Mr. Konvalin in and I will tell him to come

3  back on the 15th.

4       (Prospective Juror Konvalin entered courtroom)

5       THE COURT:  Mr. Konvalin, I am going to instruct

6  you to come back on January the 15th at 9:00 a.m for

7  further proceedings.  In the meantime, I am instructing you

8  also not to seek or obtain any information about this case,

9  or what you may think are any of the issues in this case,

Page 277

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

10   from any source.   Not to discuss the case with anyone.

11        The clerk is going to give you a card with her

12   telephone number on it.  If you need no get in touch with

13   us, you can call that number.  She would also like a

14   telephone number from you where we can reach you, if we

15   need to talk to you before the 15th.

16        PROSPECTIVE JUROR KONVALIN:  Is that all?

17        THE COURT:  Yes.  Thank you.  That is all for

18   today.

19        (Prospective Juror Konvalin departed courtroom)

20        THE COURT:  Counsel, it is now after 6:00 p.m

21   And although we came close to doing this in the period of

22   time that we set aside for it, we didn't come close enough.

23   There was one juror who is not here, and there were two

24   others that you excused before we got to them  Had that

25   one juror been here, or had you not excused the others, we

CAPITOL REPORTERS (916) 923-5447



300

1   would not have been able to complete the voir dire of these

2   20 jurors today.

3        Do you want me to set an informal time limitation on

4   your voir dire of each juror so that -- although you are

5   not bound by it, it will remind you and you will make a

6   good faith effort to keep within a time limitation?

7        MS. WHITE:  Your Honor, I think that would be a

8   good idea.  It might encourage all counsel to fine-tune

9   their line of questions so there is not a lot of

10   repetition.

Page 278

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

11          THE COURT:  There hasn't been a lot of

12     repetition.  What has happened is that there has not been a

13     lot of questioning of those jurors who haven't made some

14     suggestion in their questionnaires that causes the

15     questions to be asked.  But there is a disproportionate

16     number of questions, for example, to Mr. Sherwood, that

17     took up all the time.  And I just don't know from day to

18     day which jurors might cause a concern.

19          MR. KAROWSKY:  Your Honor, if I could weigh in

20     briefly.  I think it is interesting we have eight white

21     males who are left, some of whom had some major issues.

22     And I think, not that I am giving a psychiatric or

23     psychological evaluation, but it seems white males,

24     regardless of what their feelings may be, are much more

25     reluctant than the females to convey their feelings.


CAPITOL REPORTERS (916) 923-5447



301


1          THE COURT:  Let me chime in on this one.  The

2     Supreme Court and the other appellate courts would chew you

3     out from top to bottom for that comment that you just made,

4     which was not only sexist but racist.  It stereotyped white

5     males in a way that was different from females or persons

6     of other races.  That is something that courts are not

7     supposed to condone.

8          Having said that, I will tell you that I have been

9     very mindful, as I explained, to not just listen to the

10     words that these people said, but to try to read between

Page 279

08-01-02 Vol 2.txt

11   the lines and to discern what they were really thinking.

12   To the extent that a middle-aged male may not breakdown and

13   become incoherent to the same extent that a 22-year-old

14   female did, I tried to look at them and notice that.   And

15   if I think that someone is going through the same kind of

16   turmoil internally that Ms. Sadler was externally, I am

17   going to take that into account.   That is why we have

18   individual voir dire and that is why we have lawyer voir

19   dire in this case.   I don't know any other way to handle

20   it.

21          Now, having said that, I am observing, as I did

22   earlier today, that the government seemed to want to have

23   women jurors.   So if you think I am excusing too many women

24   jurors and leaving on too many male jurors, maybe you ought

25   to let me know that.   Because my impression, from what I

CAPITOL REPORTERS (916) 923-5447

302

1   saw, was that the government wanted to have young or old

2   women on the jury.   They said that.

3          MR. KAROWSKY:   Your Honor, I understand.   I

4   didn't say that for any purpose relative to sex or racism

5   I think the only reason I am raising that is I think it

6   takes a little bit longer with a white male, to have the

7   Court see the nuances, for all of us to see the nuances,

8   than it takes, maybe for a 22-year-old woman.

9          What I am suggesting is nobody wants to be here at

10   ten after six at night.   It just may take that much longer.

11   I don't think we were repetitious with Mr. Sherwood.   We

Page 280

**08-01-02 Vol 2.txt**

12    were trying to nail it down.    The reason for my comment, I

13    think it takes just as much time as we are giving it.    I

14    don't see that we are --

15            THE COURT:    Then I am going to make this

16    observation.    The woman who said she was getting old was 58

17    years old.    I don't have it in me to go for two weeks until

18    6:00 every day, so we are going to have to make some kind

19    of adjustment here, if you are telling me that you don't

20    think it's a fair to cut you any shorter than that.    By the

21    time we get to next week, we are probably going to have to

22    make some adjustments, because neither the Court Reporter

23    nor I can go those hours.    The Court Reporter we have right

24    now is substituting for our regular reporter, who had

25    appendicitis, who had her appendix out over the New Year's

**CAPITOL REPORTERS (916) 923-5447**

303

1    holiday.    She can't take long hours, either.    She is

2    recovering from that.

3            MS. MARKS:    Can I say something?    Instead of

4    imposing a time limit today, do you think we can just get

5    through Friday, because this is new for all of us.    Three

6    of us are sort of refining the questions we need to ask.

7    We are sort of still seeing what works.    But I suspect, and

8    I don't want to speak for Ms. White, but the government

9    appears to be doing a little bit of the same.    So, in fact,

10    does the Court.

11            Maybe this will go faster as we get a little bit

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

12    better at it.

13          THE COURT:  I can do that.  My suggestion was not

14    that I put arbitrary, intransigent time limits on you, but

15    that I set a time limit that you think is confortable and

16    that you try to abide by it, with the understanding that it

17    is not cast in cement.

18          MS. MARKS:  That is fine with me.  I

19    interpreted Mr. Karowsky's remarks to mean what he

20    essentially said; it wasn't about you at all.

21          THE COURT:  I think it was about white males,

22    which I don't think is a proper comment.

23          MS. MARKS:  It may take us longer to figure out

24    how to do this.  That's all.

25          THE COURT:  Okay.  Then I will just take it easy


CAPITOL REPORTERS (916) 923-5447


304

1     for tomorrow.  See where we end up at about 4:00.  And

2     then, if we don't come any closer to finishing than that,

3     then maybe we will have to have a readjustment of who comes

4     in on what day.

5           MS. MARKS:  Or maybe we can revisit the time

6     constraints.  I think we might be speedier tomorrow.

7           MR. LOCKE:  May we leave these materials here?

8           THE COURT:  Yes.

9           (Court adjourned at 6:13 p.m)

10                      ---oOo---

11

12

Page 282

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

13
14
15
16
17
18
19
20
21
22
23
24
25

**CAPITOL REPORTERS (916) 923-5447**

1               **REPORTER'S CERTIFICATE**

2                     ---oOo---

3      STATE OF CALIFORNIA    )
                              )        ss.
4      COUNTY OF SACRAMENTO   )

5

6           I, ESTHER F. SCHWARTZ, certify that I was the Official

7      Court Reporter, pro tem, and that I reported verbatim in

8      shorthand writing the foregoing proceedings; that I

9      thereafter caused my shorthand writing to be reduced to

10     printed form, and the pages numbered 134 through 304,

11     inclusive, constitute a complete, true, and correct record

12     of said proceedings:

Page 283

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

13

14          COURT:   U.S. DISTRICT - EASTERN CALIFORNIA

15          JUDGE:   WILLIAM SHUBB

16          CAUSE:   USA V. La BRECQUE

17          DATE:    WEDNESDAY, JANUARY 2, 2008

18

19          IN WITNESS WHEREOF, I subscribe this certificate at

20     Sacramento, California, on this 2nd of June, 2009.

21
                                    /s/ ESTHER F. SCHWARTZ
22                                      CSR NO. 1564

23

24

25


                    CAPITOL REPORTERS (916) 923-5447



1

2          I certify that the foregoing is a correct transcript

3     from the record of proceedings in the above-entitled matter.

4

5
                              /s/ Kathy L. Swinhart
6                             KATHY L. SWINHART, CSR #10150

7

8

9

10

11

12

13

14

                            Page 284

PDF created with pdfFactory trial version www.pdffactory.com

08-01-02 Vol 2.txt

15

16

17

18

19

20

21

22

23

24

25

KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

PDF created with pdfFactory trial version www.pdffactory.com